UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

JERRY SLAUGHTER,

                                        Plaintiff,

                                                            5:19-cv-0305
v.                                                          (TWD)

COLIN MAHAR,

                                        Defendant.
_____

APPEARANCES:                            OF COUNSEL:

JERRY SLAUGHTER
Plaintiff, *pro se*
18-B-2881
Great Meadow Correctional Facility
Box 51
Comstock, NY 12821

KRISTEN E. SMITH, ESQ.                  PATRICK R. BLOOD, ESQ.
Corporation Counsel of the City of Syracuse    SARAH MAE KNICKERBOCKER, ESQ.
Attorney for Defendant                  Assistant Corporation Counsel
233 East Washington Street
300 City Hall
Syracuse, NY 13202

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

<u>**DECISION AND ORDER**</u>

## I.    INTRODUCTION

        Jerry Slaughter ("Plaintiff"), proceeding *pro se*, commenced this civil rights action under

42 U.S.C. § 1983 raising claims arising from his September 1, 2017, arrest by Syracuse City

Police Officer Colin Mahar ("Defendant" or "Officer Mahar").  (Dkt. Nos. 1, 7.)  Defendant now

moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on

Plaintiff's sole remaining claim for Fourth Amendment false arrest.  (Dkt. No. 72.)  Plaintiff opposes the motion.  (Dkt. No. 78, 83, 85.)  For the reasons that follow, Defendant's motion for summary judgment is granted.

## II.   BACKGROUND

### A.   Facts[1]

On September 1, 2017, at approximately 11:53 a.m., Officer Mahar heard a "shots fired" call relayed over radio Channel Three, the Syracuse Police Department's ("SPD") frequency for the North Side patrol calls.  (Dkt. No. 72-2, Defendant's Statement of Material Facts, at ¶ 1.) The shots fired location was identified as the "intersection of 7th North and Court Streets."  *Id.* Officer Mahar arrived at the scene and parked his SPD patrol car in front of a green house located at 1303 Court Street.  *Id.* at ¶ 2.  As he exited his patrol car, Officer Mahar activated his SPD-issued Body Worn Camera ("BWC").  *Id.*[2]

Officer Mahar crossed the street from where he parked his patrol car and walked toward a group of females standing on the other side of the street.  *Id.* at ¶ 3.  The females began describing a drive-by shooting incident that occurred moments before his arrival.  *Id.*  As the female witnesses began providing physical descriptions of the shooting victims, three males walked out of the green house at 1303 Court Street and approached Officer Mahar.  *Id.*  The three males identified themselves as victims of the shooting: Kyrie Williams, Emmanuel Butler, and Rasheed Butler.  *Id.* at ¶ 4.

---

[1]  The following relevant facts are undisputed, except where otherwise noted.

[2]  Relevant to this action, Officer Mahar's BWC captured approximately one hour, four minutes, and 53 seconds of uninterrupted audio and video footage.  (Dkt. No. 72-2 at ¶ 2.)

All three victims described a black four-door sedan firing in their direction as they walked down the street. *Id*. at ¶ 5. The victims further described the shooter as a black male wearing an orange jacket or hoodie positioned in the rear left passenger seat. *Id*.

At approximately 12:05 p.m., Officer Mahar relayed a point of information over Channel Three. *Id*. at ¶ 6. Specifically, Officer Mahar reported a black four-door sedan traveling from Court Street and "the suspect will be a black male wearing an orange hoodie and he is actually in the back left passenger seat." *Id*.

Prior to the "shots fired" call, SPD's Gang Violence Task Force was conducting surveillance operations in the 100 block of Hudson Street. *Id*. at ¶ 22. At approximately 11:38 a.m., SPD Officer Joseph Commisso ("Officer Commisso") observed a male known to him as Jamar Long enter a black four-door Honda sedan with what appeared to be a firearm concealed in his waistband. *Id*. at ¶¶ 24-27. The Honda had a silver or chrome bracket around the rear license plate. *Id*. at ¶ 27. The Honda then departed. *Id*. At around 11:58 a.m., Officer Commisso received notification of the "shots fired" near the North Side of Syracuse. *Id*. at ¶ 28. Officer Commisso then heard SPD Detective Hauck, also assigned to SPD's Gang Violence Task Force, relaying a point of information regarding the shots fired incident including that the suspect vehicle was a four-door black sedan and that a black male wearing an orange hooded sweatshirt was the suspected shooter. *Id*. at ¶¶ 25, 28.

At 12:09 p.m., Officer Commisso observed Jamar Long returning to Hudson Street in the front passenger seat of the Honda. *Id*. at ¶ 29. Officer Commisso saw a male in an orange jacket with a hood exit the rear passenger's driver's side of the vehicle, walk in front of the vehicle, and enter the front passenger's side. *Id*. By that time, Jamar Long was no longer in the vehicle. *Id*. At no point did Officer Commisso observe anyone exiting the vehicle's driver seat. *Id*. The

black Honda then continued southbound on Hudson Street.  *Id*. at ¶ 31.  Officer Commisso advised the SPD's Gang Violence Task Force that the vehicle had arrived and again left the area. *Id*.  SPD Detective Randy Collins radioed that he had picked up on the vehicle, eventually ending up at the S&R Convenience Store located at 301 South Avenue.  *Id*.  Officer Commisso proceeded to drive towards the S&R Convenience Store.  *Id*. at ¶ 32.

SPD Detectives William Kittell ("Detective Kittell") and William Lashomb ("Detective Lashomb") initiated a felony stop of the vehicle.  *Id*. at ¶ 34.  Plaintiff was the driver of the vehicle.  *Id*.  When Officer Commisso arrived at the scene, he waked around the vehicle to make sure it matched the vehicle he previously observed on Hudson Street.  *Id*. at ¶ 35.  He confirmed the black Honda had the same distinctive license plate bracket as he had observed on Hudson Street.  *Id*.  At the scene, the officers ran a search of the vehicle's license plate number.  *Id*. at ¶ 36.  The search determined the vehicle owner to be Shabira Scott.  *Id*.

Plaintiff was removed from the vehicle, and Officer Commisso assisted Detectives Kittell and Lashomb in handcuffing Plaintiff.  *Id*. at ¶ 27.  Plaintiff remained detained at the scene pending a "show-up identification."[3]  *Id*.

At approximately 12:12 p.m., Officer Mahar spoke with one of the female witnesses, Shannon Warren, who stated she was on her porch at 1236 Court Street when she observed the shooting.  *Id*. at ¶ 7.  Shannon Warren explained that a dark four-door sedan, possibly a greenish color, was heading towards Court Street when she saw a black male's arm sticking out the vehicle with a silver or black gun.  *Id*.  She explained the dark colored sedan fired five or six

---

[3]  A "show up identification consists of escorting witnesses to a location where a suspect has been stopped for an in-person identification."  (Dkt. No. 72-10, Defendant's Affidavit, at ¶ 16.)

shots at three males walking up 7th North Street. *Id.* Another witness heard the gun shots and saw the victims running. *Id.* at ¶ 8.

Officer Mahar and other SPD officers on scene canvassed the area near the intersection of 7th North Street and Court Street and identified multiple 9mm shell casings. *Id.* at ¶ 9. The officers also found that a tree on the north east side of 7th North Street had been struck three times. *Id.* Officer Mahar then returned to the three victims. *Id.* at ¶ 10. The victims again recounted a black four-door sedan fired in their direction and confirmed that a black male wearing an orange jacket fired the shots from the rear left seat of the vehicle. *Id.*

At approximately 12:19 p.m., Officer Mahar received a radio transmission from SPD's Gang Violence Task Force. *Id.* at ¶ 11. An officer relayed that "we got 'em stopped down here at South [Avenue and] Talman [Street] with a black four-door Honda, with an orange . . . jacket on here. Do you guys have any witnesses or victims or anything up there or no?" *Id.*

Officer Mahar approached the three victims and asked if they would be willing to take a look at a vehicle and suspect that had been stopped at a different location. *Id.* ¶ at 12. Kyrie Williams and Emmanuel Butler agreed to participate in the show-up identification. *Id.* at ¶¶ 12, 15, 17.

Thereafter, Officer Mahar informed the other officers on scene that a car matching the description was stopped at South Avenue and Talman Street. *Id.* at ¶ 13. Officer Mahar transported Kyrie Williams and Emmanuel Butler to 300 Slocum Avenue. *Id.* at ¶ 14. Upon arrival, Officer Mahar left Emmanuel Butler with another officer while he transported Kyrie Williams to the suspect location for the show-up identification. *Id.*

At approximately 12:41 p.m., Kyrie Williams positively identified Terry Linen as the male who had fired at them. *Id.* at ¶ 15. At approximately 12:42 p.m., Kyrie Williams positively

identified the black Honda as the vehicle involved in the shooting. *Id*. During the show-up identification, Kyrie Williams was approximately 100 feet away from the suspect and the black Honda. *Id*. Officer Mahar observed that the car Kyrie Williams identified was a black four-door sedan. *Id*. He saw the individual identified as the shooter was wearing an orange hooded jacket. *Id*.

Upon returning to 300 Slocum Avenue, Officer Mahar told Kyrie Williams not to mention anything to Emmanuel Butler about what he saw. *Id*. at ¶ 16. He also asked Kyrie Williams to wait until he pulled away before approaching the other officer. *Id*. Officer Mahar then transported Emmanuel Butler to South Avenue and Tallman Street to conduct a show-up identification. *Id*.

At approximately 12:49 p.m., from a distance of approximately 100 feet, Emmanuel Butler positively identified Terry Linen as the male who had fired at them and the black Honda. *Id*. at ¶ 17. Plaintiff was identified as the driver of the Honda. *Id*. The vehicle identified by both Kyrie Williams and Emmanuel Butler was a black Honda bearing New York license plate number GFV 4894. *Id*. at ¶ 18. Subsequently, Officer Mahar transported Kyrie Williams and Emmanuel Butler to SPD's Public Safety Building where each victim provided a sworn statement memorializing the incident and the identification. *Id*. at ¶ 19.

After the positive show-up identification, Plaintiff was arrested by the Gang Violence Task Force Detectives and charged with reckless endangerment in the first degree.[4] *Id*. at ¶¶ 21, 38. Terry Linen was arrested and charged with criminal possession of a firearm, reckless

---

[4] In New York, a person is guilty of first degree reckless endangerment "when, under circumstances evincing a depraved indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person." N.Y. Penal Law § 120.25.

endangerment in the first degree, and criminal possession of a weapon in the second degree. (Dkt. No. 72-2 at ¶¶ 20, 38.)

Plaintiff was deposed on August 26, 2020.  *Id*. at ¶ 39.  He testified that he is a member of the 110 Gang and was previously convicted of a felony under the Racketeering Influenced and Corrupt Organization ACT ("RICO") relating to "drugs and violence."  *Id*.

Plaintiff testified that on September 1, 2017, during the late morning and early afternoon, he operated a black, four-door Honda sedan, New York license plate number GFV 4894, which was registered to Shabira Scott, the mother of his children.  *Id*. at ¶ 40.  Plaintiff testified that both Terry Linen and Jamar Long were passengers in the Honda that day.  *Id*. at ¶ 41.

Plaintiff testified that on September 1, 2017, he was involved in a traffic stop initiated by the SPD.  *Id*. at ¶ 42.  Plaintiff was the driver; Terry Linen was the passenger.  *Id*. at ¶¶ 42, 44. Plaintiff testified that Officer Mahar did not initiate the traffic stop that lead to his arrest.  *Id*. at ¶ 43.  He did not recall seeing Officer Mahar on September 1, 2017, or recall the names of the SPD officers who pulled him over.  *Id*.  Plaintiff did not recall what Terry Linen was wearing on September 1, 2017, or the color of Linen's clothing.  *Id*. at ¶ 45.

After the traffic stop, Plaintiff and Terry Linen were detained and transported back to the Public Safety Building by SPD.  *Id*. at ¶ 46.  Plaintiff was interviewed and issued *Miranda* rights. *Id*.  Thereafter, Plaintiff was placed under arrest.  *Id*.  During his deposition, Plaintiff did not recall who interviewed him or who provided him with his *Miranda* rights.  *Id*. at ¶ 47.

On or about September 7, 2017, Plaintiff and Terry Linen were each indicted by an Onondaga County grand jury for criminal possession of a weapon in the second degree (Penal Law § 265.03[3]), criminal possession of a weapon in the second degree (Penal Law § 265.03[1])[b]), attempted assault in the first degree (Penal Law §§ 110.00/120.10[1]), and

reckless endangerment in the first degree (Penal Law § 120.25).  (Dkt. No. 72-7, Exhibit D, at 2.)

In addition, Terry Linen was indicted for criminal possession of a controlled substance in the

seventh degree (Penal Law § 220.03).  *Id.*  Ultimately, the District Attorney decided not to

pursue the charges against Plaintiff.  (Dkt. No. 72-5 at 22-23.)  Plaintiff is currently incarcerated

on unrelated charges stemming from his arrest in January 2018.  *Id.*

> **B.      Procedural History**

On March 6, 2019, Plaintiff filed this action against Defendant pursuant to 42 U.S.C. §

1983.  (Dkt. No. 1.)  On May 6, 2019, this Court granted Plaintiff's request to proceed *in forma*

*pauperis* and recommended that only his Fourth Amendment false arrest claim against Defendant

survived initial review and required a response.  (Dkt. No. 5.)  It was further recommended that

Plaintiff's witness tampering claim be dismissed with prejudice and that his Fourteenth

Amendment stigma plus claim under § 1983 and his state law defamation claim be dismissed

with leave to amend.  *Id.*  No objections to the Report-Recommendation were filed.  However,

on May 20, 2019, Plaintiff filed an amended complaint.  (Dkt. No. 6.)

By Decision and Order filed July 31, 2019, the Honorable David N. Hurd, United States

District Judge, found Plaintiff's amended complaint failed to cure any of the defects identified in

the Report-Recommendation, and, therefore, the only claim that survived initial review and

required a response was Plaintiff's Fourth Amendment false arrest claim against Defendant.

(Dkt. No. 7.)  The amended complaint was not accepted for filing, Judge Hurd accepted the

Report-Recommendation, and Plaintiff's original complaint remains the operative pleading in

this matter.  *Id.*  Additionally, because Plaintiff was afforded an opportunity to amend, Plaintiff's

state law defamation claim and Fourteenth Amendment stigma plus claim under § 1983 were

dismissed with prejudice.  *Id.*

On September 25, 2019, the parties consented to a Magistrate Judge's jurisdiction of the full disposition of this case.  (Dkt. Nos. 23, 24.)  Defendant's motion for summary judgment, which Plaintiff opposes, is fully briefed.  (Dkt. Nos. 72 through 87.)  Oral argument was not heard.

## III.   LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.

The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists.  *Salahuddin v. Gourd*, 467 F.3d 263, 272–73 (2d Cir. 2006).  The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial.  *Salahuddin*, 467 F.3d at 273.  In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "Conclusory allegations, conjecture and speculation . . . are

insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

The Second Circuit has reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005). "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that [his] version of the events is not wholly fanciful." *Id.* (citation and internal quotation marks omitted). Accordingly, statements "that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obligated to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). Nevertheless, a *pro se* party's "bald assertion, completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Jordan v. Fischer*, 773 F. Supp. 2d 255, 268 (N.D.N.Y. 2011) (citations and quotation marks omitted).

## IV.   PLAINTIFF'S FAILURE TO RESPOND TO DEFENDANT'S STATEMENT OF MATERIAL FACTS

While courts are required to give due deference to a plaintiff's *pro se* status, that status "does not relieve [a *pro se*] plaintiff of his duty to meet the requirements necessary to defeat a

motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003). Local Rule 7.1(a)(3) requires the opposing party to file a response to the movant's Statement of Material Facts.[5] Under the rule, the response "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises." N.Y.N.D. L.R. 7.1(a)(3).

Here, Plaintiff failed to challenge the Statement of Material Facts filed by Defendant in the manner required under Local Rule 7.1(a)(3). Where, as in this case, a party has failed to respond to the movant's statement of material facts in the manner required under Local Rule 7.1(a)(3), the facts in the movant's statement to which the plaintiff has not properly responded will be accepted as true (1) to the extent that they are supported by evidence in the record, and (2) provided that the nonmovant, if proceeding *pro se*, has been specifically advised of the possible consequences of failing to respond to the motion.[6] *See Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).

Accordingly, the facts set forth in Defendant's Statement of Material Facts (Dkt. No. 72-2) that are supported by record evidence and are uncontroverted by nonconclusory allegations in Plaintiff's verified complaint will be accepted as true. *See McAllister v. Call*, No. 9:10-CV-610 (FJS/CFH), 2014 WL 5475293, at *3 (N.D.N.Y. Oct. 29, 2014) (finding allegations in plaintiff's

---

[5] The Local Rules were amended effective January 1, 2021. In the amendment, Local Rule 7.1 was dissected and various subsections were renumbered and relocated to correspond with the appropriate Federal Rule of Civil Procedure. The relevant substance of the rules did not change. In the currently operative version of the Local Rules, Local Rule 56.1 deals with summary judgement motions. However, because Defendant's motion was filed in 2020, the Court refers to the Local Rules as they existed at that time.

[6] Defendant provided Plaintiff with the requisite notice of the consequences of his failure to respond to the motion. (Dkt. No. 72-13; *see also* Dkt. No. 81.)

verified complaint sufficient to controvert facts in statement of material facts on motion for

summary judgment); *Douglas v. Perrara*, No. 9:11-CV-1353 (GTS/RFT), 2013 WL 5437617, at

*3 (N.D.N.Y. Sept. 27, 2013) ("Because Plaintiff has failed to raise any question of material fact,

the Court will accept the facts as set forth in Defendant's' Statement of Facts Pursuant to Rule

7.1(a)(3) . . . supplemented by Plaintiff's verified complaint . . . as true.").  As to any facts not

contained in Defendant's Statement of Material Facts, in light of the procedural posture of this

case, the Court is "required to resolve all ambiguities and draw all permissible factual

inferences" in favor of Plaintiff.  *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

## V.    DISCUSSION

Defendant seeks summary judgment dismissing Plaintiff's Fourth Amendment false

arrest claim against him on the ground that Plaintiff's arrest was supported by probable cause.

(Dkt. No. 72-1 at 7-12.[7])  Defendant also seeks qualified immunity.  *Id.* at 12-14.

### A.    False Arrest

To prevail on a Fourth Amendment false arrest claim, a plaintiff must establish that: "(1)

the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the

plaintiff did not consent to the confinement, and (4) the confinement was not otherwise

privileged."  *Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012) (citing *Broughton

v. State*, 373 N.Y.S.2d 87 (1975)).  "The existence of probable cause to arrest constitutes

justification and 'is a complete defense to an action for false arrest.'"  *Weyant v. Okst*, 101 F.3d

845, 852 (2d Cir. 1996) (quoting *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994)).

Probable cause exists when an officer has "knowledge or reasonably trustworthy information of

---

[7] Citations to page numbers in the filings refer to the pagination CM/ECF automatically
generates.

facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief

that the person to be arrested has committed or is committing a crime." *Jaegly v. Couch*, 439

F.3d 149, 152 (2d Cir. 2006) (quoting *Weyant*, 101 F.3d at 852).  In analyzing probable cause, a

court "must consider those facts available to the officer at the time of the arrest and immediately

before it." *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006).  A court "should look to the

'totality of the circumstances' and 'must be aware that probable cause is a fluid concept—turning

on the assessment of probabilities in particular factual contexts—not readily, or even usefully,

reduced to a neat set of legal rules.'" *Id.* (quoting *Caldarola v. Calabrese*, 298 F.3d 156, 162 (2d

Cir. 2002)).

 "[I]t is well-established that a law enforcement official has probable cause to arrest if he

received his information from some person, normally the putative victim or eyewitness," unless

the circumstances raise doubt as to the person's veracity.  *Id.* (citations omitted); *see also Singer

v. Fulton Cty. Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995).  "The collective knowledge doctrine

provides that, for the purpose of determining whether an arresting officer had probable cause to

arrest, 'where law enforcement authorities are cooperating in an investigation, . . . the knowledge

of one is presumed shared by all.'" *Savino v. City of New York*, 331 F.3d 63, 74 (2d Cir. 2003)

(quoting *Illinois v. Andreas*, 463 U.S. 765, 772 n.5 (1983)).  Moreover, "in New York, if the

Grand Jury returns an indictment against the plaintiff, a presumption exists that his arrest and

indictment were procured with probable cause." *Rivers v. O'Brien*, 83 F. Supp. 2d 328, 335

(N.D.N.Y. 2000).  The fact that the criminal charges are subsequently dismissed is not relevant

to the determination of probable cause to arrest. *Danforth v. City of Syracuse*, No. 09-CV-307,

2012 WL 4006240, at \*7 (N.D.N.Y. Sept. 12, 2012).

In this case, the uncontested evidence shows that when Plaintiff was arrested, Defendant had the following information in his possession.  Immediately after arriving on-scene to the "shots fired" call at the intersection of 7th North Street and Court Street, several female witnesses approached Officer Mahar and began providing physical descriptions of three male shooting victims.  (Dkt. No. 72-2 at ¶ 3.)  Moments later, three males walked out of a house, approached Officer Mahar, and identified themselves as the victims of the drive by shooting.  *Id.* at ¶¶ 3-4.  All three victims related that, while they were walking down the street, a black male wearing an orange jacket or hoodie fired a gun in their direction from the rear passenger seat of a black four-door sedan.  *Id.* at ¶ 5.  Based on this information, Officer Mahar relayed over an SPD radio channel a point of information: that the shots fired suspect was a "black male wearing an orange hoodie" in the "back left passenger seat" of a "black four-door sedan."  *Id.* at ¶ 6.  Officer Mahar again spoke with witnesses who provided consistent accounts relative to the victims, the gunshots, and the description of a black male firing from a dark colored sedan.  *Id.* at ¶¶ 7-8.  As other officers arrived on the scene, multiple shell casings were identified near the intersection of 7th North Street and Court Street.  *Id.* at ¶ 9.

Additionally, and prior to the "shots fired" call, Officer Commisso observed a male known to him as Jamar Long enter a black four-door Honda sedan with what appeared to be a firearm concealed in his waistband on Hudson Street.  *Id.* at ¶¶ at 24-27.  After the "shots fired" call and after Officer Mahar relayed the point of information, Officer Commisso observed Jamar Long return to Hudson Street in the black four-door Honda.  *Id.* at ¶ 29.  This time, Officer Commisso noticed another male passenger in the rear driver's side of the vehicle wearing an orange jacket with a hood.  *Id.*  Jamar Long exited the front passenger side of vehicle while the orange-hooded male moved himself to the front passenger seat.  *Id.* ¶ 29.  At no time did Officer

Commisso observe the driver exit the vehicle.  *Id*. at ¶ 30.  Based on the accumulated

information and observations, SPD officers initiated a traffic stop of the Honda, which Plaintiff

was driving.  *Id*. ¶ 33.

Viewed in conjunction, Officer Mahar's findings and Officer Commisso's surveillance of

a black four-door Honda sedan with a distinctive license plate bracket and multiple male

occupants—one wearing an orange hooded shirt and another who appeared to have a firearm—

established probable cause to arrest Plaintiff, even if the charges against him were later

dismissed.  *See Morris v. Johnson*, No. 1:17-cv-00371 (BKS/DJS), 2020 WL 4365606, at *5

(N.D.N.Y. July 30, 2020) (granting summary judgment to police officers where they were armed

with "reasonably trustworthy information" that the plaintiff had committed a crime and nothing

in the record "raised doubt as to the witnesses' veracity"); *LaFever v. Clark*,  --- F. Supp. 3d ----,

No. 3:17-CV-1206 (DNH), 2021 WL 921688, at *17 (N.D.N.Y. Mar. 11, 2021) (granting

summary judgment to officers who were entitled to rely on their own observations as well as

information they received from witnesses and victims).  Additionally, Plaintiff was indicted on

charges for, *inter alia*, reckless endangerment in the first degree, which creates a presumption

that his arrest was procured with probable cause.  *See Rivers*, 83 F. Supp. 2d at 335.

Here, even when viewed in the light most favorable to Plaintiff, no reasonable juror could

conclude that the SPD officers lacked probable cause to arrest Plaintiff for reckless

endangerment in the first degree.  Because probable cause is a complete defense to a false arrest

claim, Plaintiff's Fourth Amendment false arrest claim against Officer Mahar fails as a matter of

law.

Moreover, to the extent Plaintiff challenges that the show-up identification, which

positively confirmed the black sedan, the orange hooded passenger, and Plaintiff as the driver

during the shooting, was "unnecessarily suggestive",[8] and/or that Officer Mahar "tampered with witnesses during this course of his investigation," based on the foregoing, probable cause nonetheless supported Plaintiff's arrest based upon the officers' collective knowledge and findings prior to the show-up identification.  (Dkt. No. 72-2 at 10-12; Dkt. Nos. 1 at 5, 78 at 1.)

Accordingly, Defendant is granted summary judgment on Plaintiff's Fourth Amendment false arrest claim.

### B.    Qualified Immunity

The doctrine of qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  In determining if a particular right was clearly established, the Court "looks to whether (1) it was defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has confirmed the existence of the right, and (3) a reasonable defendant would have understood that his conduct was unlawful."  *K.D. ex rel. Duncan v. White Plains School Dist.*, No. 11 Civ. 6756, 2013 WL 440556, at *10 (S.D.N.Y. Feb. 5, 2013) (citing *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011)).

---

[8]  During Plaintiff's criminal proceedings, *inter alia*, Onondaga County Court Judge Thomas J. Miller granted Plaintiff's motion to suppress an in-court identification at trial based on the show-up identifications.  (Dkt. No. 72-6, Exhibit C, at 15, 20.)  As pointed out by Defendant, in ruling in Plaintiff's favor after a suppression hearing, Judge Miller found that a certain pre-identification conversation among Officer Mahar and other officers may have "pre-conditioned" the victims to make an identification despite Officer Mahar's later advisement against any such pre-conditioning.  (*See* Dkt. No. 72-1 at 1.)  Judge Miller concluded that although "Officer Mahar and other members of SPD acted in good faith at all times" in facilitating the identification in an independent and unbiased manner, "the totality of the circumstances leads to the inexplicable finding that the procedures were unnecessarily suggestive."  (Dkt. No. 72-6 at 16-17.)

Because qualified immunity is "'an immunity from suit rather than a mere defense to liability,'" the Supreme Court has "'repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in litigation.'"  *Pearson v. Callahan*, 555 U.S. 223, 231-32 (2009) (citations omitted).  In the case of probable cause, the Second Circuit has held that an officer is entitled to qualified immunity if he can show "arguable probable cause" for the arrest.  *Crenshaw v. City of Mt. Vernon*, 372 F. App'x 202, 205 (2d Cir. 2010).  "Arguable probable cause . . . exists when a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in the light of well established law."  *Id*. (quoting *Droz v. McCadden*, 580 F.3d 106, 109 (2d Cir. 2009) (per curiam) (other quotations omitted)).

In deciding whether arguable probable cause existed, the court examines whether "'(a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.'"  *Id*. (quoting *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (quoting *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991)) (internal quotation marks omitted)).  Even in situations in which an officer reasonably but mistakenly concludes that probable cause exists, "'the officer is nonetheless entitled to qualified immunity.'"  *Id*. (quoting *Caldarola*, 298 F.3d at 162).

Based on all the information above, even assuming that probable cause did not exist, Defendant would have reasonably believed arguable probable cause existed with respect to Plaintiff's arrest in connection with the September 1, 2017, drive-by shooting.  *See Martinez v. Simonetti*, 202 F.3d 625, 635 (2d Cir. 2000) (holding that "[i]t is not unreasonable for police officers to rely on the accounts provided by other officers at the scene" in "making the probable cause determination"); *Falls v. Rude*, No. 17-CV-1339 (VB), 2019 WL 3715087, at *8

(S.D.N.Y. Aug. 7, 2019) (relying on "a particularly distinctive feature of plaintiff's clothing" and the fact that he was observed "traveling in the direction in which the suspect was reportedly heading" to hold that defendants were entitled to qualified immunity on the plaintiff's false arrest claim).  Therefore, Defendant is entitled to qualified immunity.  *See Caldarola*, 298 F.3d at 162 ("in situations where an officer may have reasonably but mistakenly concluded that probable cause existed, the officer is nonetheless entitled to qualified immunity").

### C.     Plaintiff's Opposition Submission

The Court notes that in his sur-reply, filed without permission, but considered nevertheless, Plaintiff references for the first time a "Malicious Prosecution Claim" against Defendant and also requests that he be allowed to "pursue his tampering claims as well as his Fourteenth Amendment stigma plus claim under [§] 1983 and his state law defamation claim." (Dkt. No. 78 at 2-3.)  However, as noted, the only claim that survived the Court's *sua sponte* review was the Fourth Amendment false arrest claim; a malicious prosecution claim against Officer Mahar is not part of the present action; and Plaintiff's witness tampering, state law defamation, and Fourteenth Amendment stigma plus claims were dismissed with prejudice. (Dkt. No. 7.)

It is well settled that a litigant may not raise new claims not contained in the complaint in opposition to a motion for summary judgment.  *See Avillan v. Donahoe*, 483 F. App'x 637, 639 (2d Cir. 2012) (holding that the district court did not err in disregarding allegations the plaintiff raised for the first time in response to the defendant's motion for summary judgment) (citation omitted); *Shah v. Helen Hayes Hosp.*, 252 F. App'x 364, 366 (2d Cir. 2007) (holding that "[a] party may not use his or her opposition to a dispositive motion as a means to amend the complaint") (citation omitted); *Jackson v. Onondaga Cty.*, 549 F. Supp. 2d 204, 219-20

(N.D.N.Y. 2008) (holding that a *pro se* plaintiff's civil rights complaint should not be effectively amended by his new allegations presented in his response to the defendants' motion for summary judgment).

Accordingly, Plaintiff's opposition submissions are insufficient to defeat Defendant's motion for summary judgment.

## VI.    CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, it is hereby

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 72) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's complaint (Dkt. No. 1) is **DISMISSED** in its **ENTIRETY**; and it is further

**ORDERED** that the Court Clerk provide Plaintiff with a copy of this Decision and Order, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam); and it is further

**ORDERED** that the Court Clerk is directed to enter judgment in favor of Defendant and close this case.

Dated: June 1, 2021
      Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

KeyCite Yellow Flag - Negative Treatment

Distinguished by    McDonald v. Zerniak,    N.D.N.Y.,   November 4, 2016

2014 WL 5475293
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Charles McALLISTER also known
as Charles McCallister, Plaintiff,
v.
Harold CALL, Vocational Supervisor,
Mohawk Correctional Facility, Defendant.

No. 9:10–CV–610 (FJS/CFH).
|
Signed Oct. 28, 2014.
|
Filed Oct. 29, 2014.

Attorneys and Law Firms

Charles McAllister, Westbury, NY, pro se.

Hon. Eric T. Schneiderman, Office of the New York State
Attorney General, The Capitol, Keith J. Starlin, AAG, of
Counsel, Albany, NY, for Defendant.

## ORDER

SCULLIN, Senior District Judge.

**\*1** Currently before the Court are Magistrate Judge
Hummel's October 9, 2014 Report–Recommendation and
Order, *see* Dkt. No. 81, and Plaintiff's objections thereto, *see*
Dkt. No. 83.

Plaintiff, a former inmate who was, at all relevant times, in
the custody of the New York Department of Corrections and
Community Supervision, commenced this action pursuant
to 42 U.S.C. § 1983. In his original complaint, Plaintiff
asserted claims against Brian Fischer, Lucien J. LeClaire,
Patricia LeConey, Carol Woughter, and John and Jane Does.
Defendants moved for summary judgment. *See* Dkt. No.
49. By Report–Recommendation and Order dated July 6,
2012, Magistrate Judge Homer recommended that this Court
dismiss all claims against the named individuals and direct
Plaintiff to join Harold Call as a Defendant. *See* Dkt. No.

55. This Court accepted the Report and Recommendation and
Order in its entirety and directed Plaintiff to file an amended
complaint to "include only one cause of action a procedural
due process claim in connection with his disciplinary hearing
and one Defendant hearing officer Call ." *See* Dkt. No. 58 at
4–5.

Plaintiff thereafter filed his amended complaint and requested
compensatory and punitive damages. *See* Dkt. No. 64,
Amended Complaint at 4. In this amended complaint, Plaintiff
alleged that Defendant violated his constitutional rights under
the First, Eighth and Fourteenth Amendments. *See* Dkt. No.
64, Amended Complaint at ¶¶ 33, 34, 43.

On May 9, 2014, Defendant filed a motion for summary
judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure. *See* Dkt. No. 74. In a Report–Recommendation
and Order dated October 9, 2014, Magistrate Judge Hummel
recommended that this Court grant Defendant's motion in
part and deny his motion in part. *See* Dkt. No. 81 at
33. Plaintiff filed objections to Magistrate Judge Hummel's
recommendations. *See* Dkt. No. 83.

Where a party makes specific objections to portions of a
magistrate judge's report and recommendation, the court
conducts a *de novo* review of those recommendations. *See*
*Trombley v. Oneill,* No. 8:11–CV–0569, 2011 WL 5881781,
\*2 (N.D.N.Y. Nov. 23, 2011) (citing Fed.R.Civ.P. 72(b)
(2); 28 U.S.C. § 636(b)(1)(C)). Where a party makes no
objections or makes only conclusory or general objections,
however, the court reviews the report and recommendation
for "clear error" only. *See Salmini v. Astrue,* 3:06–CV–
458, 2009 WL 1794741, \*1 (N.D.N.Y. June 23, 2009)
(quotation omitted). After conducting the appropriate review,
a district court may decide to accept, reject, or modify those
recommendations. *See Linares v. Mahunik,* No. 9:05–CV–
625, 2009 WL 3165660, \*10 (N.D.N.Y. Sept. 29, 2009)
(quoting 28 U.S.C. § 636(b)(1)(C)).

Although Plaintiff's objections are, in most respects, general
or conclusory, given his *pro se* status, the Court has conducted
a *de novo* review of Magistrate Judge Hummel's Report–
Recommendation and Order. Having completed its review,
the Court hereby

**\*2** **ORDERS** that Magistrate Judge Hummel's October 9,
2014 Report–Recommendation and Order is **ACCEPTED
in its entirety** for the reasons stated therein; and the Court
further

**ORDERS** that Defendant's motion for summary judgment is **GRANTED in part** and **DENIED in part;** and the Court further

**ORDERS** that Plaintiff's First Amendment claims, his Eighth Amendment claims, and his challenge to the constitutionality of Directive 4913 are **DISMISSED;** and the Court further

**ORDERS** that, to the extent that Plaintiff has asserted claims against Defendant in his official capacity, those official-capacity claims are **DISMISSED;** and the Court further

**ORDERS** that Defendant's motion for summary judgment is **DENIED** with respect to Plaintiff's Fourteenth Amendment due process claims and with respect to Defendant's qualified immunity defense; and the Court further

**ORDERS** that this matter is referred to Magistrate Judge Hummel for all further pretrial matters; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

### REPORT–RECOMMENDATION AND ORDER [1]

[1] This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

CHRISTIAN F. HUMMEL, United States Magistrate Judge.

Plaintiff *pro se* Charles McAllister ("McAllister"), a former inmate who was, at all relevant times, in the custody of the New York Department of Corrections and Community Supervision ("DOCCS"), [2] brings this action pursuant to 42 U.S.C. § 1983 alleging that defendant Harold Call ("Call"), Vocational Supervisor, Mohawk Correctional Facility ("Mohawk"), violated his constitutional rights under the First, Eighth and Fourteenth Amendments. Am. Compl. (Dkt. No. 64) ¶¶ 33, 34; 4. McAllister initially commenced this civil rights action against defendants Brian Fischer, Lucien J. LeClaire, Patricia LeConey, Carol Woughter, and John and Jane Does. Defendants moved for summary judgment. Dkt. No. 49. By report and recommendation dated July 6, 2012, (1) all claims against identified defendants

were dismissed; and (2) defendant was directed to join Call, who was identified in the motion papers as a John Doe defendant. Dkt. No. 55; Dkt. No. 58. The report and recommendation was accepted in its entirety, and McAllister was directed to file an amended complaint to "include only one cause of action—a procedural due process claim in connection with his disciplinary hearing—and one Defendant—hearing officer Call." Dkt. No. 58 at 4. McAllister thereafter filed his amended complaint wherein he requested punitive and compensatory damages. Am. Compl. at 4. Presently pending is Call's motion for summary judgment on the amended complaint pursuant to Fed.R.Civ.P. 56. Dkt. No. 74. McAllister did not respond. For the following reasons, it is recommended that Call's motion be granted in part and denied in part.

[2] McAllister is no longer incarcerated and is currently under the supervision of DOCCS.

### I. Failure to Respond

The Court notified McAllister of the response deadline and extended the deadline for his opposition papers on two occasions. Dkt. No. 75; Dkt. No. 77; Dkt. No. 80. Call also provided notice of the consequence of failing to respond to the motion for summary judgment in his motion papers. Dkt. No. 74–1. Despite these notices and extensions, McAllister did not respond.

**\*3** Summary judgment should not be entered by default against a *pro se* plaintiff who has not been given any notice that failure to respond will be deemed a default." *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). Thus, "[t]he fact that there has been no response to a summary judgment motion does not ... mean that the motion is to be granted automatically." *Id.* at 486. Even in the absence of a response, defendants are entitled to judgment only if the material facts demonstrate their entitlement to judgment as a matter of law. *Id.;* FED. R. CIV. P. 56(c). "A verified complaint is to be treated as an affidavit ... and therefore will be considered in determining whether material issues of fact exist...." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (internal citations omitted); *see also Patterson v. Cnty. of Oneida, N.Y.,* 375 F.3d 206, 219 (2d Cir.2004) (same). The facts set forth in defendant's Rule 7.1 Statement of Material Facts (Dkt. No. 74–2) are accepted as true as to those facts that are not disputed in McAllister's amended complaint. N.D.N.Y.L.R. 7.1(a)(3) ("The Court shall deem admitted any properly

2014 WL 5475293

supported facts set forth in the Statement of Facts that the opposing party does not specifically controvert.").

## II. Background

The facts are reviewed in the light most favorable to McAllister as the non-moving party. *See* subsection III(A) *infra*. At all relevant times, McAllister was an inmate at Mohawk. Am. Compl. ¶ 3.

On or about July 15, 2009, nonparty Correction Officer Femia, pursuant to authorization from nonparty Captain Dauphin, searched McAllister's personal property while McAllister was confined in a secure housing unit ("SHU"). [3] Dkt. No. 74–3, Exh. A, at 14; Am. Compl. ¶¶ 5–6. Femia confiscated approximately twenty documents from McAllister's locker, including five affidavits that were signed by other inmates. Dkt. No. 74–3, Exh. A, at 14. As a result of the search, Femia issued McAllister a Tier III misbehavior report, alleging violations of prison rules 113.15 [4] (unauthorized exchange) and 180.17 (unauthorized assistance). [5] *Id.;* Am. Compl. ¶ 7.

[3]     SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population ...." N .Y. COMP.CODES R. & REGS. tit 7, § 300.2(b) (1999). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

[4]     Rule 113.15 provides that "[a]n inmate shall not purchase, sell, loan, give or exchange a personally owned article without authorization." 7 NYCRR 270.2.

[5]     Rule 180.17 provides that "[a]n inmate may not provide legal assistance to another inmate without prior approval of the superintendent or designee. An inmate shall not receive any form of compensation for providing legal assistance." 7 NYCRR 270.2.

McAllister was assigned as his inmate assistant nonparty Correction Officer A. Sullivan. Am. Compl. ¶ 7; Dkt. No. 74–3, Exh. A, at 11. McAllister requested five inmate witnesses,

documents, prison directives 4933 and 4982, and a facility rule book. Am. Compl. ¶ 8; Dkt. No. 74–3, Exh. A, at 11. He also asked Sullivan for permission to retrieve documents from his personal property. *Id.* The requested witnesses were those inmates whose signatures were affixed to the five confiscated affidavits. Dkt. No. 74–3, Exh. A, at 14. Sullivan retrieved the requested materials, and all inmate witnesses agreed to testify. *Id.* at 11.

On or about July 21, 2009, a Tier III disciplinary hearing was held before Call, who served as the hearing officer. Am. Compl. ¶ 10. McAllister pleaded not guilty to both alleged violations. Dkt. No. 74–3, Exh. A, at 38. McAllister objected to the misbehavior report as violative of prison directive 4932 because the copy he was given (1) provided insufficient notice of the charges against him and (2) differed from the report that Call read into the record. *Id.* at 39–41. McAllister stated that his copy did not list the names of the inmates to whom the confiscated affidavits allegedly belonged. *Id.* Call acknowledged the difference between the reports but concluded that the misbehavior report informed McAllister of the charges against him and the bases for the charges. *Id.* at 39, 41–42. McAllister also argued that his copy of the misbehavior report referred to confiscation of twenty documents from his cell, but did not identify the papers that were taken. *Id.* at 42. He contended that the misbehavior report's general reference to "legal work" was insufficient to provide him with notice of the documents to which the report was referring because he had several volumes of legal work. *Id.* at 42, 59. In response to this objection, Call recited the body of the misbehavior report, which described the confiscated documents as "[a]rticles of paper which appear to be legal work including some signed affidavits" and asked McAllister, "[t]hat didn't ring a bell for you? How much paperwork did you have that fit that description?" *Id.* at 42. Call also expressed his belief that the affidavits qualified as legal work. *Id.* at 45, 57–58.

**\*4** McAllister next argued that he did not provide unauthorized legal assistance to another inmate in violation of rule 180.17 because the inmate affidavits were used as evidence to prove that the Division of Parole had a "practice" of "fail[ing] to respond to appeals over the last four years .... " Dkt. No. 74–3, Exh. A at 45–49, 56. These inmates were aware that their affidavits were created for, and to be used solely in support of, McAllister's case and that they were receiving no legal benefit. *Id.* at 48–49. McAllister further contended that he did not need permission from prison personnel to collect the affidavits. *Id.* at 64.

McAllister also argued that rule 113.15 is ambiguous because it does not list the specific items which, if found in an inmate's possession, would violate the rule. Dkt. No. 74–3, Exh. A, at 54. Finally, to the extent it can be determined from the hearing transcript, McAllister objected to the SHU procedures for handling his personal property. *Id.* at 70.

At the conclusion of the hearing, Call informed McAllister that he would be considering testimony from a confidential witness. Dkt. No. 73–3, Exh. A, at 13, 38, 73. McAllister objected to consideration of confidential testimony without being informed of the contents. *Id.* at 74. Finally, McAllister declined to call the inmates that he had requested as witnesses. *Id.* at 37, 71.

Call found McAllister guilty of violating prison rules 113.15 and 180.17. Dkt. No. 74–3, Exh. A, at 8–9, 76. He imposed a penalty of three months in SHU and three months loss of privileges. *Id.* at 8. Call relied upon the misbehavior report, the confidential testimony, the packet of legal work containing the other inmates' affidavits, and McAllister's testimony and statements. *Id.* at 9.

The disciplinary determination was reversed upon administrative appeal on the ground that the evidence failed to support a finding of guilt. Dkt. No. 74–3, Exh. B, at 79; Exh. C, at 81. In May 2010, McAllister commenced this action pursuant to 42 U.S.C. § 1983.

### III. Discussion [6]

[6]      All unpublished decisions referenced herein are appended to this report and recommendation.

McAllister argues that Call violated his rights under (1) the First Amendment, by (a) retaliating against him by finding him guilty and (b) hindering his access to the courts; (2) the Eighth Amendment, by imposing a three-month SHU assignment, plus ten additional days following reversal of the disciplinary hearing; and (3) the Fourteenth Amendment, because (a) he was given insufficient notice of the charges against him, (b) he was denied advance notice of the use of a confidential witness, (c) he was forced to spend approximately fifty-two days in SHU as a result of the misbehavior report, (d) Call failed to follow certain DOCCS directives and prison regulations, (e) Call demonstrated bias

against him during the Tier III hearing and prejudged his guilt, and (f) he was denied equal protection.

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact, it was supported by affidavits or other suitable evidence, and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by providing the court with portions of pleadings, depositions, and affidavits which support the motion. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

**\*5** The party opposing the motion must set forth facts showing that there is a genuine issue for trial, and must do more than show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). For a court to grant a motion for summary judgment, it must be apparent that no rational finder of fact could find in favor of the non-moving party. *Gallo v. Prudential Residential Servs., Ltd. Partnership,* 22 F.3d 1219, 1223–24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

Where, as here, a party seeks judgment against a *pro se* litigant, a court must afford the non-movant special solicitude. *See Triestman v. Federal Bureau of Prisons,* 470 U.S. 471, 477 (2d Cir.2006). As the Second Circuit has stated,

[t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they "suggest," .... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law....

*Id.* (citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant,* 537 F.3d 185, 191–92 (2d Cir.2008).

### B. Eleventh Amendment

Call argues that he is entitled to Eleventh Amendment immunity relating to McAllister's claims for money damages against him in his official capacity. The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. AMEND. XI. "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98 (1984) (citing *Hans v. Louisiana,* 134 U.S. 1, 21 (1890)). Regardless of the nature of the relief sought, in the absence of the State's consent or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment. *Halderman,* 465 U.S. at 100. Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states. *See Quern v. Jordan,* 440 U.S. 332, 340–41 (1979).

A suit against a state official in his or her official capacity is a suit against the entity that employs the official. *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) (citing *Edelman v. Jordan,* 415 U.S. 651, 663 (1974)). "Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself," rendering the latter suit for money damages barred even though asserted against the individual officer. *Kentucky v. Graham,* 473 U.S. 159, 166 (1985). Here, because McAllister seeks monetary damages against Call for acts occurring within the scope of his duties, the Eleventh Amendment bar applies.

**\*6** Accordingly, it is recommended that Call's motion on this ground be granted.

### C. Personal Involvement

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of

damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered personally involved if:

> (1) [T]he defendant participated directly in the alleged constitutional violation;
>
> (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;
>
> (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;
>
> (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or
>
> (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon,* 58 F.3d at 873 (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)). [7] Assertions of personal involvement that are merely speculative are insufficient to establish a triable issue of fact. *See e.g., Brown v. Artus,* 647 F.Supp.2d 190, 200 (N.D.N.Y.2009).

[7]     Various courts in the Second Circuit have postulated how, if at all, the Iqbal decision affected the five Colon factors which were traditionally used to determine personal involvement. *Pearce v. Estate of Longo,* 766 F.Supp.2d 367, 376 (N.D.N.Y.2011), *rev'd in part on other grounds sub nom., Pearce v. Labella,* 473 F. App'x 16 (2d Cir.2012) (recognizing that several district courts in the Second Circuit have debated Iqbal's impact on the five Colon factors); *Kleehammer v. Monroe Cnty.,* 743 F.Supp.2d 175 (W.D.N .Y.2010) (holding that "[o]nly the first and part of the third Colon categories pass Iqbal's muster ...."); *D'Olimpio v. Crisafi,* 718 F.Supp.2d 340, 347 (S.D.N.Y.2010) (disagreeing that Iqbal eliminated Colon's personal involvement standard).

As to any constitutional claims beyond those surrounding the denial of due process at the Tier III hearing, the undersigned notes that evaluation of such is unnecessary as it is outside

of the scope set forth in this Court's prior order. Dkt. No. 58 at 4. However, to the extent that Call acknowledges these claims and provides additional and alternative avenues for dismissal, McAllister fails to sufficiently allege Call's personal involvement in impeding his access to the courts, in violation of the First Amendment. McAllister argues that, as a result of Call's determination that he violated rules 113.15 and 180.17, his legal paperwork was confiscated, which impaired his ability to continue to represent himself in pending state and federal court claims. Am. Compl. ¶¶ 38–40. However, McAllister does not suggest that Call was personally involved in either the search and confiscation of paperwork that led to the filing of the misbehavior report nor the subsequent reduction in his paperwork pursuant to directive 4913. To the contrary, McAllister concedes that the paperwork was reduced pursuant to the directive.

McAllister also fails to sufficiently allege Call's personal involvement in the SHU procedures for storing property or in holding him in SHU for ten additional days following the reversal of the Tier III determination. Call stated that hr had no involvment with the storage of property in SHU. Dkt. No. 74–3, at 5. Call also contended that he "was not responsible for plaintiff's being held in SHU for additional days following the August 26, 2009 reversal of the disciplinary hearing decision of July 22, 2009." *Id.* McAllister does not allege Call's involvement in this delay. McAllister's sole reference to the ten-day delay is his claim that he "was not released from Special Housing until September 4, 2009, approximately 10 days after the reversal" Am. Compl. ¶ 43. This conclusory statement is insufficient to demonstrate Call's personal involvement in an extension of his time in SHU following the reversal of the Tier III determination. *Brown,* 647 F.Supp.2d at 200.

**\*7** Accordingly, it is recommended that Call's motion be granted insofar as McAllister alleges that Call: denied him access to the courts in violation of the First Amendment, was at all involved with the storage of his property while he was in SHU, and caused him to be held an additional ten days in SHU following administrative reversal of the Tier III determination.

### D. First Amendment

McAllister appears to argue that, in retaliation for his filing of grievances and lawsuits, Call found him guilty of misconduct in the Tier III hearing and imposed SHU time.

He suggests that his transfer to SHU, as a result of the Tier III determination, triggered enforcement of his compliance with directive 4913, which impeded his ability to proceed with active legal matters and resulted in dismissals. Am. Compl. ¶ 41. Thus, McAllister also argues that he was denied access to the courts. Am. Compl. ¶ 38. As a preliminary matter, McAllister's First Amendment retaliation and access claims are beyond the scope of the prior order of this Court directing McAllister to limit his amended complaint "include only one cause of action—a procedural due process claim in connection with his disciplinary hearing." Dkt. No. 58, at 4. Regardless, McAllister fails to plausibly allege either retaliation or denial of access to the courts.

Courts are to "approach [First Amendment] retaliation claims by prisoners with skepticism and particular care." *See e.g., Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (citing *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds by Swierkiewicz v. Sorema, NA,* 534 U.S. 506 (2002)). A retaliation claim under section 1983 may not be conclusory and must have some basis in specific facts that are not inherently implausible on their face. *Ashcroft,* 556 U.S. at 678; *South Cherry St., LLC v. Hennessee Group LLC,* 573 F.3d 98, 110 (2d Cir.2009). To survive a motion to dismiss, a plaintiff must show "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002); *Taylor v. Fischer,* 841 F.Supp.2d 734, 737 (W.D.N.Y.2012). If the plaintiff meets this burden, the defendants must show, by a preponderance of the evidence, that they would have taken the adverse action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977). "Types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." *See Barclay v. New York,* 477 F.Supp.2d 546, 588 (N.D.N.Y.2007).

**\*8** Here, McAllister baldly states that Call's disciplinary determination was imposed in retaliation for his filing of grievances and lawsuits; however, McAllister does not identify these grievances and lawsuits nor does he claim that any of these were lodged against Call. *See generally Ciaprazi v. Goord,* No. 02–CV–915, 2005 WL 3531464,

at *9 (N.D.N.Y. Dec. 22, 2005) (dismissing the plaintiff's claim of retaliation where the plaintiff could "point to no complaints lodged by him against or implicating the conduct of [the] defendant ... who issued the disputed misbehavior report."). McAllister also provides no time frame for the apparent grievance and lawsuits. Thus, it cannot be discerned whether or how these unnamed grievances and lawsuits were a "motivating factor" in Call's Tier III determination. Doyle, 429 U.S. at 287 (internal quotation marks and citation omitted). McAllister's unsupported, conclusory claim fails to plausibly demonstrate that Call's determination was a product of retaliatory animus.

Undoubtedly, prisoners have a constitutional right to meaningful access to the courts. Bounds v. Smith, 430 U.S. 817, 824 (1977); Lewis v. Casey, 518 U.S. 343, 350 (1996) ("The right that Bounds acknowledged was the (already well-established) right of access to the courts."). This right is implicated when prison officials "actively interfer[e] with inmates' attempts to prepare legal documents[ ] or file them." Lewis, 518 U.S. at 350 (internal citations omitted). To establish a denial of access to the courts claim, a plaintiff must satisfy two prongs. First, a plaintiff must show that the defendant acted deliberately and maliciously. Davis v. Goord, 320 F.3d 346, 351 (2d Cir.2003). Second, the plaintiff must demonstrate that he suffered an actual injury. Id.; Monsky v. Moraghan, 123 F.3d 243, 247 (2d Cir.1997) (internal citations, quotation marks, and alterations omitted) (quoting Lewis, 518 U.S. at 329) ("In order to establish a violation of access to courts, a plaintiff must demonstrate that a defendant caused actual injury, i.e., took or was responsible for actions that hindered a plaintiff's effort to pursue a legal claim"). Thus, a plaintiff must allege that the defendant was "responsible for actions that hindered his efforts to pursue a legal claim." Davis, 320 F.3d at 351 (internal quotation marks omitted).

Here, there is insufficient evidence to give rise to a genuine dispute of fact regarding either element of a denial of court access claim. As noted, McAllister merely states that, as a result of the property reduction pursuant to directive 4913, his "ability to continue litigation in Federal and State court caused adverse decisions by the court and dismissals." Am. Compl. ¶ 41. This claim is insufficient to demonstrate that Call was responsible for actions that hindered his legal claims. Insofar as McAllister's claim could be read to suggest that Call denied him access to the courts by confiscating his legal documents, as noted supra, McAllister fails to present any plausible facts to support a finding that Call was involved in the initial search

of his property or in the later reduction of his property or that it was maliciously imposed by Call. As noted, the initial cell search which led to the misbehavior report was ordered by Captain Dauphin and executed by Correction Officer Femia. Similarly, McAllister concedes that his property was reduced pursuant to directive 4913. Although McAllister suggests that his transfer to SHU as a result of the Tier III hearing triggered the application of directive 4913, he was transferred to SHU on July 9, six days before the initial cell search occurred. Id. ¶ 5. Thus, if McAllister were forced to comply with directive 4913 because of his transfer to SHU, he failed to demonstrate that the compliance arose from the SHU term ordered by Call rather than the unknown incident that resulted in his transfer to SHU on July 9. Further, McAllister failed to establish any actual injury because he did not specify which cases were allegedly dismissed as a result of the property reduction. See Monsky, 123 F.3d at 247.

*9 Accordingly, it is recommended that Call's motion for summary judgment be granted on this ground.

### E. Eighth Amendment

In his amended complaint, McAllister references the Eighth Amendment. Am. Compl. ¶ 31. However, McAllister's only reference to the Eighth Amendment is his assertion that Call's use of a confidential witness violated his Eighth Amendment right to be free from cruel and unusual punishment. However, in support of this argument, McAllister states only that this right was violated when Call stated, "[s]o, um there is a lot of stuff going on through my paperwork and I want to bring it to your attention before we move on ..." Id. ¶ 33; Dkt. No. 74–3, at 73. When read in context, it becomes clear that Call made this statement immediately before informing McAllister of his consideration of confidential information. Dkt. No. 73–3, at 73. Although, in referencing this portion of the hearing transcript McAllister alleges that he was subject to cruel and unusual punishment, it appears that McAllister intended to assert that the use of a confidential witness was a due process violation. Even if McAllister had intended to argue that use of a confidential witness violates the prohibition of cruel and unusual punishment, such a claim would necessarily fail because the Eighth Amendment protects an inmate's right to be free from conditions of confinement that impose an excessive risk to an inmate's health or safety. Farmer v. Brennan, 511 U.S. 825, 834 & 837 (1994). As McAllister makes no claim that he faced conditions of confinement imposing a risk to his health or safety and instead focuses

his argument on notice of a confidential witness, giving McAllister due solicitude, his claim regarding the use of a confidential witness will be incorporated as part of the due process analysis below.

### F. Fourteenth Amendment

#### 1. Due Process

Well-settled law provides that inmates retain due process rights in prison disciplinary hearings." *Hanrahan v. Doling,* 331 F.3d 93, 97 (2d Cir.2003) (per curiam) (citing cases). However, inmates do not enjoy "the full panoply of rights" accorded to a defendant in a criminal prosecution. *Wolff v. McDonnell,* 418 U.S. 539, 556 (1974). For a plaintiff to state a claim that he was denied due process at a disciplinary hearing, the plaintiff "must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Ortiz v. McBride,* 380 F.3d 649, 654 (2d Cir.2004) (per curiam) (quoting *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001)). To satisfy the first prong, a plaintiff must demonstrate that the deprivation of which he complains is an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484 (1995). "A liberty interest may arise from the Constitution itself, ... or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin,* 545 U.S. 209, 221 (2005) (citations omitted).

#### a. Denial of Liberty Interest

**\*10** In assessing whether an inmate plaintiff was denied procedural due process, the court must first decide whether the plaintiff has a protected liberty interest in freedom from SHU confinement. *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). If the plaintiff demonstrates the existence of a protected liberty interest, the court is then to determine whether the deprivation of this interest "occurred without due process of law." *Id.* at 351, citing *Kentucky Dept. of Corr. v. Thompson,* 490 U.S. 454, 460–61 (1989). Due process generally requires that a state afford an individual "some kind of hearing" prior to depriving them of a liberty or property interest. *DiBlasio v. Novello,* 344 F.3d 292, 302 (2d Cir.2003). Although not dispositive, duration of disciplinary confinement is a significant factor in determining

atypicality. *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000); *Blackshear v. Woodward,* No. 13–CV–1165, 2014 WL 2967752 (N.D.N.Y. July 1, 2014).

McAllister suggests that his confinement in SHU for forty-two to fifty-five days is a sufficient deprivation that requires procedural protections. Freedom from SHU confinement may give rise to due process protections; however, the plaintiff must allege that the deprivation imposed "an atypical and significant hardship." *Sandin,* 515 U.S. at 484; *Gaston v. Coughlin,* 249 F.3d 156, 162 (2d Cir.2001) (concluding that SHU confinement does not give rise to due process protections where inmate failed to demonstrate atypical hardship while confined). Although the Second Circuit has cautioned that "there is no bright-line rule regarding the length or type of sanction" that meets the *Sandin* standard (*Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999)), it has made clear that confinement in SHU for a period of one year constitutes atypical and significant restraint on inmates, deserving due process protections. *See e.g. Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000) (holding confinement in SHU exceeding 305 days as atypical); *Sealey v. Giltner,* 197 F.3d 578, 589 (2d Cir.1999) (concluding confinement for fewer than 101 days in SHU, plus unpleasant but not atypical conditions, insufficient to raise constitutional claim). Although the Second Circuit has generally held that confinement in SHU for 101 or fewer days without additional indicia of atypical conditions generally does not confer a liberty interest (*Smart v. Goord,* 441 F.Supp.2d 631, 641 (2d Cir.2006)), it has "explicitly noted that SHU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions of *Sealey* or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer v. Richards,* 364 F.3d 60, 65 (2d. Cir.2004) (citing, *inter alia, Ortiz, 323 F.3d at 195, n. 1).

The undersigned notes that it is unclear what portion of McAllister's relatively brief time in SHU is attributable to the Tier III determination, because it appears that McAllister was already in SHU when the instant disciplinary report was filed. Am. Comp. ¶ 5; Dkt. No. 74–3, Exh. A, at 14. The undersigned also notes that there is no indication that McAllister endured unusual SHU conditions. The only reference McAllister makes to his time in SHU is that, upon his transfer to SHU, several bags of his paperwork were confiscated pursuant to directive 4913. *Id.* ¶ 37. However, review of directive 4913 reveals that the personal and legal

property limit set forth in directive 4913 applies to the general prison population and inmates in other forms of segregated confinement. Dkt. No. 49–2, at 5–19. Thus, the fact that McAllister was forced to comply with directive 4913 does not indicate that he was subjected to conditions more severe than the normal SHU conditions or conditions imposed on the general prison population. Dkt. No. 74–3, Exh. A, at 14.

**\*11** Although the record is largely absent of detail of the conditions McAllister faced in SHU, there is also nothing in the record comparing the time McAllister was assigned and spent in disciplinary confinement with the deprivations endured by other prisoners "in the ordinary course of prison administration," which includes inmates in administrative segregation and the general prison population. *Welch v. Bartlett,* 196 F.3d 389, 394 (2d Cir.1999) (holding that, after *Sandin,* "the relevant comparison concerning duration is between the period of deprivation endured by the plaintiff and periods of comparable deprivation typically endured by other prisoners in the ordinary course of prison administration, including general population prisoners and those in various forms of administrative and protective custody"). Because "[t]he record does not reveal whether it is typical for inmates not being disciplined to spend similar periods of time in similar circumstances," Call's motion for summary judgment should be denied. *Id.* at 394 (citing *Brooks v. DiFasi,* 112 F.3d 46, 49 (2d Cir.1997)).

Accordingly, it is recommended that defendant's motion for summary judgment on this ground be denied.

### b. **Procedural Due Process**

Assuming a liberty interest exists, it must be determined whether McAllister was denied due process at his Tier III hearing. Where disciplinary hearings could result in SHU confinement or loss of good time credit, "[i]nmates are entitled to advance written notice of the charges; a fair and impartial hearing officer; a reasonable opportunity to call witnesses and present documentary evidence; and a written statement of the disposition, including supporting facts and reasons for the action taken." *Luna v. Pico,* 356 F.3d 481, 487 (2d Cir.2004) (citing *Kalwasinski v. Morse,* 201 F.3d 103, 108 (2d Cir.1999)); *see also Wolff,* 418 U.S. at 556; *Sira v. Morton,* 380 F.3d 57, 59 (2d Cir.2004).

#### i. **Notice**

McAllister first appears to argue that he was denied procedural due process because the misbehavior report (1) violated unnamed DOCCS rules, regulations, and procedures, and (2) failed to provide him with adequate notice of the charges against him because it did not list the five inmates whose affidavits were confiscated and, thus, impacted his ability to prepare a defense to the charges. Am. Compl. ¶¶ 11–13, 16–17. Although inmates are entitled to advance written notice of the charges, "[t]his is not to suggest that the Constitution demands notice that painstakingly details all facts relevant to the date, place, and manner of charged inmate misconduct ...." *Sira,* 380 F.3d at 72 (2d Cir.2004) (citing *Wolff,* 418 U.S. at 564). "[T]here must be sufficient factual specificity to permit a reasonable person to understand what conduct is at issue so that he may identify relevant evidence and present a defense." *Id.*

First, to the extent that McAllister's argues that the differing disciplinary reports violated unspecified DOCCS rules, regulations, and procedures (Am.Compl.¶¶ 12–13), this claim must fail. A section 1983 claim is not the "appropriate forum" in which to seek review of a violation of a prison regulation. *Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) ("a § 1983 claim brought in federal court is not the appropriate forum to urge violations of prison regulation or state law ... the allegations asserted must constitute violations of constitutional due process standards."). Next, McAllister fails to plausibly allege the existence of a question of fact whether the difference between the misbehavior reports deprived him of the ability to identify relevant evidence so that he could prepare a defense. Although McAllister's copy of the report was missing the names of the inmates whose affidavits were confiscated, it informed McAllister of the date, time, and location of the alleged violations; the rules alleged to have been violated; and a description of the documents that were confiscated. *Johnson v. Goord,* 305 Fed. Appx. 815, 817 (2d Cir.2009) (concluding where the inmate's copy of misbehavior report included details of alleged violation and charges against him, a sentence missing from the inmate's copy of report did not violate the inmate's due process rights). It is clear that the discrepancy between the misbehavior reports did not affect McAllister's ability to prepare and present a defense. Prior to the hearing, McAllister requested as witnesses the five inmates whose affidavits were found during the property search. Indeed, the record demonstrates that McAllister was able to both identify the

documents referenced in the misbehavior report and address them at the hearing. Dkt. No. 74–3, Exh. A at 45, 47–48.

**\*12** Thus, because he received sufficient notice of the charges against him and was able to prepare and present a defense on his behalf, McAllister fails to raise a question of fact as to whether he was denied sufficient notice of the charges against him.

### ii. Hearing Officer Bias/Pre-determination of Guilt

McAllister also contends that his procedural due process rights were violated because Call was biased against him and prejudged his guilt. The Fourteenth Amendment guarantees inmates the right to the appointment of an unbiased hearing officer to address a disciplinary charge. *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996). An impartial hearing officer "does not prejudge the evidence" and is not say "how he would assess evidence he has not yet seen." *Patterson v. Coughlin,* 905 F.2d 564, 570 (2d Cir.1990); *see also Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989) ("it would be improper for prison officials to decide the disposition of a case before it was heard"). However, "[i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Russell v. Selsky,* 35 F.3d 55, 60 (2d Cir.1996). "A hearing officer may satisfy the standard of impartiality if there is 'some evidence in the record' to support the findings of the hearing." *Nelson v. Plumley,* No. 9:12–CV–422, 2014 WL 4659327, at \*11 (N.D .N.Y. Sept. 17, 2014) (quoting *Allred v. Knowles,* No. 06–CV–0456, 2010 WL 3911414, at \* 5 (W.D.N.Y. Oct. 5, 2010) (quoting *Waldpole v. Hill,* 472 U.S. 445, 455 (1985)). However, "the mere existence of 'some evidence' in the record to support a disciplinary determination does not resolve a prisoner's claim that he was denied due process by the presence of a biased hearing officer." *See Smith v. United States,* No. 09–CV–729, 2012 WL 4491538 at \*8 (N.D.N.Y. July 5, 2012).

Prison officials serving as hearing officers "enjoy a rebuttable presumption that they are unbiased." *Allen,* 100 F.3d at 259. "Claims of a hearing officer bias are common in [inmate section] 1983 claims, and where they are based on purely conclusory allegations, they are routinely dismissed." *Washington v. Afify,* 968 F.Supp.2d 532, 541 (W.D.N.Y.2003) (citing cases). "An inmate's own subjective belief that the hearing officer was biased is insufficient to create a genuine issue of material fact." *Johnson v. Fernandez,* No. 09–CV–

626 (FJS/ATB), 2011 WL 7629513, at \*11 (N.D.N.Y. Mar. 1, 2011) (citing *Francis,* 891 F.2d at 46).

McAllister first argues that Call prejudged his guilt. He supports this contention by pointing to moments during the Tier III hearing where Call expressed his belief that McAllister's possession of affidavits signed by other inmates was sufficient to support a violation of prison rules 113.15 and 180.17. Am. Compl., ¶¶ 13, 15, 23–25, 36. Here, however the challenged affidavits were not evidence that Call prejudged because he had the opportunity to review the affidavits and did so at the hearing. Although McAllister disagreed with Call's opinion that possession of such documents would be a *per se* violation of the rules, Call's assertion of belief in this matter was an opinion he reached following his personal review of this evidence. *See Johnson v. Doling,* No. 05–CV–376, 2007 WL 3046701, at \* 10 (N.D.N.Y. Oct. 17, 2007) (holding that where the "[p]laintiff was provided the opportunity to testify, [and] call and question witnesses .... [d]isagreement with rulings made by a hearing officer does not constitute bias"). Thus, it does not appear that Call prejudged this evidence.

**\*13** To support his claim that Call exhibited bias and partiality against him in the Tier III hearing, McAllister points out that, after he objected to the misbehavior report for failing to provide him sufficient notice of the documents confiscated, Call read the portion of the misbehavior report describing the documents as "[a]rticles of paper which appear to be legal work including some signed affidavits," and stated "that didn't ring a bell for you?" *Id.* ¶¶ 19, 32). When read in context, this statement does not establish bias on Call's part, rather it appears to be a genuine question. Though it may be said that Call could have couched this question in a kinder manner, this statement does not demonstrate bias. Moreover, that the Tier III determination was reversed on appeal, without more, is not evidence of bias or other due process violation. *Eng v. Therrien,* No. 04–CV–1146, 2008 WL 141794, at \*2 (N.D.N.Y. Jan. 11, 2008).

Thus, McAllister fails to plausibly allege the existence of question of fact whether Call prejudged his guilt or was otherwise biased in the Tier III hearing.

### iii. Failure to Investigate

McAllister next suggests that he was denied procedural due process because Call declined to interview the law library officer. Am. Compl. ¶ 29. Call permitted McAllister to present

testimony on his behalf and afforded him the opportunity call witnesses. Had McAllister wished to hear testimony from the law library officer, he could have requested the law library officer as a witness. *Wolff,* 418 U.S. at 566 (inmates have a right to call witnesses in their defense at disciplinary hearings). That Call found it unnecessary to independently interview the law library officer—especially where McAllister did not demonstrate that his testimony would be relevant—does not result in a denial of due process because "[t]here is no requirement ... that a hearing officer assigned to preside over a disciplinary hearing conduct an independent investigation; that is simply not the role of a hearing officer." *Robinson v. Brown,* No. 9:11–CV–0758, 2012 WL 6799725, *5 (N.D.N.Y. Nov. 1, 2012).

Accordingly, McAllister fails plausibly raise a due process violation based on Call's alleged failure to investigate.

### iv. **Confidential Witness**

To the extent it can be discerned, McAllister contends that he was denied due process because Call relied on confidential witness testimony, yet failed to provide him with advance notice of the confidential witness and refused to inform him of his or her identity or the nature of the testimony. Am. Compl. ¶¶ 30–34. The Second Circuit has held that a hearing officer must perform an independent assessment of a confidential informant's credibility for such testimony to be considered reliable evidence of an inmate's guilt. *Sira,* 380 F.3d at 78 (noting that, "when sound discretion forecloses confrontation and cross-examination, the need for the hearing officer to conduct an independent assessment of informant credibility to ensure fairness to the accused inmate is heightened.").

 **\*14** Here, the record provides no indication that Call independently assessed the credibility and reliability of the confidential witness. The confidential witness form merely states that Call "was provided confidential information relating to the misbehavior report ." Dkt. No. 74–3, at 13. Similarly, Call does not provide whether or how he performed an assessment of the witness's credibility. *Id.* at 4. Therefore, there exist questions of fact whether Call deprived McAllister of due process by relying on this testimony without an independent assessment of the witness's credibility.

To the extent that McAllister argues that he was denied due process by Call's decision to refuse to disclose the content of the confidential witness's testimony, the law in this circuit provides that where a prison official decides to keep certain witness testimony confidential, he or she "must offer a reasonable justification for their actions, if not contemporaneously, then when challenged in a court action." *Sira,* 380 F.3d at 75 (citing *Ponte v. Real,* 471 U.S. 491, 498 (1985)). Although "[c]ourts will not readily second guess the judgment of prison officials with respect to such matters ... the discretion to withhold evidence is not unreviewable...." *Id.* (citations omitted). Here, Call failed to provide his rationale for refraining to share the substance of this testimony, stating merely that McAllister could not be told the substance of the testimony because "it is by definition it is ... confidential." Dkt. No. 74–3, at 74. As Call presented no reason to justify withholding the identity or substance of the confidential witness's testimony, McAllister presents a viable due process claim based on the nondisclosure of this evidence. *Sira,* 380 F.3d at 76.

Accordingly, Call's motion for summary judgment should be denied on this ground.

### v. **Some Evidence**

"Once a court has decided that the procedural due process requirements have been met, its function is to determine whether there is some evidence which supports the decision of the [hearing officer]." *Freeman v. Rideout,* 808 F.2d 949, 954 (2d Cir.1986) (citations omitted). In considering whether a disciplinary determination is supported by some evidence of guilt, "the relevant question is whether there is any evidence in the record [before the disciplinary board] that could support the conclusion reached by the disciplinary board." *Superintendent v. Hill,* 472 U.S. 445, 455–56 (1985) (citations omitted); *Sira,* 380 F.3d at 69. The Second Circuit has interpreted the "some evidence" standard to require "reliable evidence" of guilt. *Luna,* 356 F.3d at 488.

In making his determination, Call relied upon McAllister's testimony and statements, testimony of a confidential witness, the misbehavior report, and the legal documents confiscated during the property search. Dkt. No. 74–3, at 4. As noted, based on the record provided, Call did not perform an independent assessment of the witness's credibility. Thus, Call's reliance on confidential testimony would be insufficient to support a finding of guilt. *Taylor v. Rodriguez,* 238 F.3d 188, 194 (2d Cir.2001) (determining that reliance on confidential informant's testimony insufficient to provide "some evidence" of guilt where there was no independent

examination of indicia relevant to informant's credibility). The remaining evidence relied upon—McAllister's testimony, the misbehavior report, and the affidavits—does not constitute some evidence of guilt, as required by the Due Process clause.

**\*15** The affidavits alone do not constitute some evidence of guilt because mere possession of affidavits signed by other inmates would not violate prison rules 113.15 and 180.17 were it true that these documents were McAllister's property and drafted solely for his benefit. Similarly, although a written misbehavior report may serve as some evidence of guilt, such is the case where the misbehavior report charges the plaintiff for behavior that the author of the misbehavior report personally witnessed. *Creech v. Schoellkoph*, 688 F.Supp.2d 205, 214 (W.D.N.Y.2010) (citations omitted) (misbehavior report drafted by officer who personally observed plaintiff possess and transfer pieces of sharpened metal to another inmate constituted some evidence of guilt). In this case, where a determination of guilt would appear to turn on knowledge of the ownership of the documents and an understanding of the circumstances under which the papers were drafted, a misbehavior report which merely states that papers appearing to be legal work signed by other inmates were found in McAllister's property, it does not establish a per se violation of rules 113.15 and 180.17. *See Hayes v. Coughlin,* No. 87 CIV. 7401, 1996 WL 453071, at \*3 (S.D.N.Y. Aug. 12, 1996) ("if a misbehavior report can serve as 'some evidence' for a hearing decision and thereby insulate a hearing from review, there would be little point in having a hearing"); *see also Williams v. Dubray,* No. 09–CV–1298, 2011 WL 3236681, at \*4 (N.D.N.Y. July 13, 2011) (holding that there were questions of fact whether the determination was based upon some evidence of guilt where the hearing officer relied on misbehavior report that was based on a corrections officer's unsupported accounts, without additional evidence to support its charges). Thus, absent additional evidence that these papers belonged to other inmates or that McAllister drafted the documents for other inmates' use, the fact that the misbehavior report identified these documents as being found in McAllister's secured property does not constitute reliable evidence of guilt.

Finally, McAllister's testimony does not constitute reliable evidence of guilt. In response to the charge of violating rule 113.15, McAllister testified that the affidavits were his property because he drafted them solely as evidence in his personal litigation against the Department of Probation. Similarly, in defense of the charge for violating rule 180.17,

McAllister repeatedly testified that he did not provide legal assistance to the inmates in question because the affidavits were written solely to serve as supporting evidence in his personal action, the inmates were aware that they would receive no legal benefit as a result, and he did not receive any compensation from the inmates. Regardless whether Call considered McAllister's testimony to be credible, without some other reliable evidence, such as, perhaps, a statement from one of the other inmates claiming that he signed the affidavit under the belief that McAllister would provide him with legal assistance, McAllister's testimony denying violations of the charged prison rules would not constitute some evidence of guilt.

**\*16** Accordingly, it is recommended that Call's motion for summary judgment be denied as to McAllister's procedural due process claim.

### c. **Directive 4913**

McAllister further argues that, as a result of the SHU placement, he suffered an unconstitutional deprivation of his legal and personal property because he was required to comply with the limits set forth in directive 4913. This Court has already ruled upon this claim when it was raised at earlier stages. In deciding Call's motion for summary judgment on the McAllister's first complaint, this Court held that the directive did not violate his Fourteenth Amendment rights:

> Directive # 4913 was reasonably related to valid institutional goals given DOCCS' responsibility to provide for the health and safety of its staff and inmates and the alternatives provided to inmates in being able to seek exceptions and choose which four or five draft bags of material would remain with them. Moreover, the rules were neutral and reasonably related to the ultimate goals of the facility, security and safety.

*McAllister v. Fischer,* 2012 WL 7681635, at \*12 (N.D.N.Y. July 6, 2012) (Dkt. No. 55, at 22–23), *Report and Recommendation adopted by* 2013 WL 954961 (N.D.N.Y. Mar. 12, 2013) (Dkt. No. 58), *appeal dismissed* 2d Cir. 13–

Case 5:19-cv-00305-TWD   Document 88   Filed 06/01/21   Page 32 of 112

111 (Jan. 13.2014). Further, the Court concluded that directive 4913 "did not violate[ ] McAllister's Fourteen Amendment rights" and was "reasonably related to valid institutional goals." Dkt. No. 55, at 23–24; Dkt. No. 58. Thus, any such claim is barred by the law of the case. *Arizona v. California,* 460 U.S. 605, 618 (1983) (citations omitted); *see also United States v. Thorn,* 446 F.3d 378, 383 (2d Cir.2006) (internal quotation marks and citations omitted) ("The law of the case doctrine counsels against revisiting our prior rulings in subsequent stages of the same case absent cogent and compelling reasons ...."); *Arizona,* 460 U.S. at 618 (citations omitted); *Wright v. Cayan,* 817 F.2d 999, 1002 n. 3 (2d Cir.1987) (citations omitted) ("Even when cases are reassigned to a different judge, the law of the case dictates a general practice of refusing to reopen what has been decided.").

Accordingly, it is recommended that defendant's motion for summary judgment be granted on this ground.

### 2. Equal Protection

McAllister's only reference to an equal protection violation in the amended complaint is his conclusory claim that Call's reference to a confidential witness during the Tier III hearing was in violation of his right to equal protection. Am. Compl. ¶ 31. Further, in this Court's previous order, McAllister's equal protection claim was dismissed for failure to demonstrate, among other things, that he was part of a protected class or that he was treated differently from any similarly-situated inmates. Dkt. No. 58, at 4; Dkt. No. 55, at 24–25. Thus, any such claim would also be barred by the law of the case. *Thorn,* 446 F.3d at 383. Regardless, McAllister's equal protection claim must also fail for the reasons discussed *infra.*

 *17  To establish an equal protection violation, a plaintiff must show that "he was treated differently than others similarly situated as the result of intentional or purposeful discrimination." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005). McAllister has not identified, nor does the record disclose, any basis for a reasonable fact-finder to conclude that he was treated differently from similarly-situated individuals. Rather, plaintiffs only support for his equal protection claim is the following:

Call, throughout the entire disciplinary hearing deprive [sic] plaintiff equal protection when he stated: "This is hearing officer Call, this is 2:21 as I was going through my paperwork I realized something that I wanted to point out to Mr. McAllister."

Defendant Call discriminated against plaintiff when he stated: "I reviewed it this morning the 22nd when it was received again is confidential"

Am. Compl. ¶¶ 31–32. McAllister does not explain how these statements denied him equal protection. McAllister fails to plausibly suggest that he was treated differently from any similarly-situated individuals. Further, even if these statements demonstrate the existence of questions of fact regarding whether McAllister was treated differently from similarly-situated persons, he fails to identify disparity in the conditions "as a result of any purposeful discrimination directed at an identifiable suspect class." *See Dolberry v. Jakob,* No. 11–CV–1018, 2014 WL 1292225, at *12 (N.D.N.Y. Mar. 28, 2014).

Accordingly, it is recommended that defendant's motion on this ground should be granted.

### G. Qualified Immunity

Call contends that, even if McAllister's claims are substantiated, he is entitled to qualified immunity. The doctrine of qualified immunity is an affirmative defense which "shield[s] an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." *Pearson v. Callahan,* 555 U.S. 223, 244 (2009). Even if a disciplinary disposition is not supported by "some evidence," prison officials are entitled to qualified immunity if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Luna,* 356 F.3d at 490 (quoting *Wilson v. Layne,* 526 U.S. 603, 614 (1999)) (internal quotation marks omitted). This assessment is made "in light of the legal rules that were clearly established at the time it was taken." *Wilson,* 526 U.S. at 614; *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991). To determine whether a state official is entitled to qualified immunity for acts taken during the course of his or her employment, a reviewing court is to determine: "(1) whether plaintiff has shown facts making out violation of a constitutional right; (2) if so, whether that right was clearly established; and (3) even if the right was clearly established, whether it was objectively reasonable for the [official] to believe the conduct at issue was lawful." *Phillips v. Wright,* 553 Fed. Appx. 16, 17 (2d Cir.2014) (citing *Gonzalez v. City of Schenectady,* 728 F.3d 149, 154 (2d Cir.2013)).

**\*18** First, as discussed, McAllister presented a viable due process claim that the determination was not based on some evidence of guilt because Call (1) relied on confidential witness testimony without making an independent assessment of the witness's credibility and (2) did not otherwise have sufficient reliable evidence to support his finding of guilt. McAllister has also raised issues of fact whether the remaining evidence relied upon—the misbehavior report, McAllister's testimony and statements, and the confiscated legal papers—provided reliable evidence of guilt.

Addressing the second prong of the analysis, there is a clearly-established right to procedural due process protections, including the right to have a disciplinary determination be based on some evidence of guilt. There is also a clearly-established right to an independent assessment of confidential witnesses performed where a hearing officer relies on the witness's testimony (*Vasquez v. Coughlin,* 726 F.Supp. 466, 472 (S.D.N.Y.1989) (right clearly established by 1986); see also *Sira,* 380 F.3d at 80). Further, although there is no bright-line for what suffices as "some evidence" in every prison disciplinary proceeding (*Woodard v. Shanley,* 505 Fed. Appdx. 55, 57 (2d Cir.2012)), there were questions of fact surrounding the allegedly reliable evidence demonstrating that McAllister was in possession of other inmates' legal documents or that he provided them with unauthorized legal assistance. *Cf. Turner v. Silver,* 104 F.3d 354, at \*3 (2d Cir.1996) (some evidence to support determination that the defendant violated rule against unauthorized legal assistance where documentary evidence indicated the plaintiff received payment from other inmates, author of misbehavior report testified regarding an interview with informant who implicated defendant, prison official testified that inmate told her he had been charged for law library services and inmate testified the same). Call both failed to perform an independent assessment of the confidential witness's credibility and provided no explanation for why both the identity of the witness and the substance of his or her testimony could not be disclosed to McAllister. *Sira,* 380 F.3d at 75 (citing *Ponte,* 471 U.S. at 498).

Thus, given the state of the law regarding the rights to which an inmate is entitled in his disciplinary hearing, it was not objectively reasonable for Call to have believed that (1) he need not perform an independent assessment of the witness credibility or (2) the misbehavior report, confiscated affidavits, and McAllister's consistent testimony

and statements, without more, sufficiently supported a determination that McAllister violated rules 113.15 and 180.17.

Accordingly, defendant's motion for summary judgment should be denied on this ground.

## IV. **Conclusion**

For the reasons stated above, it is hereby **RECOMMENDED** that defendant's motion for summary judgment (Dkt. No. 74) be

**\*19** 1. **GRANTED** insofar as:

    a. dismissing plaintiff's First Amendment claims;

    b. dismissing plaintiff's Eighth Amendment claims;

    c. dismissing plaintiff's challenge to the constitutionality of Directive 4913;

    d. defendant's Eleventh Amendment immunity defense;

2. **DENIED** as to:

    a. plaintiff's Fourteenth Amendment procedural due process claims;

    b. defendant's qualified immunity defense.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the ... recommendation." N.Y.N.D.L.R. 72 .1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)).

**FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'v of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), 6(e).

Dated: October 9, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 5475293

**McAllister v. Call, Not Reported in F.Supp.3d (2014)**

2014 WL 5475293

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 5437617
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

David DOUGLAS, Sr., Plaintiff,

v.

PERRARA, Corrr. Officer, Great Meadow
C.F.; Lawrence, Corr. Officer, Great
Meadow C.F.; Whittier, Corr. Officer, Great
Meadow C.F.; Mulligan, Corr. Officer,
Great Meadow C.F.; Deluca, Corr. Sergeant,
Great Meadow C.F.; and Russel, Deputy
Superintendent, Great Meadow C.F, Defendants.

No. 9:11–CV–1353 (GTS/RFT).
|
Sept. 27, 2013.

**Attorneys and Law Firms**

David Douglas, Sr., Liverpool, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, Colleen D. Galligan, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

**DECISION and ORDER**

GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this *pro se* civil rights action filed by David Douglas, Sr., ("Plaintiff") against the six above-captioned New York State correctional employees, are the following: (1) Defendants' motion for partial summary judgment (requesting the dismissal of Plaintiff's claims against Defendant Russell, and his claims against the remaining Defendants in their official capacities); and (2) United States Magistrate Judge Randolph F. Treece's Report–Recommendation recommending that Defendants' motion be granted. (Dkt.Nos.70, 80.) Neither party filed an objection to the Report–Recommendation, and the deadline by which to do so has expired. (*See generally* Docket Sheet.) After carefully reviewing the relevant filings in this action, the Court can find no clear error in the Report–Recommendation: Magistrate Judge Treece employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts. As a result, the Court accepts and adopts the

Report–Recommendation for the reasons stated therein. (Dkt. No. 80.)

**ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Treece's Report–Recommendation (Dkt. No. 80) is ***ACCEPTED*** and ***ADOPTED*** in its entirety; and it is further

**ORDERED** that Defendants' motion for partial summary judgment (Dkt. No. 70) is ***GRANTED;*** and it is further

**ORDERED** that the following claims are ***DISMISSED*** from this action: (a) all claims asserted against Defendant Russell, and (b) all claims asserted against Defendants in their official capacities only. The Clerk is directed to terminate Defendant Russell from this action; and it is further

**ORDERED** that the following claims ***REMAIN PENDING*** in this action: (a) Plaintiff's claim that Defendants Whittier, Mulligan, Perrara and/or Lawrence subjected him to inadequate prison conditions by depriving him of meals for approximately five consecutive days in December 2009, in violation of the Eighth Amendment; (b) Plaintiff's claim that Defendants Whittier, Mulligan, Perrara and Lawrence used excessive force against him, and that Defendant Deluca failed to protect him from the use of that excessive force, in violation of the Eighth Amendment and New York State common law; and (c) Plaintiff's claim that Defendant Deluca was deliberately indifferent to Plaintiff's serious medical needs (following the assaults) in violation of the Eighth Amendment; and it is further

**ORDERED** that Pro Bono Counsel be appointed for the Plaintiff for purposes of trial only; any appeal shall remain the responsibility of the plaintiff alone unless a motion for appointment of counsel for an appeal is granted; and it is further

**ORDERED** that upon assignment of Pro Bono Counsel, a final pretrial conference with counsel will be scheduled in this action before the undersigned, at which time the Court will schedule a jury trial for Plaintiff's remaining claims as set forth above against Defendants Whittier, Mulligan, Perrara, Lawrence and DeLuca. Counsel are directed to appear at the final pretrial conference with settlement authority from the parties.

### *REPORT–RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate Judge.

**\*2** *Pro se* Plaintiff David Douglas brought a civil rights Complaint, pursuant to 42 U.S.C. § 1983, asserting that Defendants violated his constitutional rights while he was in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") and housed in the Great Meadow Correctional Facility. Specifically, Plaintiff alleges that in early December 2009, he wrote a letter to Defendant Eileen Russell [1] complaining that he had been denied meals for several days. *See* Dkt. No. 1, Compl. at ¶¶ 8, 64, & 66. Plaintiff further alleges that the remaining Defendants violated his constitutional rights when they used excessive force against him on several occasions and denied him medical care in order to treat the injuries he sustained therewith. *See generally id.* And, according to Plaintiff, Defendant Russell's failure to take disciplinary action against these individuals and curtail their "known pattern of physical abuse of inmates" renders her liable for violating his constitutional rights. *Id.* at ¶ 66.

[1]    Although Plaintiff spells this Defendant's name as "Russel," it is clear from Defendants' submissions that the correct spelling of this individual's name is "Russell" and the Court will refer to her accordingly. Compl. at ¶ 8; Dkt. Nos. 10 & 70–3.

Presently pending is Defendants' Motion for Partial Summary Judgment whereby they seek dismissal of Defendant Russell from this action as well as dismissal of all claims against the remaining Defendants in their official capacities. Dkt. No. 70. A response to that Motion was due on February 22, 2013. To date, the Court has not received a response from Plaintiff.

### I. DISCUSSION

#### A. Standard of Review

Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I. C. v.*

*Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ( "Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) and *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995)).

**\*3** When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991). Summary judgment is appropriate "[w]here

the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

Pursuant to the Local Rules of Practice for the Northern District of New York, "[w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file to serve any papers ... shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown." N.D.N.Y.L.R. 7.1(b)(3). "The fact that there has been no response to a summary judgment motion does not, of course, mean that the motion is to be granted automatically." *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). Even in the absence of a response, Defendants are entitled to summary judgment only if the material facts demonstrate their entitlement to judgment as a matter of law. *Id.;* FED. R. CIV. P. 56(c). Because Plaintiff has failed to raise any question of material fact, the Court will accept the facts as set forth in Defendants' Statement Pursuant to Rule 7.1(a)(3) (Dkt. No. 70–2), supplemented by Plaintiffs' verified Complaint (Dkt. No. 1), as true. *See Lopez v. Reynolds,* 998 F.Supp. 252, 256 (W.D.N.Y.1997).

### B. Personal Involvement

As noted above, Plaintiff brings this civil rights action for alleged violations of his constitutional rights during his incarceration in December 2009 at Great Meadow Correctional Facility. Plaintiff claims that in early December 2009, he was subjected to threats and harassment by other inmates and correctional officers. Compl. at ¶ 1. Plaintiff alleges that beginning on December 11, 2009, he was denied several meals for several consecutive days by unnamed individuals, prompting him to file grievances and write two letters to Defendant Russell. *Id.* at ¶¶ 2–8. [2] Thereafter, on December 16, 2009, Plaintiff's meals were delivered to him and, on the following date, he was moved to protective custody. *Id.* at ¶¶ 9–10. The remainder of Plaintiff's Complaint describes a series of events wherein the remaining Defendants are accused of using excessive physical force against him and denying him medical attention.

[2] Plaintiff alleges that in addition to filing several grievances he submitted sick call requests and sent letters to the Inspector General, all explaining how his Eighth Amendment rights were being violated. Compl. at ¶¶ 5–8.

**\*4** With regard to the pending, unopposed Motion, the Court notes that there is a paucity of factual allegations contained in the Complaint concerning Defendant Russell. In fact, the only factual allegation that this Court can point to is that Plaintiff wrote two letters to Defendant Russell complaining about being denied meals. Defendant Russell is not named nor referenced throughout the remainder of the Complaint. Nevertheless, in the section of the Complaint where Plaintiff lists his causes of action, he seemingly seeks to hold Defendant Russell liable for her alleged failure to intervene and take disciplinary action against the Defendants in order to curb their known pattern of physical abuse against inmates. *Id.* at ¶¶ 64 & 66.

According to Defendants' uncontroverted submissions, Defendant Eileen Russell is employed by DOCCS and worked at Great Meadow in 2006 as the Assistant Deputy Superintendent for Special Housing assigned to the Behavioral Health Unit. Dkt. No. 70–3, Eileen Russell Decl., dated Feb. 4, 2013, at ¶¶ 1, 3, & 4. During her tenure in that position, Plaintiff neither worked nor was housed as a patient in the Behavioral Health Unit. Russell Decl. at ¶ 11. Russell did not have any responsibilities related to delivery of meals to inmates nor does she have any recollection of speaking with Plaintiff or seeing any correspondence from him. *Id.* at ¶ 13. Furthermore, at no time was she made aware of any assault against Plaintiff by any DOCCS employee. *Id.* at ¶ 15.

The Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citations omitted). Moreover, "the doctrine of *respondeat superior* cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement." *Kinch v. Artuz,* 1997 WL 576038, at *2 (S.D.N.Y. Sept. 15, 1997) (citing *Colon v. Coughlin,* 58 F.3d 865, 874 (2d Cir.1995) & *Wright v. Smith,* 21 F.3d at 501) (further citations omitted)). Thus, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the constitution." *Ashcroft v. Iqbal,* 556 U.S. 662, 676 (2009).

It appears that Plaintiff seeks to hold Defendant Russell liable due to her employment as a supervisor at Great Meadow. The Second Circuit has stated that a supervisory defendant may have been personally involved in a constitutional deprivation within the meaning of § 1983 if she: (1) directly participated

in the alleged infraction; (2) after learning of the violation, failed to remedy the wrong; (3) created a policy or custom under which unconstitutional practices occurred or allowed such policy or custom to continue; (4) was grossly negligent in managing subordinates who caused the unlawful condition or event; or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.[3] *Colon v. Coughlin,* 58 F.3d at 873 (citations omitted); *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986) (citations omitted).

[3]   The Second Circuit has yet to address the impact of *Ashcroft v. Iqbal,* 556 U.S. 662 (2009), upon the categories of supervisory liability under *Colon v. Coughlin,* 58 F.3d 865 (2d Cir.1995). *See Grullon v. City of NewHaven,* 720 F.3d 133 (2d Cir.2013) (noting that the Court's decision in *Iqbal* "may have heightened the requirements for showing a supervisor's personal involvement," but declining to resolve the issue). Lower courts have struggled with this issue, specifically whether *Iqbal* effectively calls into question certain prongs of the *Colon* five-part test for supervisory liability. *See, e.g., Sash v. United States,* 674 F.Supp.2d 531, 543 (S.D.N.Y.2009). While some courts have taken the position that only the first and third of the five *Colon* categories remain viable and can support a finding of supervisory liability, *see, e.g., Bellamy v. Mount Vernon Hosp.,* 2009 WL1835939, at *6 (S.D.N.Y. June 26, 2009), *aff'd,* 387 F. App'x 55 (2d Cir.2010), others disagree and conclude that whether any of the five categories apply in any particular cases depends upon the particular violations alleged and the supervisor's participatory role, *see, e.g., D'Olimpio v. Crisafi,* 718 F.Supp.2d 340, 347 (S.D.N.Y.2010). Nevertheless, this Court, until instructed to the contrary, continues to apply the entirety of the five-factor *Colon* test.

*5   Here, the evidence shows that Defendant Russell did not directly participate in any constitutional wrongdoing, she was not aware that Plaintiff had been experiencing any problems with other inmates and staff, in her assignment to the Behavioral Health Unit she did not come into contact with the Plaintiff, and, she was not responsible for creating policies or customs nor for rectifying any of the alleged constitutional infirmities Plaintiff is alleged to have been subjected to. Because Plaintiff failed to respond to Defendants' Motion,

he has not created any material issue of fact regarding Russell's non-involvement in any constitutional wrongdoing. Thus, based upon the record before the Court, we find that Defendant Russell was not personally involved in any wrongdoing and should be **dismissed** from this action. *See Wright v. Smith,* 21 F.3d at 501 (defendant may not be held liable simply because he holds a high position of authority).

### C. Eleventh Amendment

By their Motion, Defendants seek dismissal of claims brought against them in their official capacities. Dkt. No. 70. In making this request, the Defendants note that during the pendency of this action, Plaintiff was released from DOCCS's custody, thereby rendering moot any request he has made for injunctive relief. Dkt. No. 70–4, Defs.' Mem. of Law, at pp. 7–8. After reviewing the Complaint, the Court notes that Plaintiff primarily seeks monetary compensation for both compensatory and punitive damages. *See* Compl. at Relief Requested. In addition, he seeks a declaratory judgment that his rights have been violated, but does not seek other injunctive relief. *Id.*

The Eleventh Amendment states, "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. Although by its terms, the amendment bars suit by citizens of one state against another state, the Supreme Court has held that such amendment similarly bars suits against a state by its own citizens. *Hans v. Louisiana,* 134 U.S. 1 (1890). "The Eleventh Amendment thus 'affirm[s] that the fundamental principle of sovereign immunity limits the grant of judicial authority in Art. III.' " *Richardson v. New York State Dep't of Corr. Servs.,* 180 F.3d 426, 447–48 (2d Cir.1999) (citing *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98 (1984)). Thus, sovereign immunity provided for in the Eleventh Amendment prohibits suits against the state, including a state agency in federal court. *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. at 98–101; *Severino v. Negron,* 996 F.2d 1439, 1441 (2d Cir.1993); *Daisernia v. State of New York,* 582 F.Supp. 792, 796 (N.D.N.Y.1984). To the extent a state official is sued for damages in his or her official capacity, "such a suit is deemed to be a suit against the state, and the official is entitled to invoke the eleventh amendment immunity belonging to the state." *Rourke v. New York State Dep't. of Corr. Servs.,* 915 F.Supp. 525, 539 (N.D.N.Y.1995)

(citing *Berman Enters., Inc. v. Jorling,* 3 F.3d 602, 606 (2d Cir.), *cert. denied,* 510 U.S. 1073 (1994); *Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993)); *see also Mathie v. Fries,* 121 F.3d 808, 818 (2d Cir.1997) ("A claim against a government officer in his official capacity is, and should be treated as, a claim against the entity that employs the officer ....").

**\*6** However, whether state officials sued in their official capacities are entitled to Eleventh Amendment immunity depends also upon the relief sought in the complaint. The Second Circuit has held that in accordance with *Ex parte Young,* 209 U.S. 123 (1908), "acts of state officials that violate federal constitutional rights are deemed not to be acts of the state and may be subject of injunctive or declaratory relief in federal court." *Berman Enters., Inc. v. Jorling,* 3 F.3d at 606 (citations omitted); *see also Rourke v. New York State Dep't of Corr. Servs.,* 915 F.Supp. at 540. While much of the relief sought herein is compensatory and punitive monetary relief, to the extent Plaintiff seeks some form of declaratory relief, such claims against the Defendants in their official capacities could go forward insofar as the Plaintiff seeks prospective relief. However, in light of his release from DOCCS's custody, the Court finds that any request for prospective injunctive relief is moot and the claims against the remaining Defendants in their official capacities should be **dismissed.** *Khalil v. Laird,* 353 F. App'x 620 (2d Cir.2009) (citing *Muhammad v. City of New York Dep't of Corr.,* 126 F.3d 119, 123 (2d Cir.1997)).

## II. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion for Partial Summary Judgment (Dkt. No. 70) be **GRANTED** and all claims against Defendant Russell be **DISMISSED** and claims against the remaining Defendants in their official capacities be **DISMISSED;** and it is further

**RECOMMENDED,** that if the above recommendations are accepted, this case be set down for a final pre-trial conference with the parties to assess whether this matter is trial ready; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72 & 6(a).

### All Citations

Not Reported in F.Supp.2d, 2013 WL 5437617

**End of Document**          © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 4006240
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Willie DANFORD, Plaintiff,
v.
The CITY OF SYRACUSE; John P. Fay; Fred
Lamberton; and Unnamed Officers, Defendants.

No. 5:09–CV–0307 (GTS/ATB).
|
Sept. 12, 2012.

**Attorneys and Law Firms**

Office of Gilles R. Abitbol, Gilles R. Abitbol, Esq., of
Counsel, Liverpool, NY, for Plaintiff.

Hon. Mary Anne Doherty, Corporation Counsel for the City
of Syracuse, Joseph R.H. Doyle, Esq., of Counsel, Syracuse,
NY, for Defendants.

***MEMORANDUM–DECISION and ORDER***

GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this civil rights action filed
by Willie Danford ("Plaintiff") against the above-captioned
individuals and municipalities ("Defendants") pursuant to 42
U.S.C. § 1983, is Defendants' motion for summary judgment.
(Dkt. No. 18.) For the reasons set forth below, Defendants'
motion is granted.

## I. RELEVANT BACKGROUND

### A. Plaintiff's Claims

Generally, liberally construed, Plaintiff's Amended
Complaint alleges that, on or about April 22, 2007, at or
near 500 Delaware Street in Syracuse, New York, Defendants
violated Plaintiff's following civil rights in the following
manner: (1) Defendant Officers violated his rights under 42
U.S.C. § 1983 by falsely arresting him because he is African
American and was driving "a large SUV with chromed
wheels in an area of town targeted by police"; (2) Defendant
Officers violated his rights under the Fourth Amendment
and 42 U.S.C. § 1983 by unlawfully searching his vehicle
because he is African American and was driving "a large

SUV with chromed wheels in an area of town targeted by
police"; and (3) Defendant City of Syracuse is liable as a
municipality because the violation(s) in question were caused
by (a) a municipal custom or policy of arresting individuals
because they are African American, present in a certain
part of town and/or driving a large SUV with chromed
wheels, (b) failing to train its officers regarding the type of
vehicle stop and arrest in question, (c) being deliberately
indifferent to training its officers regarding that stop and
arrest, (d) failing to develop and review hiring and training
practices and policies to conform to constitutional standards,
(e) failing to review supervisory policies relating to citizen
complaints, and/or (f) failing to procedurally investigate
citizen complaints. (*See generally* Dkt. No. 11 [Plf.57Ds
Amend. Compl.].) [1] Familiarity with the factual allegations
supporting these claims in Plaintiff's Amended Complaint is
assumed in this Memorandum–Decision and Order, which is
intended primarily for review by the parties. (*Id.*)

---

[1]     In his Amended Complaint, Plaintiff lists
"intentional infliction of emotional distress" as
one of the injuries he allegedly suffered as a
result of his alleged false arrest. (Dkt. No. 11,
at ¶ 44 [Plf.'s Amend. Compl.].) However, the
Amended Complaint does not identify that the tort
of intentional infliction of emotional distress as
one of the claims that Plaintiff is intending to
assert, nor does it allege facts plausibly suggesting
either extreme and outrageous conduct or severe
emotional distress. (*See generally* Dkt. No. 11.)
Moreover, in his opposition papers, Plaintiff does
not argue that he is attempting to assert such
a claim. (*See generally* Dkt. No. 20.) For these
reasons, the Court does not construe Plaintiff's
Amended Complaint as attempting to assert a claim
for intentional infliction of emotional distress.

### B. Undisputed Material Facts

On October 31, 2011, in support of their motion, Defendants
filed a Statement of Material Facts, containing specific
citations to the record where each fact was established, in
accordance with Local Rule 7.1(a)(3) of the Local Rules of
Practice for this Court. (Dkt. No. 18, Attach.1.)

On November 14, 2011 (the last day on which to file a
response to Defendants' motion), Plaintiff filed an "Attorney
Affidavit" in opposition to Defendants' motion. (Dkt. No. 20.)
That affidavit neither constituted nor attached a response to
Defendants' Statement of Material Facts. (*Id.*) For example,

the affidavit did not admit or deny each of Defendants' factual assertions in matching numbered paragraphs supported by a specific citation to the record where the factual issue arises, as required by Local Rule 7.1(a)(3). (*Id.*)

The next day, a docket clerk from this Court contacted Plaintiff's counsel, and notified him that his response had omitted, inter alia, a response to Defendants' Statement of Material Facts. Plaintiff's counsel advised the docket clerk that he was aware of the omission, which was caused by the fact that he did not have enough time to prepare a response to Defendants' Statement of Material Facts. However, Plaintiff's counsel did not request an extension of time in which to rectify the omission.

**\*2** Ordinarily, the Court *might* sua sponte scour any verified operative pleading that the plaintiff had filed (which would have the force and effect as an affidavit), in deciding whether or not the plaintiff has effectively denied certain of the defendants' supported factual assertions in their Statement of Material Facts. However, here, Plaintiff has not personally verified his Amended Complaint. (*See generally* Dkt. No. 11.) [2] Rather, his attorney has verified that Amended Complaint himself pursuant to N.Y. C.P.L.R. § 3020(d)(3). (Dkt. No. 11, at 8.) Such a verification does not automatically transform Plaintiff's Amended Complaint into an affidavit for purposes of a motion for summary judgment. [3] Rather, personal knowledge of the affiant is required under such circumstances. [4] While Plaintiff's counsel claims *second-hand* knowledge of the events in question, he does not claim *personal* knowledge of those events. (*Id.*) Moreover, the Amended Complaint does not allege that Plaintiff's counsel was present at the time of the events in question, sufficient to confer on him personal knowledge of those events. (Dkt. No. 11.) Indeed, if Plaintiff's counsel did possess such personal knowledge, he would likely not be able to represent Plaintiff in this action, under New York Rules of Professional Conduct. [5] As a result, the Court declines to sua sponte scour Plaintiff's Amended Complaint in search for a genuine dispute of material fact. In any event, even if the Court were to do so, the Court would find that any such sworn allegations contained in it are not sufficiently material to create a genuine dispute of material fact with regard to the discrete facts asserted by Defendants in their Statement of Material Facts. (*Compare* Dkt. No. 18, Attach. 1 *with* Dkt. No. 11.)

[2]  Plaintiff's original Complaint, which *was* personally verified by Plaintiff, was superseded

in all respects through the filing of Plaintiff's Amended Complaint. N.D.N.Y. L.R. 7.1(a)(4); *see also Int'l Controls Corp. v. Vesco,* 556 F.2d 665, 668 (2d Cir.1977) ("It is well established that an amended complaint ordinarily supersedes the original, and renders it of no legal effect.") [citations omitted], *cert. denied,* 434 U.S. 1014 (1978); *accord, Shields v. Citytrust Bancorp,* Inc., 25 F.3d 1124, 1128 (2d Cir.1994); *Dluhos v. Floating and Abandoned Vessel,* 162 F.3d 63, 68 (2d Cir.1998); *Lomnicki v. Cardinal McCloskey Servs.,* 04–CV–4548, 2007 WL 2176059, at \*6 (S.D.N.Y. July 26, 2007) ("[T]he filing of the Second Amended Complaint makes the initial complaint a nullity....").

[3]  *See Johnson v. Doe,* 00–CV–3920, 2001 WL 314618, at \*1 (S.D.N.Y. March 30, 2001) ("Although a verified complaint may serve as an affidavit for summary judgment purposes, ... mere verification does not transform rhetoric, conclusions, and other non-admissible statements into admissible evidence."); *Alleva v. New York City Dept. of Investigation,* 696 F.Supp.2d 273, 278–79 (E.D.N.Y.2010) ("The Complaint is not verified, however; it bears only the signature of Alleva's attorney, not the signature of Alleva himself, and Alleva's attorney does not attest to any 'personal knowledge' of the Complaint's allegations. 'Personal knowledge' is required under Rule 56(e)(1) ...."); *cf. Miltope Corp. v. Hartford Cas. Ins. Co.,* 163 F.R.D. 191, 193 (S.D.N.Y.1995) ("Plaintiff's counsel apparently was following the practice in the New York State courts that permit the attorney to verify a pleading if the party 'is not in the county where the attorney has his office .' CPLR § 3020(d)(3). That practice has no applicability to verification of interrogatory answers under Fed.R.Civ.P. 33."); *Spinella v. Esperdy,* 188 F.Supp. 535, 541 (S.D.N.Y.1960) (refusing to assign evidentiary value to complaint that was not verified by plaintiff but by his attorney, and to which no affidavit by alien or anyone else having any personal knowledge was attached).

[4]  *See* Fed.R.Civ.P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would admissible in evidence, and show that the affiant or declarant is competent to testify on

the matters stated."); N.D.N.Y. L.R. 7.1(a)(3) ("The record [on a summary judgment motion] ... does not ... include attorney's affidavits."); *Alleva,* 696 F.Supp.2d at 278–79 (" 'Personal knowledge' is required under Rule 56 ...."); *cf. Johnson,* 2001 WL 314618, at *1 ("[M]ere verification [of a complaint] does not transform ... non-admissible statements into admissible evidence [for purposes of a motion for summary judgment].")

5   *See U.S. v. De Angelis,* 490 F.2d 1004, 1011 (2d Cir.1974) (Mansfield, J., concurring) (finding defense counsel's conduct violated ethical rules where he "voiced his personal knowledge of facts" of case); *Road Dawgs Motorcycle Club of the U.S., Inc. v. 'Cuse Road Dawgs, Inc.,* 679 F.Supp.2d 259, 281–82 & n. 54 (N.D.N.Y.2009) (Suddaby, J.) (finding that defense counsel could not have personal knowledge of facts giving rise to lawsuit, so as to tender affidavit, without becoming witness to lawsuit pursuant to Prof. Conduct Rules 3.4 and 3.7); N.Y. Prof. Conduct Rule 3.4(d) (2),(3) ("A lawyer shall not ... in appearing before a tribunal on behalf of a client ... assert personal knowledge of fact in issue except when testifying as a witness ... [or] assert a personal opinion as to the justness of a cause, the credibility of a witness, the culpability of a civil litigant or the guilt or innocence of an accused...."); N.Y. Prof. Conduct Rule 3.7(a) ("A lawyer shall not act as advocate before a tribunal in a matter in which the lawyer is likely to be a witness on a significant issue of fact unless: (1) the testimony relates solely to an uncontested issue; (2) the testimony relates solely to the nature and value of legal services rendered in the matter; (3) disqualification of the lawyer would work substantial hardship on the client; (4) the testimony will relate solely to a matter of formality, and there is no reason to believe that substantial evidence will be offered in opposition to the testimony; or (5) the testimony is authorized by the tribunal.").

For all of these reasons, the Court deems admitted all of the facts set forth in Defendants' Statement of Material Facts. The most material of those facts are stated below.

On or about Sunday, April 22, 2007, at approximately 4:55 p.m., on Delaware Street in the City of Syracuse, Plaintiff was operating his 1994 Chevrolet Suburban and carrying his seventeen-year-old niece, Sheaona Elmora, in the passenger

seat with the windows of the vehicle down and music playing inside. After seeing the lights of a City of Syracuse Police vehicle behind him, Plaintiff pulled his truck over.

City of Syracuse Police Officers John P. Fay and Fred Lamberton exited their patrol car. Plaintiff produced his driver's license, vehicle registration, and insurance card and handed them to one of the Officers. That Officer asked Plaintiff for his Social Security number and weight measurement. Plaintiff did not provide the information.

Officer Fay told Plaintiff to exit the truck and arrested him for violating Section 40–16(b) of the City of Syracuse Noise Control Ordinance. Officer Fay handcuffed Plaintiff at the rear of the truck, and placed Plaintiff in the rear of the patrol car. [6]

6   At some point in time (either immediately before or after the arrest), Plaintiff was told that the information regarding his weight and Social Security number was required because the music playing in his vehicle was in violation of the City Noise Ordinance. Plaintiff responded that the "music wasn't on as to be heard outside his truck."

 *3  Ms. Elmore exited the truck and moved to its rear, toward the Officer who had arrested and handcuffed Plaintiff. Officer Fred Lamberton stopped her advance and pushed her back, while she challenged the Officers regarding their arrest of Plaintiff. At this time, a crowd began to form around the scene.

The Officers subsequently removed Plaintiff from the patrol car, removed his handcuffs, returned his driver's license, vehicle registration, and insurance cards, issued him Appearance Ticket DR# 07–219798 for a City Noise Ordinance violation, and told him where and when to go to court to appear.

Plaintiff responded to Appearance Ticket DR# 07–219798, and appeared before City of Syracuse City Court Judge Langston C. McKinney on May 3, 2007. At that time, Plaintiff entered a plea of "not guilty" to the charges of having committed a violation of the City Noise Ordinance and traffic ticket charging Plaintiff with failing to produce proof of insurance. Both cases were adjourned to May 24, 2007, for a nonjury trial, at which time the case was dismissed by Judge McKinney for failure of the People to prosecute, because

neither Defendant Officer was subpoenaed to appear at that proceeding.

Familiarity with the remaining undisputed material facts of this action, as set forth in the Defendants' Rule 7.1 Statement, is assumed in this Decision and Order, which (again) is intended primarily for review by the parties. (*Id.*)

### C. Defendants' Motion for Summary Judgment

#### 1. Defendants' Motion

Generally, in support of their motion for summary judgment, Defendants assert the following five arguments: (1) no admissible record evidence exists from which a rational fact finder could conclude that Defendant Officers arrested Plaintiff because he is African American and/or was present in a certain part of town and/or was driving a large SUV with chromed wheels; (2) no admissible record evidence exists from which a rational fact finder could conclude that Defendant City of Syracuse is subject to municipal liability under *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978), through any of the six ways alleged by Plaintiff in his Amended Complaint; (3) in the alternative, it is undisputed that Defendant Officers possessed probable cause to arrest Plaintiff under the circumstances, thus precluding his claim of false arrest as a matter of law; (4) in the alternative, no admissible record evidence exists from which a rational fact finder could conclude that Defendants searched Plaintiff's truck (or that they did so without cause), thus precluding his claim of wrongful search as a matter of law; and (5) in the alternative, it is undisputed that Defendant Officers are protected from liability as a matter of law by the doctrine of qualified immunity. (*See generally* Dkt. No. 18, Attach. 22 [Defs.' Memo. of Law].)

#### 2. Plaintiff's Response

Generally, in Plaintiff's response to Defendants' motion for summary judgment, he submits an "attorney affidavit" setting forth various legal arguments. (*See generally* Dkt. No. 20.) Under the Local Rules of Practice for this Court, an affidavit must contain factual and procedural background that is relevant to the motion, and may not contain legal arguments. N.D.N.Y. L.R. 7.1(a) (2). [7] Rather, legal arguments must be set forth in a memoranda of law. N.D.N.Y. L.R. 7.1(a)(1). Here, Plaintiff failed to submit a memorandum of law, even after being advised of that failure by the Court's docket clerk on November 15, 2011. N.D.N.Y. L.R. 7.1(a)(1).

[7] In addition, an affidavit must be based on the affiant's personal knowledge. *See* Fed.R.Civ.P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."). Here, Plaintiff's counsel does not show that he possess personal knowledge of the events giving rise to this action. (Dkt. No. 20.) Indeed, if Plaintiff's counsel did possess such personal knowledge, he would likely not be able to represent Plaintiff in this action, under New York Rules of Professional Conduct. *See, supra,* note 4 of this Decision and Order. For these reasons, the affidavit is insufficient to create an issue of fact for purposes of a motion for summary judgment. *See Topliff v. Wal–Mart Stores East LP,* 04–CV–0297, 2007 WL 911891, at \*23 (N.D.N.Y. March 22, 2007) (Lowe, M.J.) ("An attorney's 'affidavit' is unable to create a question of fact for purposes of a motion for summary judgment where the attorney has no personal knowledge of any of the events giving rise to the action."); N.D.N.Y. L.R. 7.1(a)(3) ("The record for purposes of [a motion for summary judgment] ... does not ... include attorney's affidavits.").

\***4** Under the circumstances, the Court finds that deeming the document filed by Plaintiff to constitute a "memorandum of law" would contravene both common sense and the Court's Local Rules. In particular, the document filed by Plaintiff (1) is twice labeled "**ATTORNEY AFFIDAVIT,**" (2) is formatted like an affidavit, complete with notarization, (3) does not contain a table of contents (in violation of N.D.N.Y. 7.1[a] [1] ), and (4) is bereft of any legal citations, except for one perfunctory citation to a case for a point of law that is non-responsive to Defendants' legal arguments and barely relevant to any material issue in the action (also in violation of Local Rule 7.1[a][1] ). [8]

[8] *See, e.g., Clark v. New York State Electric & Gas Corp.,* 67 F.Supp.2d 63, 71 (N.D.N.Y.1999) (McAvoy, C.J.) ("[T]he papers submitted by Plaintiff did not contain adequate citations (citations were often missing entirely or did not contain specific page references) to ... supporting legal precedent ... [as required by Local Rule 7.1(a) (1) ].").

The requirement that a memorandum of law contain a table of contents is an important one warranting enforcement, because it requires a party to separate and label its legal arguments, and enables the Court to identify and evaluate those legal arguments.[9] Similarly, the requirement that a memorandum of law containing citations to legal authorities is an important one, assisting the party's opponent in responding to the arguments, and assisting the Court in evaluating the arguments and rendering a decision.[10] Simply stated, under the circumstances, the Court need not, and does not, consider the legal arguments contained in Plaintiff's "attorney affidavit."[11]

[9]    *See U.S. v. Cafolla,* 12–CV–0127, 2012 WL 2469968, at *8 (N.D.N.Y. June 27, 2012) (Suddaby, J.) ("Plaintiff's newly entitled application does not satisfy the requirements of a memorandum of law, most notably, the requirement that the memorandum of law (1) specify the case law and/ or regulations upon which the motion is based ... and (2) contain a table of contents."); *Eng'rs Joint Welfare Fund v. W. New York Contractors, Inc.,* 09–CV–0417, 2011 WL 167228, at *1, n. 2 (N.D.N.Y. Jan. 19, 2011) (Suddaby, J.) ("Plaintiffs' memorandum of law in support of their motion for reconsideration does not include a table of contents, which is required under the Local Rules of Practice for this Court."), *accord, Cent. N.Y. Laborers' Health and Welfare, Pensions, Annuity and Training Funds v. Five Star Construction Servs., Inc.,* 09–CV–0509, 2011 WL 167236, at *1, n. 2 (N.D.N.Y. Jan. 19, 2011).

[10]    *See Grassi v. Lockheed Martin Fed. Sys., Inc.,* 186 F.R.D. 277, at 278–79 (N.D.N.Y.1999) (McAvoy, C.J.) ("[T]he consequences for failure to follow the Local Rules of the Northern District of New York are clear in the above circumstances.... I have no legal argument from plaintiff that I can consider.... Insofar as it may be argued that plaintiff's attorney's affidavit is functionally equivalent to a memorandum of law, it is inadequate; there is not a single citation to any statute or case decision. Indeed, plaintiff's attorney failed to set forth the legal theory upon which plaintiff's claims are based."); *McKnight v. Dormitory Auth. of the State of New York,* 189 F.R.D. 225, 227 (N.D.N.Y.1999) (McAvoy, C.J.) ("[T]he papers

submitted by Plaintiff did not contain adequate citations (short citations should contain enough information to identify the legal precedent cited) to supporting legal precedent [as required Local Rule 7.1(a)(3) ]....").

[11]    *See Duttweiler v. Eagle Janitorial, Inc.,* 05–CV– 0886, 2009 WL 5171834, at *3 (N.D.N.Y. Dec. 22, 2009) (Suddaby, J.) (striking affidavit of counsel because [1] it was not based on personal knowledge of events giving rise to action and [2] it contained legal argument); *accord, Duttweiler v. Eagle Janitorial, Inc.,* 05–CV–0886, 2009 WL 1606351, at *2–3 (N.D.N.Y. June 4, 2009) (Suddaby, J.), *Road Dawgs Motorcycle Club of the U.S ., Inc. v. 'Cuse Road Dawgs, Inc.,* 679 F.Supp.2d 259, 281– 82 & n. 54 (N.D.N.Y.2009) (Suddaby, J.); *Gonzalez v. N.Y.S. Dep't of Corr. Servs. Fishkill Corr. Facility,* 122 F.Supp.2d 335, 341 (N.D.N.Y.Nov.29, 2000) (McAvoy, J.) (striking affidavit, in part because it improperly contained legal argument in violation of Local Rule 7.1[a][2] ); *Topliff v. Wal–Mart Stores East LP,* 04–CV–0297, 2007 WL 911891, at *23 (N.D.N.Y. March 22, 2007) (Lowe, M.J.) ("[T]o the extent that Plaintiff's counsel is attempting to present arguments in refutation of the arguments advanced by Defendant ..., the place for those arguments is in Plaintiff's opposition memorandum of law.... The Court does not have the duty to search through the numerous documents filed by Plaintiff in search of Plaintiff's legal argument."); *cf. Ragona v. Wal–Mart Stores, Inc.,* 62 F.Supp.2d 665, 667 (N.D.N.Y. July 26, 1999) (McAvoy, C.J.) ("[T]he attorney's affidavit improperly contains legal argument in support of defendant's motion for judgment as a matter of law.").

In any event, even if the Court were to consider the legal arguments contained in Plaintiff's "attorney affidavit," the Court would find that they fail to sufficiently respond to Defendants' five discrete legal arguments. For the sake of brevity, the Court will set aside the fact that the affidavit is riddled with sentence fragments, run-on sentences, typographical errors, and unanswered questions. More important is the fact that the few arguments cogently communicated by the affidavit are simply either nonsensical or immaterial in nature.

In particular, the affidavit asserts the following four arguments: (1) Defendants' motion must be "dismiss[ed]"

because the affidavit of Defendant Fay, adduced by Defendants in support of their motion, contains four purported "contradiction[s]" (i.e., testimony that Fay observed Plaintiff produce a valid license and vehicle registration, testimony that Fay arrested Plaintiff because he refused to provide the required information about his weight and Social Security number, testimony that Fay gave Plaintiff a Uniform Traffic Ticket along with the Appearance Ticket, the *absence* of any specific explanation of how Fay knew that Plaintiff's music could be heard more than 50 feet from the vehicle despite the fact that Fay swore that he "observed" that fact); (2) the fact that the assistant district attorney later failed to prosecute Plaintiff for violating the noise ordinance, and the fact that Plaintiff was not charged with "obstructing a government investigation" or resisting arrest, demonstrate that Plaintiff was falsely arrested for violating the noise ordinance; (3) the fact that defense counsel in his memorandum of law argued that Defendant Officers handcuffed Plaintiff for the safety of Plaintiff and others, indicated that (according to police department policies) a warrant check is to be made before the issuance of the Appearance Ticket, and argued that an arresting officer's actual motivation in conducting the arrest is irrelevant to whether probable cause existed for the arrest, negates the application of qualified immunity; and (4) according to a New York State Court of Appeals case, respondeat superior liability is the most effective means of deterring police misconduct. (Dkt. No. 20.)

### 3. Defendants' Reply

**\*5** Generally in their reply, Defendants respond to the legal arguments asserted in Plaintiff's "attorney affidavit." (Dkt. No. 22.) However, like Plaintiff, Defendants assert those legal arguments in an attorney "declaration." (*Id.*) For the same reasons that the Court need not and does not consider the legal arguments contained in Plaintiff's "attorney affidavit," the Court need not and does not consider the legal arguments contained in Defendants' attorney "declaration." *See, supra,* Part I.C.2. of this Decision and Order.

The Court would add only that, because it describes the unmerited arguments contained in Plaintiff's "attorney affidavit" as an alternative ground for rejecting them, the Court finds it appropriate to also briefly describe the arguments contained Defendants' attorney "declaration" as a second alternative ground for rejecting Plaintiff's arguments. In particular, in their reply, Defendants assert the following five arguments: (1) Plaintiff failed to submit a response to their Statement of Material Facts; (2) Defendants have adduced undisputed admissible record evidence establishing

how Defendant Fay knew that Plaintiff's music could be heard more than 50 feet from the vehicle; (3) based on the undisputed admissible record evidence, Defendant Officers needed Plaintiff's weight and Social Security number to complete the Appearance Ticket; (4) it is undisputed that Plaintiff refused to provide the information in question, and was arrested and handcuffed until he provided the information that Defendants Officers needed to comply with the law; and (5) the second, third and fourth above-described legal arguments asserted by Plaintiff are entirely conclusory. (Dkt. No. 22, at ¶¶ 6–13.)

## II. RELEVANT LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Under Fed.R.Civ.P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(a). In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). In addition, "[the moving party] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett,* 477 U.S. 317, 323–24 (1986); *see also* Fed.R.Civ.P. 56(c), (e). However, when the moving party has met this initial responsibility, the nonmoving party must come forward with specific facts showing a genuine dispute of material fact for trial. Fed.R.Civ.P. 56(c), (e).

A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998) [citation omitted]; *see also* Fed.R.Civ.P. 56(e)(2). As the Supreme Court has famously explained, "[The nonmoving party] must do more than simply show that there is some metaphysical doubt as to the material facts" [citations omitted]. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp .,* 475 U.S. 574, 585–86 (1986).

**\*6** As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248.

"Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* [citation omitted]. Implied in the abovestated burden-shifting standard is the fact that, where a nonmoving party willfully fails to adequately respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute. For this reason, this Court has often enforced Local Rule 7.1(a)(3) by deeming facts set forth in a moving party's statement to have been admitted where the nonmoving party has failed to properly respond to that statement. [12]

[12] Among other things, Local Rule 7.1(a)(3) of the Local Rules of Practice for this Court requires that the nonmoving party file a response to the moving party's Statement of Material Facts, which admits or denies each of the moving party's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L.R. 7.1(a)(3).

### B. Legal Standards Governing Plaintiff's Claims

Plaintiff's claims arise under a federal civil rights law that provides a remedy for individuals who have been deprived of their federal statutory or constitutional rights under color of state law. In particular, 42 U.S.C. § 1983, the statute upon which the Plaintiff relies for his claims, provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, [or] regulation ... of any State ..., subjects or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law....

42 U.S.C. § 1983. Generally, to establish a claim under § 1983, a plaintiff must establish, by a preponderance of the evidence, each of the following three things: (1) the defendant was acting under color of state law; (2) the defendant's conduct deprived the plaintiff of a federal right, that is, a right secured by the Constitution or federal statute; and (3) the defendant's conduct caused an injury to the plaintiff.

*See O'Neil v. Bebee,* 09–CV–1133, 2010 WL 502948, at \*5 (N.D.N.Y. Feb. 10, 2010) (Suddaby, J.) (citing *Dwares v. City of New York,* 985 F.2d 94, 98 [2d Cir.1993] ).

### 1. Claim of False Arrest

To establish that the defendant violated the Fourth Amendment by falsely arresting him, the plaintiff must establish, by a preponderance of the evidence, each of the following four things: (1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged. *Ahern v. City of Syracuse,* 411 F.Supp.2d 132, 146 (N.D.N.Y.2006) (Munson, J.).

Because of the fourth above-described element, "the existence of probable cause to arrest ... is a complete defense to an action for false arrest." *Provost v. City of Newburgh,* 262 F.3d 146, 157 (2d Cir.2001). When an arrest is made without a warrant and probable cause is raised as a defense, the government bears the burden to demonstrate the existence of probable cause. *Wu v. City of New York,* 934 F.Supp. 581, 586 (S.D.N.Y.1996).

\*7 Probable cause to arrest is present when law enforcement officers "have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Posr v. Court Officer Shield No. 207,* 180 F.3d 409, 414 (2d Cir.1999); *see also* N.Y.Crim. Proc. § 140.10(1)(a) (McKinney 2004). In evaluating the probable cause determination, the court "consider[s] the facts available to the officer at the time of the arrest" and the conclusions those facts reasonably support. *Ricciuti v. N.Y.C. Transit Auth.,* 124 F.3d 123, 128 (2d Cir.1997); *see also* N.Y.Crim. Proc. § 70.10(2) (McKinney 2004). The inquiry is an objective one and the subjective beliefs or motivations of the arresting officer are irrelevant. *Whren v. United States,* 517 U.S. 806 (1996). "In fact, the eventual disposition of the criminal charges is irrelevant to the probable cause determination." *Hahn v. County of Otsego,* 820 F.Supp. 54, 55 (N.D.N.Y.1993) (Hurd, M.J.). Finally, "a claim for false arrest turns only on whether probable cause existed to arrest a defendant[;] ... it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest." *Jaegly v. Couch,* 439 F.3d 149, 154 (2d Cir.2006). "Stated differently, when faced with a claim for false arrest,"

this Court must "focus on the validity of the arrest and not on the validity of each charge." *Jaegly,* 439 F.3d at 154.

### 2. Claim of Wrongful Search

Generally, to establish that the defendant violated the Fourth Amendment by subjecting Plaintiff to a wrongful search, the plaintiff must establish, by a preponderance of the evidence, that there has been an (1) intrusion by the state upon (2) the plaintiff's reasonable or legitimate interest in privacy. *See Burke v. Cicero Police Dep't,* 07–CV–0624, 2010 WL 1235411, at *6 (N.D.N.Y. March 31, 2010) (Scullin, J.); *DeVittorio v. Hall,* 589 F.Supp.2d 247, 256–57 (S.D.N.Y.2008); *Conradt v. NBC Univ., Inc.,* 536 F.Supp.2d 380, 389–90 (S.D.N.Y.2008); *Ruggia v. Kozak,* 05–CV–0217, 2008 WL 541291, at *8–12 (N.D.N.Y. Feb. 25, 2008) (ReportRecommendation of Lowe, M.J., adopted by Kahn, J.).

### 3. Claim of Municipal Liability

Finally, to establish that a municipality is liable for either such violation under *Monell v. Dep't of Social Servs.,* 436 U.S. 658 (1978), the plaintiff must establish, by a preponderance of the evidence, one of the following four things: (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing municipal policies related to the particular deprivation in question; (3) a practice so consistent and widespread that it constitutes a "custom or usage" sufficient to impute constructive knowledge of the practice to policymaking officials; or (4) a failure by policymakers to train or supervise subordinates to such an extent that it amounts to "deliberate indifference" to the rights of those who come in contact with the municipal employees. [13]

[13] *Dorsett–Felicelli, Inc.,* 371 F.Supp.2d 183, 194 (N.D.N.Y.2005) (Kahn, J.) (citing three Supreme Court cases for these four ways), *accord, Dunbar v. County of Saratoga,* 358 F.Supp.2d 115, 133–134 (N.D.N.Y.2005) (Munson, J.); *see also Clayton v. City of Kingston,* 44 F.Supp.2d 177, 183 (N.D.N.Y.1999) (McAvoy, J.) (transposing order of second and third ways, and citing five more Supreme Court cases).

**\*8** It should be noted that, "[t]o establish that the policymaker took action or constructively acquiesced to an unlawful practice, a plaintiff must show that the policymaking official 'had notice of a potentially serious problem of

unconstitutional conduct, such that the need for corrective action or supervision was obvious, ... and the policymaker's failure to investigate or rectify the situation evidences deliberate indifference, rather than mere negligence or bureaucratic inaction.' " *Bradley v. City of New York,* 08–CV–1106, 2009 WL 1703237, at *2 (E.D.N.Y. June 18, 2009) (citation omitted). Moreover, "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under Monell, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which can be attributed to a municipal policymaker." *City of Oklahoma v. Tuttle,* 471 U.S. 808, 823–24 (1985). [14]

[14] *See also Dwares v. City of New York,* 985 F.2d 94, 100 (2d Cir.1993) ("[T]he simple recitation that there was a failure to train municipal employees does not suffice to allege that a municipal custom or policy caused the plaintiff's injury. A single incident alleged in a complaint, especially if it involved only actors below the policymaking level, generally will not suffice to raise an inference of the existence of a custom or policy."); *Sarus v. Rotundo,* 831 F.2d 397, 402 (2d Cir.1987) ("[A]bsent more evidence of supervisory indifference ... a policy may not ordinarily be inferred from a single incident of illegality."); *Fiacco v. City of Rensselaer, N.Y.,* 783 F.2d 319, 327 (2d Cir.1986) ( "Since the existence of a policy of nonsupervision amounting to deliberate indifference to constitutional rights cannot be established by inference solely from evidence of the occurrence of the incident in question, ... a plaintiff cannot prevail on a § 1983 claim against a municipality without introducing other evidence."); *Turpin v. Mailet,* 619 F.2d 196, 202 (2d Cir.1980) ("We agree that, absent more evidence of supervisory indifference, such as acquiescence in a prior pattern of conduct, a policy could not ordinarily be inferred from a single incident of illegality....").

### C. Legal Standard Governing Defense of Qualified Immunity

"Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendants' alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Williams v. Smith,* 781 F.2d 319, 322 (2d Cir.1986) (*quoting Harlow v. Fitzgerald,* 457 U.S. 800, 815 [1982] ).

As a result, a qualified immunity inquiry in a civil rights case generally involves two issues: (1) "whether the facts, viewed in the light most favorable to the plaintiff establish a constitutional violation;" and (2) "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted." *Sira v. Morton,* 380 F.3d 57, 68–69 (2d Cir.2004) [citations omitted], *accord, Higazy v. Templeton,* 505 F.3d 161, 169 (2d Cir.2007) [citations omitted].

In determining the second issue (i.e., whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted), courts in this circuit consider three factors:

> (1) whether the right in question was defined with 'reasonable specificity'; whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991) [citations omitted], cert. denied, 503 U.S. 962 (1992).[15] "As the third part of the test provides, even where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy v. Templeton,* 505 F.3d 161, 169–70 (2d Cir.2007) [citations omitted].[16] This "objective reasonableness" part of the test is met if "officers of reasonable competence could disagree on [the legality of defendants' actions]." *Malley v. Briggs,* 475 U.S. 335 (1986).[17] As the Supreme Court has explained:

[15]     *See also Pena v. DePrisco,* 432 F.3d 98, 115 (2d Cir.2005); *Clue v. Johnson,* 179 F.3d 57, 61 (2d Cir.1999); *McEvoy v. Spencer,* 124 F.3d 92, 97 (2d Cir.1997); *Shechter v. Comptroller of City of New York,* 79 F.3d 265, 271 (2d Cir.1996); *Rodriguez v. Phillips,* 66 F.3d 470, 476 (2d Cir.1995); *Prue v. City of Syracuse,* 26 F.3d 14, 17–18 (2d Cir.1994);

*Calhoun v. New York State Division of Parole,* 999 F.2d 647, 654 (2d Cir.1993).

[16]     *See also Anderson v. Creighton,* 483 U.S. 635, 639 (1987) ( "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.' ") [citation omitted]; *Davis v. Scherer,* 468 U.S. 183 (1984) ("Even defendants who violate [clearly established] constitutional rights enjoy a qualified immunity that protects them from liability for damages unless it is further demonstrated that their conduct was unreasonable under the applicable standard."); *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

[17]     *Accord, Malsh v. Correctional Officer Austin,* 901 F.Supp. 757, 764 (S.D.N.Y.1995) [citing cases]; *Ramirez v. Holmes,* 921 F .Supp. 204, 211 (S.D.N.Y.1996); *see also Jenkins v. City of New York,* 478 F.3d 76, 87 (2d Cir.2007) ("An officer's determination is objectively reasonable if there was 'arguable' probable cause at the time of arrest-that is, if 'officers of reasonable competence could disagree on whether the probable cause test was met.' ") [internal quotations and other citations omitted].

**\*9** [T]he qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law.... Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized.

*Malley,* 475 U.S. at 341.[18]

[18]     *See also Hunter v. Bryant,* 502 U.S. 224, 229 (1991) ("The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.") [internal quotation marks and citation omitted].

**D. Legal Standard Governing a Non–Movant's Failure to Oppose a Motion**

In this District, when a non-movant fails to oppose a legal argument asserted by a movant in support of a motion, the movant's burden with regard to that argument has been lightened such that, in order to succeed on that argument, the movant need only show that the argument possesses facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(b) (3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein...."); *Rusyniak v. Gensini,* 07–CV–0279, 2009 WL 3672105, at *1 n. 1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este–Green v. Astrue,* 09–CV–0722, 2009 WL 2473509, at *2 & n. 3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

**III. ANALYSIS**

Because adequate grounds exist on which to base the Court's dismissal of Plaintiff's Amended Complaint, the Court need not, and does not, analyze the first of the five arguments for dismissal asserted by Defendants in their memorandum of law (other than to succinctly report that the Court has come across no admissible evidence in the record establishing that Defendant Officers' conduct was motivated by race). *See, supra,* Part I.C.1. of this Decision and Order. Rather, the Court will analyze only the four remaining such arguments. *Id.*

**A. Whether Plaintiff's Claim of False Arrest Should Be Dismissed Because It Is Undisputed that Defendant Officers Possessed Probable Cause to Arrest Plaintiff Under the Circumstances**

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated in Defendants' memorandum of law. (Dkt. No. 18, Attach. 22, at 20–23 [attaching pages "20" through "23" of Defs.' Memo. of Law].) The Court would add only the following three brief points.

First, the Court finds that Plaintiff has failed to specifically oppose this argument in a memorandum of law. *See, supra,* Part I .C.2. of this Decision and Order. As a result, Defendants' burden with respect to the argument is lightened such that, in order to succeed on it, Defendants need show only that the argument possesses facial merit. *See, supra,* Part II.D. of this Decision and Order. The Court finds that Defendants have

met this modest burden, again for the reasons stated in their memorandum of law.

Second, even if the Court were to subject Defendants' argument to the heightened scrutiny appropriate for a contested motion (thus taking into account Plaintiff's responsive arguments), the Court would still be persuaded by Defendants' argument, for the reasons stated in their memorandum of law *and* the reasons stated in their reply papers. (Dkt. No. 22, at ¶¶ 8, 11, 12 [Defs.' Reply].)

**\*10** Third, in addition to the points made by Defendants in their memorandum of law, the Court is persuaded by the fact that whether or not Defendants were authorized under New York State statute (much less a Syracuse Police Department policy) to only issue Plaintiff an appearance ticket for violating the City Noise Ordinance (rather than arresting him for that violation) is largely, if not entirely, irrelevant for purposes of a claim under 42 U.S.C. § 1983 and the Fourth Amendment. *See Picciano v. McLoughlin,* 723 F.Supp.2d 491, 503–04 (N.D.N.Y.2010) (Suddaby, J.) (relying, in part, on *Williams v. Schultz,* 06–CV–1104, 2008 WL 463 5383, at *7–9 [N.D.N.Y. Oct. 16, 2008] [Lowe, M.J.] ). As indicated above in Part II.B., the term "the Constitution and laws" in 42 U.S.C. § 1983 refers to United States Constitution and federal laws. *Picciano,* 723 F.Supp. at 504. A violation of a state law, in and of itself, does not give rise to liability under 42 U.S.C. § 1983. *Id.*

For each of these three alternative reasons, the Court dismisses Plaintiff's false arrest claim.

**B. Whether Plaintiff's Claim of Wrongful Search Should Be Dismissed Because No Admissible Record Evidence Exists Establishing that Defendants Searched Plaintiff's Truck (or that They Did So Without Cause)**

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated in Defendants' memorandum of law. (Dkt. No. 18, Attach. 22, at 20–23 [attaching pages "20" through "23" of Defs.' Memo. of Law].) The Court would add only the following two brief points.

First, the Court finds that Plaintiff has failed to specifically oppose this argument in a memorandum of law. *See, supra,* Part I .C.2. of this Decision and Order. As a result, Defendants' burden with respect to the argument is lightened such that, in order to succeed on it, Defendants need show only that the

argument possesses facial merit. *See, supra,* Part II.D. of this Decision and Order. The Court finds that Defendants have met this modest burden, again for the reasons stated in their memorandum of law.

Second, even if the Court were to subject Defendants' argument to the heightened scrutiny appropriate for a contested motion (thus taking into account Plaintiff's responsive arguments), the Court would still be persuaded by Defendants' argument, again for the reasons stated in their memorandum of law.

Third, even if the Court were to find that admissible record evidence exists establishing that Defendant Officers searched Plaintiff's truck, the Court would find that any search of the passenger compartment (and any containers therein) that occurred was authorized under the circumstances. In particular, although Plaintiff was handcuffed in the back of the patrol car at the time of any such search, his niece was not. Rather, she was near the truck, exhibiting confrontational behavior, and causing an angry crowd to form at the scene. As the Supreme Court explained in *Arizona v. Gant,* an officer is permitted to search a vehicle's passenger compartment "when he has reasonable suspicion that an individual, whether or not the arrestee, is dangerous and might access the vehicle to gain immediate control of weapons." *Arizona v. Gant,* 556 U.S. 332, 346–47 (2009) (quotation marks omitted).

**\*11**  For each of these three alternative reasons, the Court dismisses Plaintiff's wrongful search claim.

### C. Whether, in the Alternative, Plaintiff's Claims Against Defendant Officers Should Be Dismissed Because It Is Undisputed that They Are Protected from Liability as a Matter of Law by the Doctrine of Qualified Immunity

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated in Defendants' memorandum of law. (Dkt. No. 18, Attach. 20, at 14–20 [attaching pages "14" to "20" of Defs'. Memo. of Law].) The Court would add only the following two brief points.

First, the Court finds that Plaintiff has failed to specifically oppose this argument in a memorandum of law. *See, supra,* Part I .C.2. of this Decision and Order. [19] As a result, Defendants' burden with respect to the argument is lightened such that, in order to succeed on it, Defendants need show

only that the argument possesses facial merit. *See, supra,* Part II.D. of this Decision and Order. The Court finds that Defendants have met this modest burden, again for the reasons stated in their memorandum of law.

[19]  Even if the Court were inclined to treat Plaintiff's "attorney affidavit" as a memorandum of law (which it declines to do), that attorney affidavit merely argues that, "[a]s such it is Plaintiff's position that the Defendant Officers did not avail themselves of the defense of qualified immunity." (Dkt. No. 20, at ¶ 5.) The problem is that the rationale from which this conclusion is drawn is the fact that defense counsel argued that Defendant Officers arrested and handcuffed Plaintiff for the safety of Plaintiff and the Officers: the rationale in no way addresses Defendants' argument that, based on the specific record evidence described by Defendants, and the nature of the Noise Ordinance, it was certainly objectively reasonable for Defendant Officers to believe that their actions did not violate any law. (Dkt. No. 18, Attach. 20, at 16–20 [attaching pages "16" to "20" of Defs.' Memo. of Law].)

Second, even if the Court were to subject Defendants' argument to the heightened scrutiny appropriate for a contested motion (thus taking into account Plaintiff's responsive arguments), the Court would still be persuaded by Defendants' argument, again for the reasons stated in their memorandum of law.

For each of these two reasons, the Court dismisses Plaintiff's claims against Defendant officers on the alternative ground of qualified immunity.

### D. Whether, in the Alternative, Plaintiff's Claims Against Defendant City of Syracuse Should Be Dismissed Because No Admissible Record Evidence Exists Establishing that Defendant City of Syracuse Is Subject to Municipal Liability Under *Monell*

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated in Defendants' memorandum of law. (Dkt. No. 18, Attach. 20, at 7–13 [attaching pages "7" through "13" of Defs.' Memo. of Law].) The Court would add only the following three brief points.

2012 WL 4006240

First, the Court finds that Plaintiff has failed to specifically oppose this argument in a memorandum of law. *See, supra,* Part I .C.2. of this Decision and Order. [20] As a result, Defendants' burden with respect to the argument is lightened such that, in order to succeed on it, Defendants need show only that the argument possesses facial merit. *See, supra,* Part II.D. of this Decision and Order. The Court finds that Defendants have met this modest burden, again for the reasons stated in their memorandum of law.

[20]  Even if the Court were inclined to treat Plaintiff's "attorney affidavit" as a memorandum of law (which it declines to do), that attorney affidavit merely argues that, according to a New York State Court of Appeals case, respondeat superior liability is the most effective means of deterring police misconduct. (Dkt. No. 20, at ¶ 6.) That argument does not address Defendants' detailed argument regarding why no admissible record evidence exists from which a rational fact finder could conclude that Defendant City of Syracuse is subject to municipal liability under *Monell v. Dep't of Social Servs.,* 436 U.S. 658 (1978), through any of the six ways alleged by Plaintiff in his Amended Complaint. (Dkt. No. 18, Attach. 20, at 7–13 [attaching pages "7" to "13" of Defs.' Memo. of Law].)

Second, even if the Court were to subject Defendants' argument to the heightened scrutiny appropriate for a contested motion (thus taking into account Plaintiff's responsive arguments), the Court would still be persuaded by Defendants' argument, for the reasons stated in their memorandum of law *and* the reasons stated in their reply papers. (Dkt. No. 22, at ¶ 12 [Defs.' Reply].)

**\*12**  Third, and finally, in addition to the points made by Defendants in their memoranda of law, the Court is persuaded by the fact that there occurred no underlying constitutional violation that Defendant City of Syracuse could be deemed to have caused through (1) a formal policy officially endorsed by the City of Syracuse, (2) actions taken by officials responsible for establishing City Police Department policies related to the particular deprivation alleged, (3) a practice so consistent and widespread in the City Police Department that it constitutes a "custom or usage" sufficient to impute constructive knowledge to the practice of policymaking officials, or (4) a failure by policymakers to train or supervise subordinates to such an extent that it amounts to "deliberate indifference" to the rights of those who come in contact with City Police Officers.

For each of these three alternative reasons, the Court dismisses Plaintiff's claims against Defendant City of Syracuse.

**ACCORDINGLY,** it is

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 18) is ***GRANTED;*** and it is further

**ORDERED** that Plaintiff's Amended Complaint (Dkt. No. 11) is ***DISMISSED.***

The clerk is directed to enter judgment in favor of the defendants and close this case.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 4006240

---

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 4365606
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Quron MORRIS, Plaintiff,

v.

Police Officer JOHNSON: I.D. #2437, Police
Officer Christo Cornell: I.D. # 2363, Defendants.

1:17-cv-00371 (BKS/DJS)
|
Signed 07/30/2020

**Attorneys and Law Firms**

Plaintiff, pro se: Quron Morris, 15-A-4139, Cayuga Correctional Facility, P.O. Box 1186, Moravia, New York 13118.

For Defendants: Abigail W. Rehfuss, Esq., The Rehfuss Law Firm, P.C., 40 British American Boulevard, Latham, New York 12110.

**MEMORANDUM-DECISION AND ORDER**

Brenda K. Sannes, United States District Judge:

**I. INTRODUCTION**

 **\*1** Plaintiff Quron Morris, proceeding pro se, brings this civil rights action under 42 U.S.C. § 1983, raising claims arising from his September 2013 arrest by Albany Police Department ("APD") Officer Milton Johnson and Detective Christopher Cornell ("Defendants"). (Dkt. No. 15). Defendants now move for summary judgment under Federal Rule of Civil Procedure 56 on Plaintiff's sole remaining claims for false arrest. (Dkt. No. 46). Plaintiff did not respond to Defendants' motion. [1] For the reasons that follow, Defendants' motion for summary judgment is granted.

[1]
Plaintiff's response to Defendants' motion for summary judgment was due on March 16, 2020. (Dkt. No. 46). On March 24, 2020, the Court issued a Text Order noting that Plaintiff had not filed a response to Defendants' motion and that Defendants had not sent Plaintiff the "Notification of the Consequences of Failing to Respond to a Summary Judgment Motion," as required by Local Rule 56.2. (Dkt. No. 48 (citing N.D.N.Y.

L.R. 56.2)). The Court directed the Clerk to mail the notice to Plaintiff and extended the response deadline to April 10, 2020. (*Id.*). Plaintiff did not respond. In light of Plaintiff's pro se status, the Court has conducted a thorough review of the record on summary judgment. *See, e.g.*, *Rates Tech. Inc. v. Broadvox Holding Co., LLC*, 56 F. Supp. 3d 515, 525 (S.D.N.Y. 2014) ("[B]efore summary judgment may be entered, the district court must ensure that each statement of material fact is supported by record evidence sufficient to satisfy the movant's burden of production even if the statement is unopposed. The district court has discretion to rely on other evidence in the record even if uncited. The district court must also determine whether the legal theory of the motion is sound.").

**II. FACTS** [2]

[2]
The facts are drawn from the Defendants' submissions in support of their motion for summary judgment, as well as Plaintiff's verified Amended Complaint and attached exhibits. The facts are taken in the light most favorable to Plaintiff. *Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007).

**A. The Shooting and Subsequent Investigation**

On the night of September 13, 2013, City of Albany police reported to a residence located at 423 Clinton Avenue in Albany, New York (the "Residence") in response to a report of "shots fired." (Dkt. No. 46-8; Dkt. No. 46-5, at 1; Dkt. No. 46-1, ¶ 1). According to a police investigative report, when officers arrived on the scene, they observed "several projectile strikes into the residence." (Dkt. No. 46-8). A detective who responded to document the scene recovered one of the projectiles. (Dkt. No. 46-5, at 1).

According to an investigative report, police officers canvased the area. (Dkt. No. 46-7). One witness stated that he heard "one shot," but he could not identify anyone. (*Id.*). A second witness stated that she "hear[d] one shot and saw one black male walking west" on Clinton Avenue and stated that she was unsure of his first name but that his last name was Morris and that he goes by the street name "Bop." (*Id.*). A third witness stated that she "saw one black male fire one shot, and run west" on Clinton. (*Id.*). A fourth witness stated that he "[h]eard one shot and observed on black male running west"

on Clinton. (*Id.*). A fifth witness was home all night and "did not hear or see anything." (*Id.*).

**\*2** According to an investigative report created on September 14th, the officers who responded to the scene located "several projectile strikes into the [R]esidence" and on "further investigation" located Janta Welcome "inside [the R]esidence hiding in fear." (Dkt. No. 46-8). The officers checked Welcome for injuries and "transported [him] to the detective office for an interview." (*Id.*). There, Welcome disclosed to police that "he was shot at by an individual whose nick name is 'Bop' after breaking up a fight that involved an individual named Naishawn Williams." (*Id.*; Dkt. No. 46-1, ¶ 4). Welcome identified "Bop" as Plaintiff Quron Morris and stated that "Mr. Morris [was] responsible for shooting at him tonight." (Dkt. No. 46-8). Welcome explained that Williams was Plaintiff's nephew and that Welcome had tried to break up a fight between Williams and "a fifteen-year-old female," which caused Williams to get "Bop." (*Id.*). Welcome stated that "words were exchanged thus causing 'Bop' to shoot into the house as [Welcome] stood in the doorway about fifteen feet away from 'Bop.' " (*Id.*). Welcome also "identified a firearm that resembled the firearm he observed to be possessed by [Plaintiff] at the time of the shooting which was a revolver." (*Id.*).

According to that same report, Defendant Detective Christopher Cornell interviewed Welcome's aunt, Williette Loyd. (*Id.*). Although the report states that Loyd was "not a direct witness to the incident," she identified "Bop" as Plaintiff through a photo array. (*Id.*; Dkt. No. 46-17, at 1–4). Loyd's signed photo array form states that Loyd "learned from [her] family that ["Bop"] is responsible for the shooting tonight." (*Id.* at 2). Loyd further stated that Plaintiff had recently been paroled. (Dkt. No. 46-8). Defendants have submitted evidence indicating that at about 1:30 a.m., Cornell received a copy of Plaintiff's criminal record, which indicated that he had been paroled on July 29, 2013. (Dkt. No. 46-13).

Cierra Dale, Welcome's sister, lived at the Residence on the night of the shooting. (Dkt. No. 46-16 at 2; Dkt. No. 46-1, ¶ 7). On the morning of September 14th, Dale viewed a photo array and gave her account of what had transpired that evening. (Dkt. No. 46-16, at 2). Dale stated that Plaintiff "pulled out a gun in [her] hallway last night" after Welcome had a fight with Williams, who then brought Plaintiff to the house. (*Id.*). According to Dale, Welcome and Plaintiff "exchanged words" and "[a]fter [Welcome] said something to him, [Plaintiff] shot the gun into [Dale's] house towards

[Welcome]." (*Id.*). Dale described the gun as "an old western style gun" that "was long and had the wheel in it where the bullets go." (*Id.*). She also stated that Plaintiff "had a glove around the handle." (*Id.*). Dale also identified Plaintiff, from a photo array, as the shooter. (*Id.* at 2, 4).

That evening, two APD officers—Sergeant Jones and Officer Martin—interviewed Williams. According to an investigative report, Williams denied any involvement in the "altercation ... or even being in the area, stating that he never left his mother's house that evening." (Dkt. No. 46-9). Williams was shown a photo array that included Plaintiff, his uncle. (*Id.*). Williams stated that he did not "recognize any of the individuals" in the photo array. (*Id.*). He was then directed to Plaintiff's photo and "remained insistent" that he did not recognize anyone. (*Id.*). "When confronted with the fact that [one of the images] was in fact his uncle," he invoked his right to remain silent and declined to speak further. (*Id.*).

On September 16, 2013, Detective T. Haggerty conducted "inmate debriefs at the Albany County Correctional Facility." (Dkt. No. 46-10). While leaving the correctional facility Haggerty overheard two women discussing the shooting that took place at the Residence, one of whom was Tracy Palmer. (*Id.*). After a brief introduction, Palmer informed the detective that she was present at the time of the shooting and would be interested in speaking further about the incident. (*Id.*).

The following evening, September 17th, Palmer met with three APD officers, including Cornell and Haggerty. (*Id.*). Palmer identified Plaintiff in a photo array and gave her account of the incident. (*Id.*; Dkt. No. 46-15 at 2). Palmer informed the officers that she was standing "at the gate" in front of the Residence when the shooting occurred. (*Id.*). Palmer stated that Plaintiff was "close to [her]" and fired two rounds at Welcome and "put holes in the windows of the house." (*Id.*).

**B. Plaintiff's Arrest and Indictment**

**\*3** On September 21, 2013, Cornell and Defendant Officer Milton Johnson arrested Plaintiff.[3] (Dkt. No. 46-6, at 1; Dkt. No. 46-1, ¶ 12). Plaintiff alleges that he was riding his bicycle when Johnson cut Plaintiff off "while driving up in a vehicle." (Dkt. No. 46-4, at 4). Johnson then approached Plaintiff with his "gun drawn," telling Plaintiff to put his hands on his head. (*Id.*). Plaintiff complied. (*Id.*). Johnson read Plaintiff his *Miranda* rights while handcuffing him. (*Id.*).

Plaintiff was never shown an arrest warrant nor told why he was being arrested. (*Id.*). Plaintiff contends that the officers lacked probable cause and made their arrest based upon uncorroborated hearsay. (*Id.* at 6).

3       In his verified Amended Complaint, Plaintiff asserts that he was arrested on September 28, 2013; the arrest report Defendants submitted with their motion for summary judgment motion states that Plaintiff was arrested on September 21st. (Dkt. No. 46-4, at 4; Dkt. No. 46-6, at 1). Any dispute regarding the date of the arrest is immaterial.

Plaintiff was then "brought to Central Booking to be processed" and later arraigned in local criminal court on charges of criminal possession of a weapon in the second degree and reckless endangerment in the first degree. (*Id.*). According to New York Supreme Court Judge Thomas A. Breslin's decision and order in Plaintiff's criminal proceeding, Cornell testified to the Grand Jury "concerning identifications made by witnesses of the shooting." (*Id.* at 10–11). None of the eyewitnesses at the Residence were called during Plaintiff's grand jury proceedings. (*Id.* at 10; Dkt. No. 46-1, ¶ 14). On March 12, 2014, Plaintiff was indicted for second-degree criminal possession of a weapon in violation of N.Y. Penal Law § 265.03(1)(b).[4] (Dkt. No. 46-4, at 8–9).

4       A person is guilty of criminal possession of a weapon in the second degree under N.Y. Penal Law § 265.03(1)(b), a class C felony, when he possesses a loaded firearm "with intent to use the same unlawfully against another."

### C. Dismissal of Charges Against Plaintiff

Following the indictment, Plaintiff was imprisoned for one year at the Albany County Correctional Facility "without bail or any prospect of being released." (*Id.* at 6*)*. On August 18, 2014, Judge Breslin granted Plaintiff's unopposed renewed motion to dismiss the indictment against him, finding that Cornell's "testimony concerning identifications by witnesses was hearsay and not competent evidence" and as a result the evidence against Plaintiff "was not legally sufficient." (*Id.* at 10–11). On August 18, 2014, the indictment against Plaintiff was dismissed and sealed. (*Id.* at 11–12; Dkt. No. 46-1, ¶ 15). On September 21, 2014, Plaintiff was released from custody. (Dkt. No. 46-4, at 6).

### III. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

**\*4**  If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson,* 477 U.S. at 248, 250, 106 S.Ct. 2505; *see also Celotex,* 477 U.S. at 323–24, 106 S.Ct. 2548; *Wright v. Goord,* 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.,* 352 F.3d 775, 780 (2d Cir. 2003). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### IV. DISCUSSION

Defendants argue that summary judgment is proper on Plaintiff's false arrest claim because Defendants had "trustworthy facts and information" which established probable cause for his arrest. (Dkt. No. 46-2, at 5–8). The Court agrees.

To prevail on a Fourth Amendment false arrest claim, a plaintiff must establish that: "(1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Ackerson v. City of White Plains,* 702 F.3d 15, 19 (2d Cir. 2012) (citing *Broughton v. State,* 37 N.Y.2d 451, 456,

373 N.Y.S.2d 87, 335 N.E.2d 310 (1975)). "The existence of probable cause to arrest constitutes justification and 'is a complete defense to an action for false arrest.' " *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (quoting *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994)). Probable cause exists when an officer has "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Jaegly v. Couch*, 439 F.3d 149, 152 (2d Cir. 2006) (Sotomayor, J.) (quoting *Weyant*, 101 F.3d at 852). In analyzing probable cause, a court "must consider those facts *available to the officer* at the time of the arrest and immediately before it." *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006). A court "should look to the 'totality of the circumstances' and 'must be aware that probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules.' " *Id.* (quoting *Caldarola v. Calabrese*, 298 F.3d 156, 162 (2d Cir. 2002)).

"[I]t is well-established that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness," *id.* (quoting *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000)), unless the circumstances raise doubt as to the person's veracity. *Id.* (citing *Singer v. Fulton County Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995)); *Singer*, 63 F.3d at 119 ("An arresting officer advised of a crime by a person who claims to be the victim, and who has signed a complaint or information charging someone with the crime, has probable cause to effect an arrest absent circumstances that raise doubts as to the victim's veracity."). "The collective knowledge doctrine provides that, for the purpose of determining whether an arresting officer had probable cause to arrest, 'where law enforcement authorities are cooperating in an investigation, ... the knowledge of one is presumed shared by all.' " *Savino v. City of New York*, 331 F.3d 63, 74 (2d Cir. 2003) (quoting *Illinois v. Andreas*, 463 U.S. 765, 772 n.5, 103 S.Ct. 3319, 77 L.Ed.2d 1003 (1983)).

**\*5** In this case, the uncontested evidence shows that when Plaintiff was arrested, Defendants had the following information in their possession. Welcome (whom Plaintiff allegedly fired at), Dale, and Palmer—who were all present during the incident—provided officers with eyewitness accounts of the shooting and each identified Plaintiff from a photo array as the shooter. (Dkt. No. 46-8; Dkt. No. 46-16, at 2; Dkt. No. 46-15, at 2). *Singer*, 63 F.3d at 119; *Panetta*,

460 F.3d at 395; *Celestin v. City of New York*, 581 F. Supp. 2d 420, 431 (E.D.N.Y. 2008) ("A positive photo identification by an eyewitness is normally sufficient to establish probable cause to arrest."). Loyd also identified Plaintiff in a photo array and stated that she "heard from [her] family [Plaintiff] is responsible for the shooting." (Dkt. No. 46-17, at 2).

Moreover, the information provided by Welcome, Dale, and Palmer contained significant overlap. Welcome and Dale both stated that a fight had transpired directly before the shooting. (Dkt. No. 46-8; Dkt. No. 46-16, at 2). Welcome, Dale, and Palmer all stated that Plaintiff was outside the house and shot inside towards Welcome. (Dkt. Nos. 46-8, 46-15, 46-16). And Welcome identified the gun as a revolver, (Dkt. No. 46-8), which Dale corroborated when she described the gun used as "an old western style gun" that "had the wheel in it where the bullets go." (Dkt. No. 46-16, at 2). *Smith v. Ware*, No. 17-cv-5152, 2019 WL 2616194, at \*4, 2019 U.S. Dist. LEXIS 106897 (S.D.N.Y. June 26, 2019) (granting summary judgment on a plaintiff's false arrest claim where the defendant officer had testimony from three witnesses, "two of whom filed criminal complaints with the NYPD, and each of whom offered accounts of the scheme that corroborated the others' stories" and where the plaintiff did "nothing to establish that [the defendant] had any reason to doubt the veracity of any of these witnesses"). Clearly, Defendants were armed with "reasonably trustworthy information" that Plaintiff had committed a crime. *Jaegly*, 439 F.3d at 152 (quoting *Weyant*, 101 F.3d at 852), and nothing in the record "raise[s] doubt as to the [witnesses'] veracity." *Betts v. Shearman*, 751 F.3d 78, 82 (2d Cir. 2014) (quoting *Panetta*, 460 F.3d at 395).

Plaintiff's verified Amended Complaint alleges that these identifications are uncorroborated hearsay and are insufficient to establish probable cause. (Dkt. No. 46-4, at 6). This assertion is unpersuasive. "[A] police officer's judgment as to probable cause, unlike a criminal complaint, may be based on hearsay evidence, upon suspicious circumstances and upon probabilities." [5] *Velaire v. City of Schenectady*, 862 F. Supp. 774, 780 (N.D.N.Y. 1994). Here, no reasonable juror could conclude that the Defendants lacked probable cause to arrest Plaintiff. Accordingly, Defendants are granted summary judgment on Plaintiff's false arrest claims. [6]

5     To the extent Plaintiff asserts that his arrest was unconstitutional because Defendants did not "show [him] an arrest warrant," (Dkt. No. 46-4, at

4), that proposition likewise fails. "[T]he Fourth Amendment permits warrantless arrests in public places where an officer has probable cause to believe that a felony has occurred." *Fla. v. White,* 526 U.S. 559, 565, 119 S.Ct. 1555, 143 L.Ed.2d 748 (1999).

6  As there is no genuine, material dispute of fact as to whether Defendants violated Plaintiff's Fourth Amendment rights, the Court does not reach Defendants' qualified immunity argument. (Dkt. No. 46-5, at 9–10).

**V. CONCLUSION**
For these reasons, it is hereby

**ORDERED** that Defendants' Motion for Summary Judgment (Dkt. No. 46) is **GRANTED**; and it is further

**\*6  ORDERED** that the Amended Complaint (Dkt. No. 15) is **DISMISSED** in its **ENTIRETY**; and it is further

**ORDERED** that the Court Clerk is directed to close this case.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2020 WL 4365606

---

**End of Document**                                   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 921688
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Donna LAFEVER, Plaintiff,

v.

Brandon CLARKE, Daniel J. Sheehan, Ernest
R. Cutting, Jr., Ed White, Craig Hackett, Tracy
Rotundo, and Alleesha Shopa, Defendants.

3:17-CV-1206
|
Signed 03/11/2021

**Synopsis**
**Background:** Arrestee brought § 1983 action against
city police officers for false arrest and imprisonment,
unreasonable search and seizure, and excessive force, against
correctional officers employed by county sheriff's office for
false arrest and imprisonment, excessive force, and violation
of her rights to due process and equal protection, and against
county sheriff for municipal liability, alleging that police
officers used excessive force while falsely arresting her at
hotel and that correctional officers used excessive force when
they took custody of her at county jail. Arrestee thereafter
moved for partial summary judgment as to claims against
correctional officers and sheriff. Police officers moved for
summary judgment on all claims against them. Sheriff and
correctional officers also moved for summary judgment on all
claims against them.

**Holdings:** The District Court, David N. Hurd, J., held that:

[1] police officers had probable cause to arrest arrestee for
criminal trespass, and thus were not liable for false arrest;

[2] police officers' use of force while effecting arrest was
objectively reasonable in light of the facts and circumstances
confronting them;

[3] correctional officers' use of force in removing arrestee
from police cruiser, spraying her with pepper spray, and
taking her inside jail was objectively reasonable;

[4] correctional officers' use of force while subjecting arrestee
to decontamination shower was objectively reasonable;

[5] correctional officers' strip search of arrestee was not for
purpose of intimidation, harassment, or punishment, and thus
was not excessive force;

[6] sheriff was not personally involved in correctional
officers' alleged use of excessive force, and thus sheriff was
not liable under § 1983 in his individual capacity; and

[7] arrestee failed to establish that alleged deprivation of her
due process right to freedom from excessive use of force was
caused by county custom, policy, or usage, and thus failed to
establish that county and sheriff, in his official capacity, were
liable under § 1983.

Motion for partial summary judgment denied; motions for
summary judgment granted.

**Procedural Posture(s):** Motion for Summary Judgment.

West Headnotes (67)

**[1]** **Federal Civil Procedure** 🔑 Materiality and
genuineness of fact issue

An issue of fact is "material" for purposes of
summary judgment if it might affect the outcome
of the suit under the governing law.

**[2]** **Federal Civil Procedure** 🔑 Materiality and
genuineness of fact issue

A dispute of material fact is "genuine" for
purposes of summary judgment if the evidence is
such that a reasonable jury could return a verdict
for the nonmoving party.

**[3]** **Federal Civil Procedure** 🔑 Lack of cause of
action or defense

Summary judgment is inappropriate where a
review of the record reveals sufficient evidence
for a rational trier of fact to find in the non-
movant's favor.

**[4]**    **Civil Rights**  🗝  Good faith and reasonableness;  knowledge and clarity of law;  motive and intent, in general

The doctrine of "qualified immunity" shields defendants from liability for damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

**[5]**    **Civil Rights**  🗝  Government Agencies and Officers

**Civil Rights**  🗝  Good faith and reasonableness;  knowledge and clarity of law;  motive and intent, in general

To defeat qualified immunity a plaintiff must show that (1) the official violated a statutory or constitutional right (2) that was clearly established at the time of the challenged conduct.

**[6]**    **Civil Rights**  🗝  Good faith and reasonableness;  knowledge and clarity of law;  motive and intent, in general

In analyzing a claim of qualified immunity, the most helpful approach is to consider the constitutional question as being whether the officer made a reasonable mistake of fact, while the qualified-immunity question is whether the officer was reasonably mistaken about the state of the law.

**[7]**    **Civil Rights**  🗝  Good faith and reasonableness;  knowledge and clarity of law;  motive and intent, in general

At the second step of qualified-immunity analysis, i.e., whether the statutory or constitutional right allegedly violated by a public official was clearly established, a right is "clearly established" when the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right.

**[8]**    **Civil Rights**  🗝  Good faith and reasonableness;  knowledge and clarity of law;  motive and intent, in general

To be "clearly established" for purposes of qualified immunity, a rule must be "settled law," which means it is dictated by a controlling authority or a robust consensus of cases of persuasive authority.

**[9]**    **Civil Rights**  🗝  Good faith and reasonableness;  knowledge and clarity of law;  motive and intent, in general

The qualified-immunity clearly-established standard requires the settled law to be particularized to the facts of the case.

**[10]**    **Civil Rights**  🗝  Good faith and reasonableness;  knowledge and clarity of law;  motive and intent, in general

To help sharpen the qualified-immunity analysis, courts often break the second prong, i.e., whether the statutory or constitutional right allegedly violated by the defendant was clearly established, down into a pair of separate considerations: (a) whether the defendant's action violated clearly established law and, even if it did, (b) whether it was objectively reasonable for the defendant to believe that his action was nevertheless lawful at the time.

**[11]**    **Civil Rights**  🗝  Good faith and reasonableness;  knowledge and clarity of law;  motive and intent, in general

In determining whether a statutory or constitutional right allegedly violated by an officer was clearly established, if officers of reasonable competence could disagree on the legality of the action at issue in its particular factual context, the officer is still entitled to qualified immunity.

**[12]**    **Federal Civil Procedure**  🗝  By both parties

**Federal Civil Procedure** 🔑 **Presumptions**

Where the parties have cross-moved for summary judgment, a reviewing court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.

[13]   **Federal Civil Procedure** 🔑 **By both parties**

Where the parties have cross-moved for summary judgment, the district court is not required to grant judgment as a matter of law for one side or the other.

[14]   **Federal Civil Procedure** 🔑 **Hearing and Determination**

Properly supported facts set forth in city defendants' statement of material facts would be deemed admitted for purpose of assessing city defendants' motion for summary judgment in arrestee's § 1983 action alleging that city police officers used excessive force while falsely arresting her, where arrestee's counsel failed to respond to statement despite being warned about need to comply with local rule requiring response, arrestee's counsel had demonstrated workable understanding of said procedural requirement given that she submitted partially responsive statement of material facts in opposition to separate summary-judgment motion by different defendants, and counsel's failure was not corrected by belated filing or supplemental request, even after city defendants pointed it out. 42 U.S.C.A. § 1983; U.S.Dist.Ct.Rules N.D.N.Y., Rule 56.1(b).

[15]   **Federal Civil Procedure** 🔑 **Hearing and Determination**

The local rule requiring the party opposing summary judgment to file a response to the movant's statement of material facts is not just a pro forma requirement; to the contrary, the rule and other local rules governing summary judgment are essential tools intended to relieve the district court of the onerous task of hunting through voluminous records without guidance from the parties. U.S.Dist.Ct.Rules N.D.N.Y., Rule 56.1(b).

[16]   **Federal Civil Procedure** 🔑 **Hearing and Determination**

A proper response to the statement of material facts filed by the party moving for summary judgment, as required by the local rule governing summary judgment, streamlines the summary-judgment analysis by allocating responsibility for flagging genuine factual disputes on the participants ostensibly in the best position to do so: the litigants themselves. U.S.Dist.Ct.Rules N.D.N.Y., Rule 56.1(b).

[17]   **Federal Civil Procedure** 🔑 **Hearing and Determination**

Under the local rule governing summary-judgment procedure, the non-movant's response to the movant's statement of material facts must do three important things: (1) mirror the movant's statement by (2) admitting and/or denying each of the movant's assertions in a short and concise statement, in matching numbered paragraphs with (3) a specific citation to the record where the factual issue arises. U.S.Dist.Ct.Rules N.D.N.Y., Rule 56.1(b).

[18]   **Evidence** 🔑 **Information acted on by witness**
**Federal Civil Procedure** 🔑 **Hearing and Determination**

Assertion in correctional officers' statement of material facts that they were told by city police that pretrial detainee "was being uncooperative and that she had an unknown object in her hand" would be admitted for purposes of evaluating officers' motion for summary judgment on detainee's § 1983 excessive-force claim, where detainee's response did not include admission or denial or citation to record, as required by local rule, and although detainee alleged that assertion was hearsay, officers offered assertion for permissible, non-hearsay purpose, namely, that information received by

officers suggesting that detainee was physically combative and/or possessed unknown object informed reasonableness of their response to detainee's arrival at jail. 42 U.S.C.A. § 1983; U.S.Dist.Ct.Rules N.D.N.Y., Rule 56.1(b).

**[19]    Civil Rights ⚷ Arrest and detention**

A § 1983 excessive-force claim requires a pretrial detainee to show that the officers' use of force was objectively unreasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation; this is a fact-specific inquiry guided by considerations that include the severity of the security problem at issue, the threat reasonably perceived by the officer, and whether the plaintiff was actively resisting. 42 U.S.C.A. § 1983.

**[20]    Federal Civil Procedure ⚷ Hearing and Determination**

Paragraphs in correctional officers' statement of material facts describing what happened when they removed pretrial detainee from police officer's vehicle would be admitted for purposes of evaluating officers' motion for summary judgment on detainee's § 1983 excessive-force claim, where detainee's response failed to state whether she admitted or denied specific facts offered by officers, as required by local rule, and detainee's response instead offered her own narrative opinion about video recording of officers removing detainee from vehicle, which did not properly controvert officers' factual assertions about what happened. 42 U.S.C.A. § 1983; U.S.Dist.Ct.Rules N.D.N.Y., Rule 56.1.

**[21]    Federal Civil Procedure ⚷ Hearing and Determination**

Paragraphs in correctional officers' statement of material facts describing what happened when they brought pretrial detainee from intake area into jail, specifically, that detainee was taken to shower area for "decontamination" because she had been sprayed with "chemical agent" during intake and that detainee "continued to be both physically and verbally noncompliant," would be admitted for purposes of evaluating officers' motion for summary judgment on detainee's § 1983 excessive-force claim, where detainee's response admitted she was taken to shower area, but then went on to quote extensively from portions of affidavit she filed elsewhere, which did not amount to admission of denial of fact and thus was not actually responsive. 42 U.S.C.A. § 1983; U.S.Dist.Ct.Rules N.D.N.Y., Rule 56.1.

**[22]    Federal Civil Procedure ⚷ Civil rights cases in general**

**Federal Civil Procedure ⚷ Admissibility**

Video recording that pretrial detainee created, which depicted her looking into camera as she initiated telephone call with hotel manager who called police after detainee allegedly refused to vacate her room after her stay had expired, would not be considered for purposes of city defendants' and county defendants' motions for summary judgment in detainee's § 1983 action alleging defendants subjected her to false arrest and imprisonment and excessive force while arresting her and moving her into county jail, where recording was not made under oath and did not offer real-time window into events as they unfolded, but was instead detainee's post hoc recollection of some events and could not establish presence or absence of any genuine disputes over any material facts. 42 U.S.C.A. § 1983.

**[23]    Federal Civil Procedure ⚷ Matters considered**

Pretrial detainee abandoned all of her claims against city police officers arising from her arrest, with exception of her § 1983 false-arrest and excessive-force claims, where officers moved for summary judgment on all claims, but detainee only offered arguments concerning false-arrest and excessive-force claims. 42 U.S.C.A. § 1983.

**[24]    Federal Civil Procedure** 🔑 **Matters considered**

Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.

**[25]    Civil Rights** 🔑 **Arrest and detention**

A § 1983 false arrest claim is grounded in the Fourth Amendment right of an individual to be free from unreasonable seizures. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

**[26]    Civil Rights** 🔑 **Arrest and detention**

To establish a claim under § 1983 for false arrest a plaintiff must show that: (1) the defendant intended to confine the plaintiff; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the confinement was not otherwise privileged. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

**[27]    Civil Rights** 🔑 **Arrest and detention**

Arrestee's § 1983 false-arrest claim against police officers was barred by her guilty plea to harassment charge, although arrestee received conditional dismissal following her plea, where certificate of conviction/disposition indicated that arrestee "pled guilty" to offense. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

**[28]    Civil Rights** 🔑 **Arrest and detention**

Where a plaintiff alleging a § 1983 false-arrest claim has been convicted of at least one offense for which he was arrested, the conviction will generally foreclose the claim by serving as conclusive evidence of probable cause to arrest; this rule applies regardless of whether the conviction was after a trial or simply the result of a plea. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

**[29]    Civil Rights** 🔑 **Arrest and detention**

**Civil Rights** 🔑 **Sheriffs, police, and other peace officers**

To avoid liability for a claim of false arrest, an arresting officer may demonstrate that either (1) he had probable cause for the arrest, or (2) he is protected from liability because he has qualified immunity. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

**[30]    Arrest** 🔑 **What constitutes such cause in general**

A police officer has probable cause to arrest when he has knowledge of reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime. U.S. Const. Amend. 4.

**[31]    Arrest** 🔑 **Time of existence; after-acquired information**

The test for probable cause to arrest is an objective one and depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest. U.S. Const. Amend. 4.

**[32]    Arrest** 🔑 **Appearance, acts, and statements of persons arrested**

**Arrest** 🔑 **Arrested person's presence or association**

**Civil Rights** 🔑 **Arrest and detention**

Police officers had probable cause to arrest arrestee for criminal trespass, and thus were not liable for false arrest, where officers received information from hotel manager indicating that arrestee refused to vacate her room after her stay had expired, arrestee ignored officers' orders to vacate room, and arrestee herself acknowledged that she had overstayed her period of lawful occupancy and gotten into "heated debate" with

hotel staff over whether she had to leave. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983; N.Y. Penal Law § 140.05.

**[33]**   **Arrest**   Appearance, acts, and statements of persons arrested

**Civil Rights**   Arrest and detention

Police officers had probable cause to arrest arrestee for second-degree harassment, and thus were not liable for false arrest, where hotel manager called police to report that arrestee refused to vacate her room after her stay had expired, officers responded to call, and arrestee spoke in raised voice to manager and to officers and then made physical contact with one officers on more than one occasion. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983; N.Y. Penal Law § 240.26(1).

**[34]**   **Arrest**   Use of force

The Fourth Amendment prohibits the use of unreasonable and therefore excessive force by a police officer in the course of effecting an arrest. U.S. Const. Amend. 4.

**[35]**   **Civil Rights**   Arrest and detention

To succeed on a § 1983 excessive-force claim, a plaintiff must show that the defendant's use of force was objectively unreasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

**[36]**   **Civil Rights**   Arrest and detention

If the force used by a police officer in the course of effecting an arrest was unreasonable and excessive, the plaintiff may recover even if the injuries inflicted were not permanent or severe. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

**[37]**   **Arrest**   Use of force

The objective-reasonableness inquiry into whether a police officer used excessive force in the course of effecting an arrest is necessarily case and fact specific and requires balancing the nature and quality of the intrusion on the plaintiff's Fourth Amendment interests against the countervailing governmental interests at stake. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

**[38]**   **Arrest**   Use of force

Review of a § 1983 excessive-force claim is guided by consideration of at least three factors: (1) the nature and severity of the crime leading to the arrest, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

**[39]**   **Arrest**   Use of force

Importantly, a court considering a claim that a police officer used excessive force in the course of effecting an arrest must evaluate the record from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

**[40]**   **Arrest**   Use of force

In considering a claim that a police officer used excessive force in the course of effecting an arrest, it is important to make allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

**[41]**   **Arrest**   Use of force

Police receive a fairly wide zone of protection from excessive-force claims in close cases involving potential danger, emergency conditions, or other exigent circumstances. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

**[42]** **Civil Rights** 🔑 Criminal law enforcement; prisons

Evidence about the nature and extent of a plaintiff's injuries are not dispositive of an excessive-force claim. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

**[43]** **Arrest** 🔑 Use of force

The relevant legal analysis for an excessive-force claim depends not on a particular quantum of injury but on a showing of the objective reasonableness of the conduct. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

**[44]** **Civil Rights** 🔑 Criminal law enforcement; prisons

Evidence of a plaintiff's injury is relevant to an excessive-force claim because it is probative of the amount and type of force actually used by the arresting officers. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

**[45]** **Arrest** 🔑 Use of force

Police officers' use of force while effecting arrest was objectively reasonable in light of the facts and circumstances confronting them, where arrestee acted aggressively during entirety of police encounter and continuously physically resist officers' attempts to arrest her, resistance included punching and kicking one officer, thrashing her body around, and flailing her arms and legs, and arrestee continued to resist even after she was handcuffed. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

**[46]** **Arrest** 🔑 Use of force

The fact that a person whom a police officer attempts to arrest resists, threatens, or assaults the officer no doubt justifies the officer's use of some degree of force, but it does not give the officer license to use force without limit. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

**[47]** **Arrest** 🔑 Use of force

Clearly established law makes it impermissible to use significant force against a restrained arrestee who is not actively resisting. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

**[48]** **Constitutional Law** 🔑 Safety and security

**Prisons** 🔑 Use of force

Correctional officers' use of force in removing pretrial detainee from police cruiser, spraying her with pepper spray, and taking her inside jail was objectively reasonable, where officers were put on notice by police that detainee was being uncooperative and was in possession of unknown object, detainee refused officers' verbal commands to drop object, use of force was not gratuitous, degree of force used was reasonably related to officers' attempt to get detainee to drop object, use of force did not continue after plaintiff complied, and detainee did not suffer serious or lasting injury, and officers had legitimate nonpunitive governmental purpose for use of force, namely, that contraband items posed danger to health and safety of jail inmates, officers, and staff. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

**[49]** **Constitutional Law** 🔑 Threats, harassment, and use of force

The right not to be subject to excessive force, perhaps most commonly associated with the Fourth and Eighth Amendments, can also arise under the Fourteenth. U.S. Const. Amends. 4, 8, 14.

**[50]** **Constitutional Law** 🔑 Safety and security

The Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment. U.S. Const. Amend. 14.

**[51]    Constitutional Law** 🔑 Threats, harassment, and use of force

An officer's actions can amount to punishment, for purposes of an excessive-force claim under the Due Process Clause, if they are taken with an expressed intent to punish. U.S. Const. Amend. 14.

**[52]    Constitutional Law** 🔑 Safety and security

Even in the absence of an expressed intent to punish, a pretrial detainee can nevertheless prevail on an excessive-force claim under the Due Process Clause by showing that the actions are not rationally related to a legitimate nonpunitive governmental purpose or that the actions appear excessive in relation to that purpose. U.S. Const. Amend. 14.

**[53]    Constitutional Law** 🔑 Safety and security

The objective-reasonableness standard applicable to a pretrial detainee's excessive-force claim under the Due Process Clause should be applied from the perspective and with the knowledge of the defendant officer, and should account for factors such as the relationship between the need for the use of force and the amount of force used; the extent of the detainee's injury; any effort made by the officer to temper or limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the detainee was actively resisting. U.S. Const. Amend. 14.

**[54]    Constitutional Law** 🔑 Safety and security

In applying the objective-reasonableness standard to a pretrial detainee's excessive-force claim under the Due Process Clause, the factfinder must take account of the legitimate interests in managing a jail, acknowledging as

part of the objective reasonableness analysis that deference to policies and practices needed to maintain order and institutional security is appropriate. U.S. Const. Amend. 14.

**[55]    Constitutional Law** 🔑 Safety and security

**Prisons** 🔑 Use of force

Correctional officers' use of force while subjecting pretrial detainee to decontamination shower was objectively reasonable, where detainee was being physically and verbally noncompliant in shower area, use of force was not gratuitous, degree of force was reasonably related to attempt to gain compliance, use of force did not continue after detainee complied, and detainee did not suffer serious or lasting injury. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

**[56]    Constitutional Law** 🔑 Other particular conditions

**Prisons** 🔑 Search, seizure, and confiscation

Correctional officers' strip search of female pretrial detainee was not for purpose of intimidation, harassment, or punishment, and thus was not excessive force, where officers had legitimate penological interest for conducting search, i.e., to determine whether detainee possessed any contraband, female officers conducted search in shower area, away from any other inmates or male officers, and search itself was visual only. U.S. Const. Amends. 4, 14; 42 U.S.C.A. § 1983.

**[57]    Searches and Seizures** 🔑 Skin, strip, and body searches

A "strip search" is an inspection of a naked individual, without any scrutiny of the subject body's cavities.

**[58]    Searches and Seizures** 🔑 Skin, strip, and body searches

A strip search is distinguishable from a visual body cavity search, which extends to visual inspection of the anal and general areas, or a manual body cavity search, which includes some degree of touching or probing of body cavities.

**[59]**    **Prisons**  ⟜  Strip searches

**Prisons**  ⟜  Search, seizure, and confiscation

Strip searches of pre-trial detainees, as well as inmates, are constitutionally valid if they are reasonably related to a legitimate penological interest. U.S. Const. Amend. 4.

**[60]**    **Searches and Seizures**  ⟜  Skin, strip, and body searches

In determining the overall reasonableness of a strip search, courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted. U.S. Const. Amend. 4.

**[61]**    **Civil Rights**  ⟜  Criminal law enforcement; prisons

County sheriff was not personally involved in county correctional officers' alleged use of excessive force against pretrial detainee, and thus sheriff was not liable under § 1983 in his individual capacity. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

**[62]**    **Civil Rights**  ⟜  Vicarious liability and respondeat superior in general; supervisory liability in general

**Civil Rights**  ⟜  Complaint in general

A supervisor may not be held liable under § 1983 merely because his subordinate committed a constitutional tort; instead, a plaintiff must plead and prove that each government-official defendant, through the official's own individual actions, has violated the Constitution. 42 U.S.C.A. § 1983.

**[63]**    **Civil Rights**  ⟜  Criminal law enforcement; prisons

Pretrial detainee, who was strip searched during jail-intake process, failed to establish that alleged deprivation of her due process right to freedom from excessive use of force was caused by county custom, policy, or usage, and thus failed to establish that county and county sheriff, in his official capacity, were liable under § 1983, notwithstanding detainee's argument that county and sheriff failed to provide adequate training or guidelines to county correctional officers about how to avoid constitutional violations when strip-searching pretrial detainees, where detainee failed to establish any viable § 1983 claims against individual correctional officers who searched her or against sheriff in his individual capacity. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

**[64]**    **Civil Rights**  ⟜  Acts of officers and employees in general; vicarious liability and respondeat superior in general

Unlike state tort law, a municipality cannot be held liable under § 1983 merely because it happened to employ the alleged tortfeasor. 42 U.S.C.A. § 1983.

**[65]**    **Civil Rights**  ⟜  Liability of Municipalities and Other Governmental Bodies

Under § 1983, local governments are responsible only for their own illegal acts. 42 U.S.C.A. § 1983.

**[66]**    **Civil Rights**  ⟜  Governmental Ordinance, Policy, Practice, or Custom

To establish municipal liability under § 1983, a plaintiff must demonstrate that the deprivation of his constitutional right was caused by a governmental custom, policy or usage of the municipality. 42 U.S.C.A. § 1983.

[67]   **Civil Rights**  🔑  Governmental Ordinance, Policy, Practice, or Custom

**Civil Rights**  🔑  Lack of Control, Training, or Supervision;  Knowledge and Inaction

*Monell*, which held that a municipality may be held liable under § 1983 if a plaintiff can demonstrate that the constitutional violation was caused by a municipal policy or custom, does not provide a separate cause of action for the failure by the government to train its employees; it extends liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation. 42 U.S.C.A. § 1983.

**Attorneys and Law Firms**

W. ANDREW MCCULLOUGH, ATTORNEY AT LAW, OF COUNSEL: WILLIAM A. MCCULLOUGH, ESQ., Attorneys for Plaintiff, 6885 South State Street, Suite 200, Midvale, UT 84047.

OF COUNSEL: GREGG T. JOHNSON, ESQ., APRIL J. LAWS, ESQ., COREY A. RUGGIERO, ESQ., LORAINE CLARE JELINEK, ESQ., JOHNSON LAWS, LLC, Attorneys for Defendants Brandon Clarke and Daniel J. Sheehan, 646 Plank Road, Suite 205, Clifton Park, NY 12065.

OF COUNSEL: FRANK W. MILLER, ESQ., CHARLES C. SPAGNOLI, ESQ., OFFICE OF FRANK W. MILLER, Attorneys for Defendants Brandon Clarke, Daniel J. Sheehan, Ernest R. Cutting, Jr., Ed White, Craig Hackett, Tracy Rotundo, and Alleesha Shopa, 6575 Kirkville Road, East Syracuse, NY 13057.

**MEMORANDUM-DECISION and ORDER**

DAVID N. HURD, United States District Judge

**TABLE OF CONTENTS**

\*1  I. INTRODUCTION...——

II. BACKGROUND...——

A. Arrest at the Hotel...——

B. Booking at the Police Station...——

C. Intake at the County Jail...——

III. LEGAL STANDARDS...——

A. Summary Judgment...——

B. Qualified Immunity...——

IV. DISCUSSION...——

A. Threshold Matters...——

  1. The City Defendants' Statement of Facts...——

  2. The County Defendants' Statement of Facts...——

    i. Paragraph Nine...——

    ii. Paragraphs Twelve Through Sixteen...——

    iii. Paragraphs Eighteen and Nineteen...——

  3. LaFever's Declarations...——

  4. The Video Evidence...——

B. The Merits...——

  1. The City Defendants...——

    i. False Arrest...——

    ii. Excessive Force...——

  2. The County Defendants...——

    i. Remaining Claims...——

      a. The Jail Intake Video...——

      b. The Decontamination Shower...——

      c. The Strip Search...——

      d. Municipal Liability...——

  3. The Remaining Doe...——

V. CONCLUSION...——

# I. INTRODUCTION

On October 31, 2017, plaintiff Donna LaFever ("LaFever" or "plaintiff") filed this 42 U.S.C. § 1983 action against defendants City of Norwich, New York ("Norwich" or the "City"), Norwich Police Chief Rodney V. Marsh ("Chief Marsh"), Norwich Police Officer Brandon Clarke ("City Officer Clarke"), Norwich Police Officer Daniel Sheehan ("City Officer Sheehan"), and a group of John and Jane Does (the "Does") employed by the Chenango County (the "County") Sheriff's Office at the County Jail (the "County Jail" or the "Jail").

LaFever's complaint alleged that City Officer Clarke and City Officer Sheehan used excessive force while falsely arresting her at the Howard Johnson's Hotel in Norwich, New York. Dkt. No. 1. The complaint further alleged that the Does used excessive force when they took custody of her at the County Jail. *Id.*

On December 6, 2017, LaFever amended her complaint to add County Sheriff Ernest R. Cutting, Jr. ("Sheriff Cutting") as a named defendant. Dkt. No. 5. Thereafter, plaintiff amended her complaint to identify four of the Does: County Jail Corrections Officers Craig Hackett ("County Officer Hackett"), Tracy Rotundo ("County Officer Rotundo"), Ed White ("County Officer White"), and Alleesha Shopa ("County Officer Shopa"). Second Am. Compl., Dkt. No. 34. A single Doe defendant remained unidentified. *Id.*

LaFever's nine-count second amended complaint asserts § 1983 claims against City Officers Clarke and Sheehan for false arrest and imprisonment (Second Cause of Action), unreasonable search and seizure (Third Cause of Action), and excessive force (Fifth Cause of Action). The second amended complaint also asserts § 1983 claims against County Officers Hackett, Rotundo, White, Shopa, and the Doe for false arrest and imprisonment (Second Cause of Action), excessive force (Fourth Cause of Action), and a violation of her rights to due process and equal protection (Seventh Cause of Action). Finally, the second amended complaint asserts § 1983 municipal liability claims against the City and the County (Eighth Cause of Action). [1]

[1]   In her First Cause of Action, LaFever improperly asserts a freestanding claim for relief under 42 U.S.C. § 1983. Second Am. Compl. ¶¶ 55-62. Plaintiff also skips a Sixth Cause of Action entirely; instead, she labels two sequential causes of action

as her "Eighth." *Compare id.* ¶¶ 112-15 (Eighth Cause of Action), *with id.* ¶¶ 116-20 (Eighth Cause of Action). The second of these "eighth" causes of action is just asking for damages and is better understood as part of the operative pleading's *ad damnum* clause.

**\*2**  On May 3, 2019, LaFever moved for partial summary judgment under Federal Rule of Civil Procedure ("Rule") 56. Dkt. No. 71. [2] According to plaintiff, surveillance video from the receiving area of the County Jail establishes that the conduct of County Officers Hackett, Rotundo, White, Shopa, and the Doe amounts to excessive force as a matter of law. Dkt. No. 71-4. Plaintiff further argues that she is entitled to summary judgment on her municipal liability claim against the County. *Id.*

[2]   LaFever initially filed this motion on February 6, 2019, Dkt. No. 57, but it was denied without prejudice to renew because she had failed to comply with the Local Rules governing dispositive motion practice in this District, Dkt. No. 70.

On June 28, 2019, the City, Chief Marsh, City Officer Clarke, and City Officer Sheehan (collectively the "City defendants") moved for summary judgment on all of the claims LaFever asserted against them. Dkt. No. 79. According to the City defendants, other video evidence and testimony from the hotel's manager conclusively establishes that both officers acted reasonably in arresting plaintiff after she pushed and shoved them and refused to leave the hotel. Dkt. No. 79-14.

On June 30, 2019, Sheriff Cutting and County Officers Hackett, Rotundo, White, and Shopa (collectively the "County defendants") also moved for summary judgment on all of the claims LaFever asserted against them. Dkt. No. 80. According to the County defendants, they acted reasonably in using a modest degree of force on her at the County Jail because she was physically resistant and ignored commands to drop an unknown object. Dkt. No. 80-16.

On August 20, 2019, LaFever stipulated to the discontinuance of her claims against the City and Chief Marsh. Dkt. No. 87. The remaining matters have been fully briefed and will be considered on the basis of the submissions without oral argument.

# II. BACKGROUND

LaFever is a California resident who, during the time period relevant here, was engaged to Ronald Busbee ("Busbee"). Second Am. Compl. ¶¶ 1, 10. Plaintiff and her fiancé had come to New York to visit relatives in Chenango County. *See* County Defs.' Rule 7.1(a)(3) Statement ("County Facts"), Dkt. No. 80-2. They stayed in Room 204 at the Howard Johnson's Hotel, which is located at 75 North Broad Street in Norwich. City Defs.' Rule 7.1(a)(3) Statement ("City Facts"), Dkt. No. 79-15 3.

On November 30, 2015, LaFever and her fiancé were scheduled to check out of the hotel room. City Facts ¶ 3. They had not booked another night. *Id.* ¶ 4. For some reason, though, plaintiff called hotel manager Katherine Babcock ("Babcock") and told her that she refused to leave the hotel room. [3] *Id.* ¶¶ 1, 6–7. The conversation got heated, plaintiff continued to refuse to vacate the room, and eventually she told Babcock to "call the cops." *Id.* ¶¶ 7–9.

[3]  According to plaintiff, this was the hotel's mistake —they'd double-booked the room. LaFever County Dep., Ex. B to White Aff., Dkt. No. 80-10 at 61:3– 61:13. Plaintiff testified that Babcock offered to move her to a different room in the hotel, but plaintiff refused because her room had "a jacuzzi" and other "amenities that we wanted." *Id.* at 64:16– 64:23.

### A. Arrest at the Hotel

Hotel management called LaFever's bluff. They telephoned the Norwich Police Department ("Norwich PD") and requested assistance with "a guest refusing to vacate the hotel room after her scheduled stay had expired." City Facts ¶¶ 10– 12. City Officer Clarke and City Officer Sheehan responded to the hotel's call for help. *Id.* ¶ 13. The two officers showed up in uniform and a marked Norwich PD police cruiser. *Id.* ¶¶ 14–15.

 **\*3**  Babcock led the officers to LaFever's hotel room. City Facts ¶ 16. City Officer Clarke knocked on the door and requested identification from plaintiff. *Id.* ¶¶ 17–18. Plaintiff refused to provide any; instead, she shut the door on City Officer Clarke. *Id.* ¶¶ 21–22. Plaintiff then began arguing with the officers through the hotel room door, telling them that her refusal to leave the hotel was "none of your business." *Id.* ¶¶ 23–24.

After some back and forth, LaFever opened the door to the hotel room and, ignoring the officers, began talking directly to

Babcock in a "raised" voice. City Facts ¶¶ 25–26. City Officer Clarke gave plaintiff "multiple orders" to vacate the room. *Id.* ¶ 27. Plaintiff ignored him. *Id.* ¶ 28.

LaFever soon turned her attention away from Babcock and toward City Officer Clarke, addressing him in an "aggressive manner." City Facts ¶ 30. With the two officers still standing in the doorway to the hotel room, plaintiff tried multiple times to push past them. *Id.* ¶¶ 31–35. On her second attempt, plaintiff shoved City Officer Clarke on his right side. *Id.* ¶¶ 36–37.

The two officers decided to arrest LaFever for harassment based on the physical contact she had made with City Officer Clarke. City Facts ¶ 38. They told plaintiff she was under arrest. *Id.* ¶ 38. Then they tried to put her in handcuffs. *Id.* ¶ 39. Plaintiff resisted. *Id.* ¶¶ 40–41. She punched and kicked City Officer Clarke. *Id.* ¶¶ 42–43, 46–47. She also thrashed her body around and flailed her arms and legs. *Id.* ¶¶ 44–45. Both officers directed her to calm down, but she continued to resist. *Id.* ¶¶ 48–54. Plaintiff screamed obscenities and made statements that both officers perceived as threatening. *Id.* ¶¶ 55–57.

Eventually, the two officers managed to place LaFever in handcuffs. City Facts ¶ 58. But she continued to resist as they tried to escort her to the police cruiser. *Id.* ¶ 58. Plaintiff refused to walk, leaned her body against the police car, and tried to prevent City Officer Clarke from putting her in the backseat of the vehicle. *Id.* ¶¶ 59–62. Babcock, the hotel manager, witnessed these events, *id.* ¶¶ 63–64, but Busbee, plaintiff's fiancé, did not arrive until after the incident had ended, *id.* ¶¶ 65–66.

### B. Booking at the Police Station

After they got her into the police car, City Officers Clarke and Sheehan transported LaFever to the Norwich police station so they could complete some paperwork about the arrest. *See* City Facts ¶¶ 71–72, 77. Plaintiff made "alarming" and "threatening" statements to the officers during this trip. *Id.* ¶¶ 71–74. Surveillance camera footage offered by the City defendants shows that plaintiff was taken inside the police station and handcuffed to a chair in an open booking area. Ex. A to Jelinek Decl., Dkt. No. 79-1 ("Police Station Booking Video" or the "Booking Video") (conventionally filed with the Court).

LaFever did not have any obvious injuries as a result of her arrest. City Facts ¶¶ 75–76; *see also* Police Station Booking

Video. And plaintiff never requested medical attention or claimed that she was injured while she was in Norwich PD's custody. City Facts ¶¶ 114–15. However, the Booking Video does show plaintiff acting in an agitated manner. *Id.* ¶¶ 80–98; *see generally* Police Station Booking Video.

For instance, the footage shows LaFever almost immediately begin arguing with the duty officer, launching into an extended recitation of her version of events and an explanation of why she is innocent. Police Station Booking Video at 12:26:45–12:27:10, 12:28:13–12:38:40.[4] At one point, plaintiff stands on the chair and performs some kind of extended stretching exercise. *Id.* at 12:27:49–12:28:08.

[4]     The Booking Video has a hardcoded timestamp that differs from the runtime of the media file itself. The specific timestamp citations found in this opinion are to the former.

**\*4** After an officer adjusts LaFever's handcuffs, she calms down and begins answering questions about her pedigree information. *See* Police Station Booking Video at 12:38:40. Importantly, though, plaintiff refuses the officer's request to hand over a small crystal necklace because she does "witchcraft" and believed "demons [would] come" if she gave it up. City Facts ¶ 99. However, plaintiff did not tell anyone that it was a religious symbol or discuss her religious affiliation with the officers. *Id.* ¶¶ 101–02.

When the duty officer leaves the booking area, the Police Station Booking Video shows LaFever slip out of her handcuffs and begin doing handstands against the wall. *See, e.g.*, Booking Video at 12:50:45. She also does a split and performs some yoga moves. *Id.* at 12:51:25. She eventually tries to leave the booking area, but finds the door is locked. *Id.* at 12:51:50. Unable to leave, she writes some messages on the dry-erase whiteboard hanging on the wall.[5] *Id.* at 12:53:02. Finally, two officers return and handcuff plaintiff more securely to a nearby chair. *Id.* at 12:56:49–12:57:07.

[5]     The City defendants have included as an exhibit a picture of the text on the whiteboard, which reads as "the officer will c me in his dream ..". Ex. G to Jelinek Decl., Dkt. No. 79-9.

LaFever's detention at the Norwich police station lasted about an hour. *See generally* Police Station Booking Video. The officers charged plaintiff with second-degree harassment for making physical contact with City Officer Clarke.

City Facts ¶ 105. Thereafter, the officers left the booking area with plaintiff and transported her to an arraignment proceeding before Norwich City Judge James E. Downey. *Id.* ¶ 106. Plaintiff continued to be uncooperative and physically combative. *Id.* ¶ 103. Judge Downey remanded plaintiff to the County Jail. *Id.* ¶ 107. Plaintiff's "defiant and combative behavior continued" as City Officer Sheehan transported her to the Jail in his police cruiser. *Id.* ¶¶ 108–09.

### C. Intake at the County Jail

Norwich PD had phoned ahead to County Officer Hackett to warn him that LaFever "was being uncooperative and that she had an unknown object in her hand." County Facts ¶ 9. Upon arrival, County Officers Hackett, Rotundo, White, and Shopa forcefully removed plaintiff from the vehicle. County Facts ¶ 13; Ex. 2 to Pl.'s Mot. for Summ. J., Dkt. No. 71-6 ("Jail Intake Video") (conventionally filed with the Court).

LaFever tried to pull away from the County Officers and refused commands to drop the object in her hands. County Facts ¶ 13. The County Officers took plaintiff down to the ground. *Id.* ¶ 13. Because she continued to refuse their commands, County Officer Hackett "applied a one second burst of chemical agent to [plaintiff's] head area." *Id.* ¶ 14. Plaintiff finally dropped the object, which turned out to be the crystal necklace that she had refused to give up at the Norwich police station.

Thereafter, County Officers Shopa and Rotundo escorted LaFever inside the Jail and searched her for contraband. County Facts ¶ 17. They took plaintiff to the shower area for "decontamination from exposure to the chemical agent." *Id.* ¶ 18. Plaintiff was also strip-searched. *Id.* ¶ 20.

Finally, LaFever was taken to a holding cell, where she was seen by Nurse Locke. County Facts ¶ 22. Plaintiff had no apparent injuries and did not report any injuries or medical problems to Nurse Locke. *Id.* ¶ 23. Plaintiff was eventually released on bail. *Id.* ¶ 24. She later pleaded guilty to second-degree harassment. City Facts ¶ 110.

## III. LEGAL STANDARDS

### A. Summary Judgment

**\*5** **[1]** **[2]** The entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). An issue of fact is

material for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). And a dispute of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

 [3] In assessing whether there are any genuine disputes of material fact, "a court must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party." *Ward v. Stewart*, 286 F. Supp. 3d 321, 327 (N.D.N.Y. 2017) (citation omitted). Summary judgment is inappropriate where a "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (citation omitted).

### B. Qualified Immunity

 [4] The doctrine of qualified immunity shields defendants from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).

 [5] Under the two-step framework articulated by the Supreme Court in *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), to defeat qualified immunity a plaintiff must show that (1) the official violated a statutory or constitutional right (2) that was "clearly established" at the time of the challenged conduct. *Francis v. Fiacco*, 942 F.3d 126, 139 (2d Cir. 2019).

 [6] As the Third Circuit has explained, "the most helpful approach is to consider the constitutional question as being whether the officer made a reasonable mistake of fact, while the qualified immunity question is whether the officer was reasonably mistaken about the state of the law." *Curley v. Klem*, 499 F.3d 199, 214 (3d Cir. 2007).

Importantly, though, in *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009), the Supreme Court held that the lower courts can "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236, 129 S.Ct. 808. In other words, since *Pearson* was decided "lower courts have had the option to proceed directly to step two of the analysis

and, if they find that qualified immunity applies, avoid the unnecessary litigation of constitutional issues at step one." *Francis*, 942 F.3d at 137 (cleaned up).

 [7] At this second step, "[a] right is clearly established when the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Dancy v. McGinley*, 843 F.3d 93, 106 (2d Cir. 2016) (cleaned up).

 [8]  [9] To be clearly established, the rule must be "settled law," which means it is dictated by a "controlling authority" or a "robust consensus of cases of persuasive authority." *Wesby*, 138 S. Ct. at 589 (cleaned up). This "clearly established" standard also requires the settled law to be "particularized" to the facts of the case. *White v. Pauly*, ––– U.S. ––––, 137 S. Ct. 548, 552, 196 L.Ed.2d 463 (2017).

*Saucier*'s step two inquiry has proven challenging in practice. *See, e.g., Morrow v. Meachum*, 917 F.3d 870, 874 (5th Cir. 2019) ("The second question—whether the officer violated clearly established law—is a doozy."); *Stephenson v. Doe*, 332 F.3d 68, 80 n.15 (2d Cir. 2003) ("Qualified immunity is a difficult concept; it looks to the reasonableness of an officer's belief that he acted lawfully after the officer is found to have been unreasonable in his conduct.").

 **\*6**  [10] To help sharpen the analysis, courts often break the second prong down into a pair of separate considerations: (a) whether the defendant's action violated clearly established law and, even if it did, (b) whether it was objectively reasonable for the defendant to believe that his action was nevertheless lawful at the time. *Garcia v. Does*, 779 F.3d 84, 92 (2d Cir. 2015); *see also Taravella v. Town of Wolcott*, 599 F.3d 129, 134 (2d Cir. 2010) (framing the latter component of this inquiry as "whether a reasonable official would reasonably believe his conduct did not violate a clearly established right").

 [11] Put differently, "if officers of reasonable competence could disagree on the legality of the action at issue in its particular factual context," the officer is still entitled to qualified immunity. *Dancy*, 843 F.3d at 106 (cleaned up); *see also Philip v. Cronin*, 537 F.3d 26, 34 (1st Cir. 2008) ("[E]ven if a constitutional right is clearly established, the defendant is entitled to qualified immunity so long as a reasonable official in [the defendant's] position could believe, albeit mistakenly, that his conduct did not violate the [law].").

## IV. DISCUSSION

There are three motions pending: (1) the City defendants' motion for summary judgment; (2) the County defendants' motion for summary judgment; and (3) LaFever's motion for partial summary judgment.

[12]   [13]   "Where, as here, the parties have cross-moved for summary judgment, a reviewing court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *United States v. Bedi*, 453 F. Supp. 3d 563, 570 (N.D.N.Y. 2020) (cleaned up). "In undertaking this analysis, it bears noting that a district court is not required to grant judgment as a matter of law for one side or the other." *Id.*

### A. Threshold Matters

As is too often the case with summary judgment briefing, there is some housekeeping to do before reaching the merits.

### 1. The City Defendants' Statement of Facts

[14]   To begin with, the properly supported material facts set forth in the City defendants' Local Rule 7.1(a)(3) Statement will be deemed admitted for the purpose of assessing whether the City defendants' motion for summary judgment should be granted or denied. Dkt. No. 79-15.

This is so because LaFever's counsel has failed to properly dispute the facts asserted in this document. *See generally* Dkt. No. 89. Under the Local Rules, the party opposing summary judgment is obligated to file a response to the movant's Statement of Material Facts. N.D.N.Y. L.R. 7.1(a) (3) (2020 ed.) ("The opposing party shall file a response to the Statement of Material Facts."). [6]

[6]   The 2020 version of the Local Rules were in effect at the time these motions were filed. Effective January 1, 2021, Local Rule 7.1(a)(3) was restyled as Local Rule 56.1. The substance of the Rule is mostly unchanged. As relevant here, however, the Rule has been amended to make the consequences imposed in the event of a procedural deficiency a discretionary question for the Court to decide. *Compare* Local Rule 7.1(a)(3) (2020 ed.) ("The Court shall deem admitted ...."), *with* Local

Rule 56.1(b) (2021 ed.) ("The Court may deem admitted ....").

[15]   This is not just a *pro forma* requirement. *Frantti v. New York*, 414 F. Supp. 3d 257, 284 (N.D.N.Y. 2019) ("The responding Statement of Material Facts is not a mere formality."). "To the contrary, this and other local rules governing summary judgment are essential tools intended to relieve the district court of the onerous task of hunting through voluminous records without guidance from the parties." *Id.* (cleaned up).

*7   [16]   [17]   A proper response to a movant's statement of material facts streamlines the summary judgment analysis "by allocating responsibility for flagging genuine factual disputes on the participants ostensibly in the best position to do so: the litigants themselves." *Alke v. Adams*, 2018 WL 5297809, at *2 (N.D.N.Y. Oct. 25, 2018), *aff'd*, 826 F. App'x 4 (2d Cir. 2020) (summary order). To that end, the non-movant's response must do three important things:

> It must (1) "mirror the movant's Statement of Material Facts" by (2) "admitting and/or denying each of the movant's assertions in a short and concise statement, in matching numbered paragraphs" with (3) "a specific citation to the record where the factual issue arises."

*Crawley v. City of Syracuse*, —— F. Supp. 3d ——, ——, 2020 WL 6153610, at *5 (N.D.N.Y. Oct. 21, 2020) (quoting N.D.N.Y. L.R. 7.1(a)(3) (2020 ed.)).

LaFever did not comply with this Local Rule. [7]   In fact, plaintiff did not file any responsive statement whatsoever to the City defendants' Statement of Material Facts. *See generally* Dkt. No. 89. Plaintiff's failure is particularly galling for three reasons.

[7]   For some reason, litigants routinely fail to get this right. *See, e.g.*, *Crawley*, —— F.Supp.3d at ——, 2020 WL 6153610, at *5 (deeming certain of movant's facts admitted where non-movant failed to comply with the Local Rule); *Frantti*, 414 F. Supp. 3d at 285 (same); *Carter v. Broome County*, 394 F. Supp. 3d 228, 238-39 (N.D.N.Y. 2019) (faulting both parties for injecting unnecessary confusion into the briefing); *Alke*, 2018 WL 5297809, at *1–*3 (admonishing non-movant for failing to include responsive statement of material facts).

First, LaFever was previously warned about the need to comply with the Local Rules governing dispositive motion practice in this District. As mentioned *supra* in footnote two, plaintiff's motion for partial summary judgment was initially denied without prejudice to renew because, as the Court's text order explained, plaintiff had "failed to comply with Local Rule 7.1(a)." Dkt. No. 70. In short, plaintiff was on notice of the relevant Local Rule.

Second, LaFever's counsel has demonstrated a workable understanding of this exact procedural requirement. In her opposition to the County defendants' *separate* motion for summary judgment, plaintiff actually submitted a partially responsive statement of material facts "pursuant to Local Rule 7.1." Dkt. No. 90-2. That filing has shortcomings that will be discussed *infra*, but it is a better approach than not filing a response at all.

Third, the City defendants pointed out LaFever's lack of a proper responsive statement of material facts in their reply memorandum. City Defs.' Reply, Dkt. No. 98-2 at 6-9. [8] So even if plaintiff's error started out as an innocent oversight, it is one that has been left uncorrected by a belated filing or even a supplemental request.

[8] Pagination corresponds to CM/ECF.

There is really no excuse for this mistake. "[T]he requirement that a non-movant submit a responsive statement of material facts in connection with its opposition to summary judgment is not the sort of newfangled procedural requirement that might reasonably be expected to trip up an unsuspecting-but-well-intentioned litigant." *Alike*, 2018 WL 5297809, at *2. "Just the opposite, in fact: the party-driven procedure for identifying factual disputes that is set forth in Local Rule 7.1(a)(3) mirrors the practice adopted by every single federal judicial district in the Second Circuit." *Id.* (collecting citations to local rules). [9]

[9] The address of record for LaFever's counsel is in Utah. The District of Utah has its own version of this procedural requirement. *See* DUCivR 56-1(c)(3).

**\*8** Thus, for these three reasons, the properly supported facts set forth in the City defendants' Local Rule 7.1(a)(3) Statement shall be deemed admitted for the purpose of assessing the City defendants' motion for summary judgment. *See* FED. R. CIV. P. 56(e)(2) (permitting the court to consider improperly supported or inadequately addressed facts as undisputed for the purpose of summary judgment).

### 2. The County Defendants' Statement of Facts

As noted, LaFever did file a response to the County defendants' separate Local Rule 7.1(a)(3) Statement. Dkt. No. 90-2. This filing is at least nominally in accordance with the relevant Local Rule. *Id.* But there are a few aspects of this responsive filing that have made a proper summary judgment analysis more challenging than it needs to be.

#### i. Paragraph Nine

[18] The first is a problem with LaFever's response to paragraph nine of the County defendants' Statement of Material Facts, which asserts that:

> 9. Defendant Hackett was told by Officer Burdick of the Norwich P.D. that Plaintiff was being uncooperative and that she had an unknown object in her hand. (Def. Hackett Resp. Interrog. ¶5; Aff. of Def. Hackett in Supp. ¶7).

County Facts ¶ 9. Plaintiff's response is as follows:

> 9. That statement is hearsay and inadmissible. Plaintiff has no idea what Officer Burdick told anyone.

Pl.'s Response to County Facts, Dkt. No. 90-2 ¶ 9.

This response does not conform to Local Rule 7.1(a)(3). First, it does not include an admission or a denial. *Id.* Second, there is no citation to the record that might establish a factual dispute. *See, e.g.*, *Davis v. City of Syracuse*, 2015 WL 1413362, at *2 (N.D.N.Y. Mar. 27, 2015) (Suddaby, J.) ("[D]enials of fact that are based on a lack of personal knowledge, mere information or belief, and/or inadmissible evidence are insufficient to create a genuine dispute."). Third, this is not the proper place to raise an evidentiary objection. *Attenborough v. Constr. & Gen. Bldg. Laborers' Local 79*, 691 F. Supp. 2d 372, 383 (S.D.N.Y. 2009) ("The law is clear that 'blanket denials,' wholesale evidentiary objections,

and counterstatements unsupported by any citations are insufficient to create genuine issues of material facts.").

These failures might not matter if LaFever's response to paragraph nine happened to be correct on the law. FED. R. CIV. P. 56(c)(2); *see also Soto v. City of N.Y.*, 132 F. Supp. 3d 424, 434 (E.D.N.Y. 2015), ("[H]earsay evidence may not be used to support a motion for summary judgment ...."). But they matter in this instance because the County defendants have offered the fact found in paragraph nine for a permissible, non-hearsay purpose.

LaFever's excessive force claim against the County Officers is based in part on her forceful removal from City Officer Sheehan's police cruiser when she arrived at the County Jail. *See, e.g.*, Pl.'s Response to County Facts ¶ 11 ("Plaintiff was met at the intake area by the several Defendants and pounced upon without ANY discussion of ANYthing." (emphases in original)).

 **[19]**  A § 1983 excessive force claim requires a pretrial detainee to show that the officers' use of force was "objectively unreasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Hulett v. City of Syracuse*, 253 F. Supp. 3d 462, 494 (N.D.N.Y. 2017); *see also Kingsley v. Hendrickson*, 576 U.S. 389, 397, 135 S.Ct. 2466, 192 L.Ed.2d 416 (2015) (explaining that a pretrial detainee's excessive force claim is measured by roughly the same objective standard of reasonableness).

 **\*9**  This is a fact-specific inquiry guided by considerations that include "the severity of the security problem at issue," "the threat reasonably perceived by the officer," and "whether the plaintiff was actively resisting." *Kingsley*, 576 U.S. at 397, 135 S.Ct. 2466. To that end, information received by the County defendants from another law enforcement official tending to suggest that LaFever was still being physically combative and/or was in possession of an unknown object would necessarily inform the reasonableness of their response to plaintiff's arrival at the County Jail.

In short, LaFever has not placed the assertion of fact found in paragraph nine in genuine dispute. Accordingly, paragraph nine will be deemed admitted for the purpose of evaluating the County defendants' motion for summary judgment.

### ii. **Paragraphs Twelve Through Sixteen**

 **[20]**  The other glaring problem is found in LaFever's response to paragraphs twelve through sixteen of the County defendants' Statement of Material Facts. There, defendants offer their description of what happened when the County Officers removed plaintiff from Officer Sheehan's vehicle. According to the County defendants, plaintiff (1) refused her verbal commands to drop the object in her hands, (2) was taken to the ground, (3) continued to refuse to comply, and was eventually (4) sprayed with a short burst of pepper spray or mace, which (5) caused her to drop the object. County Facts ¶¶ 12–16.

In response, LaFever begins with a rambling complaint about the County defendants' alleged failure to fulfill their discovery obligations in connection with the Jail Intake Video. Pl.'s Response to County Facts ¶ 12. It should go without saying, but there are judicial mechanisms in place that allow litigants to air that kind of discovery dispute prior to dispositive motion practice. Plaintiff did not pursue those mechanisms, and the time in which to do so has long passed. [10]

 [10]    For reasons discussed *infra*, the Court will independently consider the video evidence offered by plaintiff.

LaFever's response also fails to state whether she admits or denies the specific facts offered by the County defendants in these paragraphs. *See* Pl.'s Response to County Facts ¶¶ 12–16. Requiring a party to admit or deny each fact offered by a movant is not an onerous procedural requirement. Plaintiff's counsel has demonstrated an understanding of this requirement elsewhere in his response. *See, e.g.*, *id.* ¶ 8 (admitting); *id.* ¶ 10 (denying). Counsel's failure to do so with respect to these important factual assertions is baffling.

Most importantly, LaFever's response to these paragraphs is just her own narrative opinion about the Jail Intake Video. *Id.* ¶ 12. For example, plaintiff states:

27. At 15:07:54, one of the female officers opens the door and reaches inside. The other officers crowd around.

28. At 15:07:55, the female officer violently pulls me from the car. At least two other officers immediately join in holding onto me. At 15:08:05, I am dragged from the vehicle and put on the ground by four officers. I clearly am still handcuffed and offering no resistance. I am held on the ground until 15:08:11 and sprayed with chemical "mace".

29. At 15:08:28, I am dragged through the jail door by three officers, and it closes behind me. The total time elapsed from my first contact with the female officer to the time the door closes behind me is 33 seconds.

Pl.'s Response to County Facts ¶ 12.

In LaFever's view, these block quotations "largely show[ ] that [defendants'] statements are without basis in fact." Pl.'s Response to County Facts ¶ 12. Plaintiff instructs the reader to refer to this same block quotation in paragraphs thirteen through seventeen. *Id.* ¶¶ 13–17.

**\*10** Upon review, this response does not properly controvert the County defendants' factual assertions about what happened in the receiving area outside the County Jail. At best, this response establishes that LaFever believes that the Jail Intake Video shows she was "offering no resistance." But the Court is fully capable of viewing the video for itself and can draw its own conclusions about whether or not the surveillance footage establishes any relevant facts for the purpose of summary judgment.

Indeed, the Supreme Court has instructed lower courts to do just that. *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the [video] record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

LaFever's opinion about what the Jail Intake Video "clearly" shows or does not show is not useful in the summary judgment analysis. And it is not helpful in determining whether the disputes over the facts are genuine or not. After all, plaintiff herself was present for the events depicted in the Jail Intake Video. She was a participant in these events. She is in the best position to admit or deny being "physically resistant" when she was removed from the vehicle. County Facts ¶ 12. She is fully capable of admitting or denying that she "ignored or failed to comply with several commands to drop what was in her hands." *Id.* And she knows whether or not she tried "to pull away from the officers" before she was placed on the ground. *Id.* ¶ 13.

As before, answers to these questions inform the reasonableness of the County Officers' conduct. *Kingsley*, 576 U.S. at 397, 135 S.Ct. 2466. If, as the County defendants assert, plaintiff was physically resisting and refusing verbal

commands to drop the object before she entered the County Jail, some measure of force was permissible as a matter of law. *Kingsley*, 576 U.S. at 397, 135 S.Ct. 2466. If, however, some or all of those facts are genuinely in dispute—say, if plaintiff denied being given any commands to drop the object and/ or denied being physically uncooperative—then a jury trial might be necessary to properly adjudicate this claim.

LaFever's decision to respond by giving her own impression of the Jail Intake Video does not help answer these important questions. That is especially so where, as here, the viability of her excessive force claim depends in part on whether or not she resisted commands to drop the object. As is often the case with surveillance footage, the Jail Intake Video does not have any accompanying audio. So in the absence of any specific denials by plaintiff, the movant's properly supported assertions about what was said or not said are left uncontroverted for purposes of summary judgment.

Why bother picking these nits? Because Local Rule 7.1(a)(3) exists to save "the reviewing court the trouble of having to do what this Court is doing right now—double- and triple-checking each individual factual allegation to determine whether it is genuinely in dispute or whether the non-movant just wants it to appear to be in dispute ... because they think it is damaging to their case." *Crawley,* ––– F.Supp.3d at ––––, 2020 WL 6153610, at *6.

A court's responsibility on summary judgment is challenging enough when everyone follows the rules. *Gallo v. Prudential Res. Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994) (Cardamone, J.) ("[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them.").

**\*11** When one party fails to live up to their end of the deal, the Court is forced to pick its own way through the briar patch. *See United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (per curiam) ("Judges are not like pigs, hunting for truffles buried in briefs."). A false step might open an avenue for appeal. And that's often true even if the uncertainty or confusion resulted from the litigant's own misconduct.

Experience suggests that this happens when the Court and a litigant are working at cross-purposes. For example, a litigant who knows they will have proof problems at trial might be tempted to muddle the fact record so hopelessly that it frustrates any meaningful summary judgment analysis. If

the reviewing court tosses the entire matter over to a trial, the litigant can declare it a win. This kind of intermediate procedural victory might give the litigant one more shot at extracting a settlement.

The Court's goal is different. "The right to trial by jury has long been an important protection in the civil law of this country." *Pereira v. Farace*, 413 F.3d 330, 337 (2d Cir. 2005). But the time and attention of jurors should not be squandered for expediency's sake. In recognition of the judicial responsibility to guard against those abuses, summary judgment has a serious purpose: it is supposed to help the Court decide if a trial would be a waste of time.

Consider the fact pattern of this case. The County defendants have already offered their version of what happened in the receiving area of the County Jail. They claim plaintiff was physically combative and refused to drop an object in her hands, so they took her to the ground and gave her a quick burst of pepper spray, which caused her to drop the object. County Facts ¶¶ 12–16. The County defendants have offered a valid justification for this use of force: contraband items possessed by a person entering the Jail pose a danger to the safety of the inmates, officers, and staff.[11] *Id.* ¶ 10. And once plaintiff complied by releasing her grip on the object, the County defendants assert that the use of force quickly abated. *See id.* ¶¶ 12–16.

[11]  LaFever denies this assertion because, in her view, the object was not a concern to the Norwich PD officers at the police station. Pl.'s Response to County Facts ¶ 10. That response does not appropriately controvert this fact.

Those facts, if true, would tend to strongly support the conclusion that the County Officers acted reasonably under the circumstances. *Kingsley*, 576 U.S. at 397, 135 S.Ct. 2466 (explaining that objective reasonableness on a pre-trial detainee's § 1983 excessive force claim is assessed by considering, *inter alia*, "any effort made by the officer to temper or limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting").

At trial, the initial burden would be LaFever to offer evidence sufficient for a jury to reach a different conclusion about what happened. The jury would be able to view the Jail Intake Video, but it would have to rely on testimony to establish what was said or not said during the encounter. If plaintiff failed

to offer evidence that established a different version of events than the one given by the County defendants in their summary judgment papers, the jury would almost certainly find in the defendants' favor. And even if for some reason the jury did not reach that result, the Court would likely be obligated to vacate the award for a failure of proof.

**\*12**  That is one reason why Local Rule 7.1(a)(3) asks the non-movant to point out portions of the record that, if introduced at a trial and credited by a finder of fact, would support their claim for relief. LaFever has not done this at all. Instead, she has only offered her own opinion about what she thinks the Jail Intake Video shows. Because plaintiff has failed to admit or deny these assertions of fact or otherwise validly place these matters in dispute, paragraphs twelve through sixteen will be deemed admitted subject to the Court's independent review of the Jail Intake Video.

### iii. **Paragraphs Eighteen and Nineteen**

[21]  The final problem with LaFever's response to the County defendants' Statement of Material Facts is located at paragraphs eighteen and nineteen. There, defendants offer their account of what happened once plaintiff was taken inside the County Jail.

Unlike the receiving area outside, there is no surveillance footage of what happened inside the County Jail. According to the County defendants, LaFever was taken to a shower area for "decontamination" because she had been sprayed with the "chemical agent." County Facts ¶ 18. Defendants contend that plaintiff "continued to be both physically and verbally noncompliant" at this time. *Id.* ¶ 19.

LaFever's response to these factual assertions is unnecessarily confusing. First, plaintiff correctly indicates that she "admit[s]" paragraph eighteen. Pl.'s Response to County Facts ¶ 18. In other words, she admits that she was taken to a shower area. For some reason, though, plaintiff then goes on to quote extensively from portions of an affidavit she has filed elsewhere:

30. Once inside the jail, two female officers further abused me by stripping my clothes off and forcing me to take a freezing cold shower. Since the court ordered me to be released upon posting bail in the amount of $500, none of these actions were reasonable.

31. Officers slammed my body against the shower walls several times and down on the shower floor while I remained in handcuffs.

32. Officers verbally abused me by screaming various commands at me like where to stand and how to use the shampoo. I was on my hands and knees struggling to stand, as I was still blind and disoriented from the mace .... [M]y hands were bleeding from my handcuffs being so tight. My inability to follow these commands led to further physical beatings.

....

34. I suffered considerable pain and suffering due to the treatment I received, both from the arresting officers and the officers at the jail. I received medical treatment and physical therapy for a bulging disk and pinched nerves in my neck and spine. I have also been treated for PTSD .... I sustained considerable injuries of both a physical and psychological nature, many of which are continuing in nature.

Pl.'s Response ¶ 18. As for the County defendants' factual assertion that plaintiff was physically noncompliant with commands and directions during this decontamination shower, plaintiff denies it with a citation to the same block response reproduced above. *Id.* ¶ 19.

The problem with this response is that it is not actually responsive. It does not amount to an admission or a denial of an important assertion of fact: whether or not LaFever "continued to be both physically and verbally noncompliant." County Facts ¶ 19. Instead, plaintiff's response seeks to add additional facts about the events inside the County Jail.

But additional facts do not belong in this part of the response to a movant's statement of material facts. Local Rule 7.1(a)(3) instructs the non-movant to include these "additional material facts" separately from the admissions or denials that make up a non-movant's response to the movant's statement of facts.

 **\*13**  In other words, the correct way for LaFever to have gone about this would have been to admit or deny the movant's facts about their version of events and then add additional facts about her own version of events in a separate response. Plaintiff's improper approach to this simple procedural requirement again results in an unnecessary degree of confusion.

LaFever's additional facts include a claim that the County Officers "slammed" her body against the walls while she was handcuffed in the shower area. Pl.'s Response to County Facts ¶ 18. If true, that might tend to support a conclusion that the officers' use of force was objectively unreasonable under the circumstances.

However, the County defendants have asserted that LaFever continued to be "physically and verbally noncompliant" at this time. County Facts ¶ 19. For instance, County Officer Rotundo avers that plaintiff "continued to be noncompliant in the shower area, so she was placed against the wall while I held her right arm against the wall and [County Officer] Shopa held her left arm against the wall. Rotundo Aff., Dkt. No. 80-5 ¶ 14. If these facts are *also* true, then an active struggle with a noncompliant detainee that results in the detainee being "slammed" against the wall of the shower area might not be an unreasonable use of force under *Kingsley*.

As before, LaFever was a direct participant in these events. She is in the best position to know whether or not she physically resisted the County Officers and/or verbally resisted their commands. She is competent to admit or deny those assertions. She has not done so. And the declaration she cites in response does not include details about the incident that would be sufficient to infer that she meant her explanation as a denial. *See generally* LaFever County Decl. Accordingly, paragraphs eighteen and nineteen of the County defendants' Statement of Material Facts will be deemed admitted for the purpose of assessing the County defendants' motion for summary judgment.

### 3. LaFever's Declarations

LaFever has submitted declarations in opposition to the City defendants' and the County defendants' motions for summary judgment. LaFever City Decl., Dkt. No. 89-1; LaFever County Decl., 90-1. These declarations offer additional facts about plaintiff's encounters with law enforcement, first at the hotel and then later at the County Jail. These additional facts will be considered to the extent they do not specifically controvert the admitted facts discussed *supra* in IV.A.1–2.

### 4. The Video Evidence

 **[22]**  Finally, the parties have conventionally filed three different pieces of video evidence. LaFever has submitted the Jail Intake Video, which depicts the events that occurred in the receiving area of the County Jail. Ex. 2 to Pl.'s Mot. for Summ. J., Dkt. No. 71-6. The City defendants have submitted

the Police Station Booking Video, which depicts the events that happened while plaintiff was being processed at the police station. Ex. A to Jelinek Decl., Dkt. No. 79-1.

These two videos have already been discussed at some length and will be considered in evaluating the summary judgment motions. However, there is a third video that has not yet been mentioned: a video recording that LaFever herself created at some point after she was released from the County Jail. Ex. B to Jelinek Decl., Dkt. No. 79-4 ("Recorded Call Video"). This video, which is over fifteen minutes in length, is entitled "Confronting Kathy from Howard Johnson's." Apparently intended for public dissemination on social media, the video depicts plaintiff looking into the camera as she initiates a telephone call with Babcock, the hotel manager.

**\*14** As the City defendants try to explain:

> In such video, Plaintiff <u>admits</u> that she made physical contact with Officer Clarke (at multiple points during the parties' telephone conversation) prior to being placed under arrest, that she had refused to leave the hotel room, and that she was being uncooperative when Officers Clarke and Sheehan attempted to obtain relevant information and get Plaintiff's version of the facts.

City Defs.' Mem., Dkt. No. 79-14 at 15 (emphasis in original).

For some reason, LaFever seems to believe this video is helpful to her own arguments. She has actually attached a transcription of this recorded call as an exhibit to her opposition to the City defendants' motion for summary judgment. Ex. A to Pl.'s City Opp'n, Dkt. No. 89-3.

The Court has reviewed this video. It does not help LaFever's case. If anything, some of the statements made by plaintiff in this recording support the officers' version of events at the hotel. *See, e.g.*, Recorded Call Video at 4:57–5:02 ("It doesn't matter that I touched [the officer's] chest, I asked him to leave, he deserved to."); *id.* at 5:57–6:00 ("When I touched the police officer, I asked him to get out of my way."); *id.* at 12:59–13:03 ("I pushed my finger at him. I said you have to

get out, you have to leave. And I thought he should have left. I don't think he should have been there."). [12]

[12]      There are no hardcoded timestamps on this video, so citations are to the media file itself.

Even so, this video is not useful at summary judgment. Unlike the Police Station Booking Video and the Jail Intake Video, this third recording does not offer a real-time window into the events as they unfolded at the hotel. It was not made under oath. And this is so regardless of whether plaintiff believed otherwise. *See* Recorded Call Video at 12:46–12:51 ("She's under oath. We are under oath to each other. That's why I called live. I have to tell the truth, too.").

Instead, this video is merely LaFever's *post hoc* recollection of some of the events that occurred at the hotel. She just happened to record it and publish it to the world. While it might have somehow proved useful as impeachment evidence at a trial, it cannot establish the presence or absence of any genuine disputes over any of the material facts. Accordingly, the Recorded Call Video will not be considered at summary judgment.

### B. The Merits

#### 1. The City Defendants

 **[23]**  LaFever's second amended complaint asserted § 1983 claims against City Officer Clarke and City Officer Sheehan for false arrest and imprisonment (Second Cause of Action), unreasonable search and seizure (Third Cause of Action), and excessive force (Fifth Cause of Action). The second amended complaint also asserted § 1983 claims against the City and Chief Marsh.

LaFever has since stipulated to the discontinuance of her § 1983 claim against the City and agreed to the dismissal of any claims she may have had against Chief Marsh. [13] Dkt. Nos. 87, 88. And a review of her opposition to the City defendants' motion reveals that she has abandoned several others as well.

[13]      Chief Marsh was not a necessary defendant for purposes of a § 1983 municipal liability claim against the City. *See, e.g.*, *Benacquista v. Spratt*, 217 F. Supp. 3d 588, 599 n.4 (N.D.N.Y. 2016) (explaining that supervisory liability and municipal liability are distinct concepts). And he was not a direct participant in any of the

alleged events. Proving his liability would have been all but impossible. *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (clarifying the "personal involvement" requirement that applies in the context of a § 1983 supervisory liability claim).

**\*15** The preliminary statement in LaFever's opposition memorandum contends that plaintiff has sued the City defendants for a whole host of different constitutional deprivations. But plaintiff only offers arguments in opposition to the dismissal of her false arrest and excessive force claims. *Compare* Pl.'s City Opp'n, Dkt. No. 89 at 3–8 (accusing defendants of violating her rights to, *inter alia*, "privacy, security, [and] bodily integrity"), *and id.* at 19–21 (articulating an Eighth Amendment standard "as alternative support"), *with id.* at 13–30 (explaining why her Fourth Amendment false arrest and excessive force claims should not be dismissed).

**[24]** In their reply brief, the City defendants argue that LaFever has abandoned all of these undefended claims. City Defs.' Reply, Dkt. No. 98-2 at 9–11. Upon review, the City defendants are correct. "Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way." *Frantti*, 414 F. Supp. 3d at 291 (citation omitted).

As the Second Circuit has explained:

> Generally, but perhaps not always, a partial response [to a motion for summary judgment] reflects a decision by a party's attorney to pursue some claims or defenses and to abandon others. Pleadings often are designed to include all possible claims or defenses, and parties are always free to abandon some of them. Moreover, preparation of a response to a motion for summary judgment is a particularly appropriate time for a non-movant party to decide whether to pursue or abandon some claims or defenses. Indeed, Rule 56 is known as a highly useful method for narrowing the issues for trial.

*Jackson v. Fed. Express*, 766 F.3d 189, 196 (2d Cir. 2014).

With the exception of her false arrest and excessive force claims, the Court concludes that LaFever has abandoned all of her other claims against the City defendants because she has not mounted a defense against the facially valid arguments for dismissal that were advanced by those defendants in their opening brief. *See, e.g.*, *Kovaco v. Rockbestos-Surprenant Cable Co.*, 834 F.3d 128, 143 (2d Cir. 2016) (instructing lower courts to make a specific finding of abandonment where appropriate). Accordingly, those claims will be dismissed as abandoned.

### i. False Arrest

**[25]** **[26]** A § 1983 false arrest claim is grounded in the Fourth Amendment right of an individual to be free from unreasonable seizures. *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996). "To establish a claim under § 1983 for false arrest a plaintiff must show that: (1) the defendant intended to confine the plaintiff; (2) the plaintiff was conscious of the confinement; (3) the defendant did not consent to the confinement; and (4) the confinement was not otherwise privileged." *Jackson v. City of N.Y.*, 939 F. Supp. 2d 235, 248 (E.D.N.Y. 2013) (citation omitted).

**[27]** As an initial matter, the City defendants contend that LaFever's § 1983 false arrest claim is barred by her guilty plea to the harassment charge. City Defs.' Reply at 11–13. In support of this argument, defendants have submitted a "certificate of conviction/disposition" from Norwich City Court. Ex. H to Jelinek Decl., Dkt. No. 79-10. This certificate establishes that plaintiff pleaded guilty to the "physical contact" prong of New York's harassment statute. *Id.* (citing N.Y. PENAL LAW 240.26(1)).

**[28]** "Where the plaintiff has been convicted of at least one offense for which he was arrested, the conviction will generally foreclose a false arrest claim by serving as conclusive evidence of probable cause to arrest." *Colon v. City of Rochester*, 419 F. Supp. 3d 586, 596 (W.D.N.Y. 2019) (cleaned up). This rule applies regardless of whether the conviction was after a trial or simply the result of a plea. *Hayes v. Cty. of Sullivan*, 853 F. Supp. 2d 400, 428 (S.D.N.Y. 2012) (collecting cases).

**\*16** Notably, certain kinds of conditional dismissals might not have preclusive effect on a § 1983 false arrest claim. For example, several courts have held that an adjournment in contemplation of dismissal ("ACD") does not bar a later false arrest claim because it does not necessarily indicate the

arrestee was guilty of the charge. *Case v. City of N.Y.*, 233 F. Supp. 3d 372, 383 (S.D.N.Y. 2017) ("Unlike a conviction, an ACD leaves open the question of guilt ...."); *see also Ivery v. Baldauf*, 284 F. Supp. 3d 426, 436 (W.D.N.Y. 2018) ("The fact that plaintiff eventually received an ACD does not bar his false-arrest claim.").

Upon review, however, LaFever's guilty plea bars her § 1983 false arrest claim against the City defendants. Plaintiff received a conditional dismissal following her plea. City Facts ¶ 111. Importantly, though, there is no indication that this matter was resolved by an ACD, which is essentially an adjournment of the charge. Instead, the certificate of conviction/disposition indicates that plaintiff "pled guilty" to the offense. Ex. H to Jelinek Decl., Dkt. No. 79-10. Accordingly, plaintiff's § 1983 false arrest claims against the City defendants must be dismissed. *Phelan v. Sullivan*, 541 F. App'x 21, 23 (2d Cir. 2013) (summary order) ("A false arrest claim is defeated by the plaintiff's conviction for the arrest for which he was arrested.").

 **[29]**  Even assuming otherwise, LaFever's § 1983 false arrest claims would still fail because the admitted facts establish the existence of probable cause. "To avoid liability for a claim of false arrest, an arresting officer may demonstrate that either (1) he had probable cause for the arrest, or (2) he is protected from liability because he has qualified immunity." *Hulett*, 253 F. Supp. 3d at 494 (quoting *Simpson v. City of N.Y.*, 793 F.3d 259, 265 (2d Cir. 2015)).

 **[30]**  **[31]**  "A police officer has probable cause to arrest when he has knowledge of reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Hulett*, 253 F. Supp. 3d at 494 (cleaned up). "The test for probable cause is an objective one and 'depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest.' " *Id.* (quoting *Yorzinski v. City of N.Y.*, 175 F. Supp. 3d 69, 75 (S.D.N.Y. 2016)).

The City defendants assert that City Officers Clarke and Sheehan had probable cause to arrest LaFever for (1) second-degree harassment and/or (2) criminal trespass. City Defs.' Mem. at 30. They are correct on both counts.

 **[32]**  A person is guilty of criminal trespass when she "knowingly enters or remains unlawfully in or upon premises." N.Y. PENAL LAW § 140.05. The admitted facts establish that City Officers Clarke and Sheehan received information from Babcock, the hotel manager, that indicated plaintiff refused to vacate her room after her stay had expired. City Facts ¶ 11. The facts further establish that plaintiff ignored the officers' orders to vacate the room. *Id.* ¶ 27.

 *\*17*  In fact, LaFever herself acknowledges that she had overstayed her period of lawful occupancy and gotten into a "heated debate" with hotel staff over whether she had to leave. Pl.'s Opp'n to City Defs., Dkt. No. 89 at 26 ("The incident occurred less than 15 minutes after checkout time...."); *see also* Ex. D to Jelinek Decl., Dkt. No. 79-6 ("LaFever City Dep.") at 67:1–68:5 (testifying that hotel staff told her "you have to leave" and "you can't stay").

The officers were entitled to rely on their own observations as well as information they received from Babcock in assessing whether there was probable cause to believe LaFever was trespassing. *See, e.g., Curley v. Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) ("[W]e have found probable cause where a police officer was presented with different stories from an alleged victim and the arrestee.").

 **[33]**  There was also probable cause to believe LaFever was guilty of second-degree harassment. A person is guilty of second-degree harassment when, "with intent to harass, annoy or alarm another person" she "strikes, shoves kicks or otherwise subjects such person to physical contact, or attempts or threatens to do the same." N.Y. PENAL LAW ¶ 240.26(1).

The admitted facts establish that LaFever spoke in a raised voice to Babcock and to the officers and then made physical contact with City Officer Clarke on more than one occasion. City Facts ¶¶ 32–37. Plaintiff also admits that she made some kind of physical contact with the officer. LaFever City Dep. at 75:6–75:14; *see also* LaFever City Decl., Dkt. No. 89-1 ("There was only one contact initiated by me, and it was not threatening, harmful or aggressive.").

In short, the officers had probable cause to arrest LaFever for criminal trespass or second-degree harassment. *See, e.g., District of Columbia v. Wesby*, ––– U.S. ––––, 138 S. Ct. 577, 584 n.2, 199 L.Ed.2d 453 (2018) ("Because probable cause is an objective standard, an arrest is lawful if the officer had probable cause to arrest for any offense, not just the offense cited at the time of arrest or booking."). Because probable cause is a complete defense to a false arrest claim, plaintiff's §

1983 false arrest claims against Officers Clarke and Sheehan must be dismissed.

#### ii. Excessive Force

**[34]** **[35]** **[36]** "The Fourth Amendment prohibits the use of unreasonable and therefore excessive force by a police officer in the course of effecting an arrest." *Hulett*, 253 F. Supp. 3d at 491 (quoting *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010)). To succeed on a § 1983 excessive force claim, a plaintiff must show that the defendant's use of force was "objectively unreasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* (cleaned up). "If the force used was unreasonable and excessive, the plaintiff may recover even if the injuries inflicted were not permanent or severe." *Id.*

**[37]** This "objective reasonableness" inquiry is "necessarily case and fact specific and requires balancing the nature and quality of the intrusion on the plaintiff's Fourth Amendment interests against the countervailing governmental interests at stake." *Hulett*, 253 F. Supp. 3d at 491 (quoting *Tracy*, 623 F.3d at 96).

**[38]** Thus, review of an excessive force claim is "guided by consideration of at least three factors: (1) the nature and severity of the crime leading to the arrest, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Tracy*, 623 F.3d at 96 (citing *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)).

*\*18* **[39]** **[40]** **[41]** "Importantly, a court must evaluate the record from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Hulett*, 253 F. Supp. 3d at 491 (cleaned up). "In so doing, it is important to make allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* "Accordingly, police receive a fairly wide zone of protection in close cases involving potential danger, emergency conditions, or other exigent circumstances." *Id.*

As an initial matter, the Court has deemed admitted the City defendants' Statement of Material Facts because LaFever failed to file a proper responsive submission. These admitted facts establish that plaintiff acted aggressively during the

police encounter and physically resisted the officers' attempts to arrest her. City Facts ¶¶ 17–38. Plaintiff's resistance included punching and kicking City Officer Clarke, thrashing her body around, and flailing her arms and legs. *Id.* ¶¶ 42–47. She screamed obscenities and made threatening statements to both officers. *Id.* ¶¶ 55–57. Plaintiff continued to resist even after she was handcuffed. *Id.* ¶ 59–62.

In opposition to summary judgment on this claim, LaFever asserts in a declaration that the two officers tackled her, rolled her on the floor, threw her against the walls, and then dragged her out of the room. LaFever City Decl., Dkt. No. 89-1, 25–27. Plaintiff asserts she was eventually "shoved" into the patrol car, but not until after her "face was smashed against the window." *Id.* ¶ 30. Plaintiff denies resisting at all. *See, e.g.*, *id.* ¶¶ 25, 27.

This account suggests LaFever would have suffered significant physical injury. Indeed, plaintiff asserts that she suffered "a bulging disk and pinched nerves" in her "neck and spine," and was "treated for PTSD." LaFever City Decl. ¶ 35. But plaintiff acknowledges that she did not seek any conventional medical treatment for these injuries. *Id.* ¶ 34. Instead, plaintiff explains, she is a "Chinese medical practitioner" and "sought [her] own eastern Buddhists [*sic*] methods of treatment immediately, and for a year, until [she] had to get western medical help." *Id.*

LaFever has not offered any of these later, "western" medical records to support her claims of injury in opposition to the City defendants' motion for summary judgment. *See generally* Dkt. No. 89. However, plaintiff has provided some photographs of her alleged injuries. [14] These photographs show swelling and irritation around her eyes. They also show a bump on her head and some bruising and swelling on her wrists, biceps, and fingers.

[14]     These photographs are labeled "injuries sustained 11-30-2015 by Norwich, New York Law Enforcement Officers." However, plaintiff only included them as an exhibit to her opposition to the County defendants' separate motion for summary judgment. Ex. G to Pl.'s County Opp'n, Dkt. No. 90-12. Plaintiff has since submitted a "supplemental declaration" against "all defendants" that references these photographs. Dkt. No. 90-3. Accordingly, the Court will examine

them in connection with the City defendants' motion as well.

**[42] [43] [44]** Of course, evidence about the nature and extent of a plaintiff's injuries are not dispositive of an excessive force claim. *Rolkiewicz v. City of N.Y.*, 442 F. Supp. 3d 627, 645 (S.D.N.Y. 2020). Indeed, "the relevant legal analysis depends not on a particular quantum of injury but on a showing of the objective reasonableness of the conduct." *Moore v. Keller*, —— F. Supp. 3d ——, ——, 2020 WL 6384691, at *16 (N.D.N.Y. 2020) (explaining that evidence of "lasting or serious injury" is not the *sine qua non* of an excessive force claim). However, evidence of a plaintiff's injury is still relevant, "because it is probative of the amount and type of force actually used by the arresting officers[.]" *Rolkiewicz*, 442 F. Supp. 3d at 645 (citation omitted).

*\*19* Upon review, these photographs are of limited use on summary judgment because they raise more questions than they answer. How much, if any, of these injuries are traceable to the hotel incident with City Officers Clarke and Sheehan? How much, if any, of the bruising on plaintiff's wrists is attributable to her own conduct in slipping out of her handcuffs in the police station booking area? As for the eye irritation and swelling, everyone agrees that plaintiff was sprayed with a "chemical agent" (*e.g.*, mace or pepper spray) by the County Officers. Those injuries would not be traceable to the City defendants. [15]

[15]   The Police Station Booking Video recorded shortly after plaintiff's arrest at the hotel shows her performing handstands, a split, and yoga moves. *See generally* Booking Video. The video is not exactly high quality, but there is no indication of any serious wrist injuries or eye irritation at that time.

Nor do these photographs definitively contradict any party's version of events. Many of these injuries would be consistent with handcuffing and resisting arrest. However, many of these injuries would also be consistent with being pepper sprayed and resisting at the County Jail. And viewed in the light most favorable to her, these injuries could also be consistent with the story told in LaFever's declaration.

**[45] [46] [47]** With all this in mind, the Court concludes that no reasonable jury could find in LaFever's favor on this excessive force claim. To be sure, "[t]he fact that a person whom a police officer attempts to arrest resists, threatens, or assaults the officer no doubt justifies the officer's use of *some*

degree of force, but it does not give the officer license to use force without limit." *Sullivan v. Gagnier*, 225 F.3d 161, 165–66 (2d Cir. 2000) (emphasis in original). And as the Second Circuit has recently reiterated, clearly established law makes it "impermissible to use significant force against a restrained arrestee who is not actively resisting." *Lennox v. Miller*, 968 F.3d 150, 157 (2d Cir. 2020).

The problem here is that the admitted facts establish that LaFever acted aggressively during the *entirety* of the police encounter and continuously physically resisted the officers' attempts to arrest her. City Facts ¶¶ 17–38. This resistance included punching and kicking City Officer Clarke, thrashing her body around, and flailing her arms and legs. *Id.* ¶¶ 42–47. Plaintiff continued to resist even after she was handcuffed. *Id.* ¶ 59–62.

As discussed *supra*, LaFever in her declaration claims that the two officers tackled her, rolled her on the floor, threw her against the walls, and then dragged her out of the room. [16] LaFever City Decl. ¶¶ 23, 25–27. But even assuming these additional facts as true and drawing all permissible favorable inferences from them, the other admitted facts would still prevent a jury from concluding that plaintiff was subjected to "significant force" at a time that she was no longer "actively resisting." *Cf. Lennox*, 968 F.3d at 157 (affirming denial of qualified immunity on excessive force claim where a "reasonable jury could find that the force used by Officer Clarke was significant and that [the plaintiff] was not resisting when such force was used"). Accordingly, plaintiff's § 1983 excessive force claims against the City defendants will be dismissed.

[16]   As noted, plaintiff denies resisting at all. LaFever City Decl. ¶¶ 25, 27. But the fact of her continuous, significant physical resistance (*e.g.*, punching and kicking, thrashing her body around, and flailing her arms and legs) has been admitted for purposes of summary judgment.

### 2. The County Defendants

*\*20* LaFever's second amended complaint asserted § 1983 claims against County Officers Hackett, Rotundo, White, Shopa, and the remaining Doe for false arrest and imprisonment (Second Cause of Action), excessive force (Fourth Cause of Action), and a violation of her right to due process and equal protection (Seventh Cause of Action). The second amended complaint also asserted a § 1983 claim against the County (Eighth Cause of Action).

However, LaFever has abandoned several of these claims. *See, e.g., Frantti*, 414 F. Supp. 3d at 291. In particular, plaintiff has failed to offer a defense of her false arrest or equal protection claims. *See, e.g., Kovaco*, 834 F.3d at 143. Accordingly, those claims will be dismissed against the County defendants.

### i. Remaining Claims
This leaves for consideration LaFever's (a) excessive force claim arising from her transfer into the custody of the County Jail, which is captured on the Jail Intake Video; (b) excessive force claim arising from the decontamination shower that followed; (c) unlawful strip search claim; and (d) municipal liability claim against the County and Sheriff Cutting.

### a. The Jail Intake Video
[48] LaFever's first excessive force claim is based on the County Officers' allegedly unreasonable use of force in removing her from the police cruiser, spraying her with mace or pepper spray, and taking her inside the County Jail. As discussed *supra*, this incident is captured on the Jail Intake Video without any accompanying audio.

[49] [50] "The right not to be subject to excessive force, perhaps most commonly associated with the Fourth and Eighth Amendments, can also arise under the Fourteenth." *Edrei v. Maguire*, 892 F.3d 525, 533 (2d Cir. 2018). As relevant here, "the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment." *Frost v. N.Y. City Police Dep't*, 980 F.3d 231, 251–52 (2d Cir. 2020) (quoting *Graham*, 490 U.S. at 395 n.10, 109 S.Ct. 1865).

[51] [52] Of course, "[a]n officer's actions can amount to punishment if they are taken with 'an expressed intent to punish.' " *Frost*, 980 F.3d at 252 (quoting *Bell v. Wolfish*, 441 U.S. 520, 538, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)). "But even 'in the absence of an expressed intent to punish, a pretrial detainee can nevertheless prevail by showing that the actions are not rationally related to a legitimate nonpunitive governmental purpose or that the actions appear excessive in relation to that purpose.' " *Id.* (quoting *Kingsley*, 576 U.S. at 389, 135 S.Ct. 2466).

In *Kingsley*, the Supreme Court held that a pretrial detainee's excessive force claim must be measured by an "objective reasonableness" standard that "turns on the facts and

circumstances of each particular case." 576 U.S. at 397, 135 S.Ct. 2466. In other words, the standard used to evaluate an excessive force claim brought by a pretrial detainee under the Due Process Clause of the Fourteenth Amendment is broadly similar to the standard applied in the context of an excessive force claim brought by an arrestee under the Fourth Amendment.

Even so, the distinction is a relevant one. "[M]any Fourth Amendment decisions relating to the use of force during an arrest turn on factors that have little relevance in the context of force used against a person who has already been taken into custody, such as the severity of the crime that led to the arrest, the risk of the suspect's flight to avoid arrest, and the danger that the suspect posed to members of the public." *Casiano v. Ashley*, ---- F. Supp. 3d ----, ----, 2021 WL 281460, at *3 (W.D.N.Y. Jan. 28, 2021) (citation omitted).

*21 [53] [54] As the Second Circuit has explained:

> This standard should be applied "from the perspective and with the knowledge of the defendant officer," and should account for factors such as "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting. The factfinder must also "take account of the legitimate interests in managing a jail, acknowledging as part of the objective reasonableness analysis that deference to policies and practices needed to maintain order and institutional security is appropriate."

*Frost*, 980 F.3d at 252.

Upon review, no reasonable jury could find in LaFever's favor on this excessive force claim. As explained *supra*, the Court has deemed admitted paragraph nine of the County's Statement of Material Facts, which establishes that the County Officers were put on notice by Norwich PD that plaintiff was being uncooperative and was in possession of an unknown object. County Facts ¶ 9. The Court has also deemed admitted paragraphs twelve through sixteen, which establishes that plaintiff refused the officers' verbal commands to drop the object in her hands. *Id.* ¶¶ 12–16. Once plaintiff complied, the use of physical force abated. *See id.* ¶¶ 12–16.

Importantly, the County defendants have offered a "legitimate nonpunitive governmental purpose" behind this forceful approach. According to them, contraband items possessed by a person entering the County Jail pose a danger to the health and safety of the inmates, officers, and staff. County Facts ¶ 10.

LaFever denies this assertion because, in her view, the object was not a sufficient concern to the Norwich PD officers. Pl.'s Response to County Facts ¶ 10; *see also* Pl.'s Opp'n Br., Dkt. No. 90 at 12 (explaining that the City defendants "did not think it posed enough of a danger that they attempted to force it from her when she was handcuffed for transportation to the jail").

However, this response does not appropriately controvert the County defendants' assertion of fact. Even if it did, the County Jail is not the Norwich police station. It is a separate facility with different security needs. As the Supreme Court recognized in *Kingsley*, courts considering an excessive force claim brought by a pretrial detainee must be sure to account for the legitimate interests in institutional security that arise in the prison context. 576 U.S. at 397, 135 S.Ct. 2466.

The Court has also independently reviewed the Jail Intake Video. It does not support LaFever's version of events. *See, e.g.*, *Berman v. Williams*, 2019 WL 4450810, at *6 (S.D.N.Y. Sept. 17, 2019) ("The defendants' use of force during the Intake Search Area incident was objectively reasonable because it was proportionate to the plaintiff's resistance. The plaintiff refused to comply with orders to remove his clothing in the Intake Search Area, which was a legitimate command.").

**\*22** There is no indication in the Jail Intake Video that the County Officers' use of force was gratuitous (*e.g.*, no indication of any kicks, punches, etc.). *Kingsley*, 576 U.S. at 397, 135 S.Ct. 2466 (directing courts to consider "whether the plaintiff was actively resisting"). There is no indication that the degree of force used was not reasonably related to the County Officers' attempt to get plaintiff to drop the object. *Id.* (directing courts to assess the relationship "between the need for the use of force and the amount of force used"). There is no indication that the use of force continued after plaintiff complied. *Id.* (directing courts to consider whether there was "any effort made by the officer to temper or limit the amount of force used"). And there is little evidence to support any claim of serious or lasting injury. *Id.* (directing courts to consider "the extent of the plaintiff's injury").

As with her opposition to the City defendants' motion, LaFever claims she "suffered considerable pain and suffering" and needed "physical therapy for a bulging disk and pinched nerves" in her neck and spine." LaFever County Decl. ¶ 34. Once again, though, plaintiff has not submitted any medical evidence in support of these assertions. *See generally* Dkt. No. 90.

This leaves for consideration the photographs of her alleged injuries. Ex. G to Pl.'s County Opp'n, Dkt. No. 90-12. As before, it is unclear to what extent, if any, plaintiff has asserted that she received these injuries from the County Officers rather than the City defendants. However, the eye swelling and irritation would be consistent with being pepper sprayed or maced.

When measured against the various factors outlined by the Supreme Court in *Kingsley*, a review of the Jail Intake Video in light of the admitted facts confirms that no reasonable jury could find in LaFever's favor on an excessive force claim against the County Officers. *Casiano*, ---- F.Supp.3d at ----, 2021 WL 281460, at *4 (granting summary judgment on excessive force claim where pre-trial detainee resisted, was taken to the ground, and given a short burst of pepper spray with no lasting injuries).

In the alternative, qualified immunity would defeat this claim. "Second Circuit precedent clearly disallows the gratuitous use of pepper spray against restrained individuals. However, there is no clearly established law forbidding its use against individuals who refuse to comply with officer instructions after a warning." *Taylor v. Nieves*, 2020 WL 7028907, at *3 (S.D.N.Y. Nov. 30, 2020) (internal citation omitted).

As discussed *supra*, LaFever has left uncontested the County defendants' factual assertion that they did not use the "chemical agent" until after she refused multiple verbal commands to drop the object in her hands. A review of the Jail Intake Video does not undermine this assertion. Accordingly, this excessive force claim against the County Officers will be dismissed.

### b. The Decontamination Shower

**[55]** Broadly construed, LaFever has asserted a separately cognizable claim for excessive force based on the County Officers' allegedly unreasonable use of force in the decontamination shower. Unlike the incident in the receiving area outside the Jail, these events are not captured on video. The entirety of plaintiff's argument on this point is as follows:

> There was a total lack of explanation
> of anything that was happening until
> Plaintiff had been pushed, shoved,
> and thrown around for a substantial
> period of time without any attempt to
> obtain compliance, and without any
> attempt to use anything but brute force.
> Defendant [*sic*] describes the shower
> as freezing, and her treatment as being
> subject to verbal and physical abuse.
> She was shoved against the shower
> walls and down on the shower floor, at
> least part of the time while restrained
> in handcuffs.

Pl.'s Opp'n, Dkt. No. 90 at 24.

As discussed *supra*, LaFever has introduced some additional relevant facts through a declaration she filed in opposition to the County defendants' motion for summary judgment:

> **\*23** 30. Once inside the jail, two female officers further abused me by stripping my clothes off and forcing me to take a freezing cold shower. Since the court ordered me to be released upon posting bail in the amount of $500, none of these actions were reasonable.

> 31. Officers slammed my body against the shower walls several times and down on the shower floor while I remained in handcuffs.

> 32. Officers verbally abused me by screaming various commands at me like where to stand and how to use the shampoo. I was on my hands and knees struggling to stand, as I was still blind and disoriented from the mace .... [M]y hands were bleeding from my handcuffs being so tight. My inability to follow these commands led to further physical beatings.

Pl.'s Response ¶ 18; *see also* LaFever County Decl., Dkt. No. 90-1 ¶¶ 30–32.

Upon review, this claim will also be dismissed. "Excessive force claims frequently involve factual disputes that make them difficult to resolve pursuant to summary judgment." *Savage v. Acquino*, 2018 WL 1478254, at \*7 (W.D.N.Y. Mar. 23, 2018). However, plaintiff has failed to controvert that

she was being "physically and verbally noncompliant" during the events in the shower area. County Facts ¶ 19. Taking LaFever's additional facts about the encounter as true, the summary judgment analysis amounts to assessing whether a reasonable jury could conclude that the County Officers' conduct during an active struggle with a noncompliant detainee was unreasonable in light of the *Kingsley* factors.

As with the Jail Intake Video, there is no indication in the record that the County Officers' use of force in the shower was gratuitous (*e.g.*, no allegations of any kicks, punches, etc.). *Kingsley*, 576 U.S. at 397, 135 S.Ct. 2466 (directing courts to consider "whether the plaintiff was actively resisting"). There is no indication that the degree of force was not reasonably related to an attempt to gain compliance. *Id.* (directing courts to assess the relationship "between the need for the use of force and the amount of force used"). There is no indication that the use of force continued after LaFever complied. *Id.* (directing courts to consider whether there was "any effort made by the officer to temper or limit the amount of force used"). And there is little evidence to support any claim of serious or lasting injury. *Id.* (directing courts to consider "the extent of the plaintiff's injury").

To be sure, LaFever's declaration claims she was slammed into the shower walls and that her inability to follow the County Officers' commands "led to further physical beatings." LaFever County Decl. ¶¶ 30–32. But plaintiff does not even try to explain what she means by this kind of generalized, non-specific accusation about more "beatings." And she has offered little to no supporting evidence to back it up.

So the Court is left to ask: do the few, relatively ambiguous statements about the use of force made by plaintiff in her declaration along with the photographs of her alleged injuries create a material issue of fact for trial in light of the admission that she was physically resistant during this entire encounter? The answer is no. Even viewing the disputed facts in the light most favorable to plaintiff, the factors outlined in *Kingsley* make clear that no reasonable jury could find in her favor on this § 1983 claim for excessive force. [17] Accordingly, this claim will also be dismissed.

[17]    In the alternative, qualified immunity would attach to these facts.

### c. **The Strip Search**

Case 5:19-cv-00305-TWD    Document 88    Filed 06/01/21    Page 85 of 112

**\*24** **[56]** LaFever argues that she was subjected to an "unlawful" strip search. Pl.'s County Opp'n, Dkt. No. 90 at 21–24. According to plaintiff, it was "administered as part of punishment for perceived disrespectful behavior towards a police officer." *Id.* at 21.

**[57]** **[58]** "A 'strip search' is an inspection of a naked individual, without any scrutiny of the subject body's cavities." *Jenkins v. City of N.Y.*, 2020 WL 6700087, at \*2 n.4 (E.D.N.Y. Nov. 12, 2020) (cleaned up). "A strip search is distinguishable from a 'visual body cavity search,' which extends to visual inspection of the anal and general areas, or a 'manual body cavity search,' which includes some degree of touching or probing of body cavities." *Id.*

**[59]** **[60]** "Strip searches of pre-trial detainees (as well as inmates) are constitutionally valid if they are reasonably related to a legitimate penological interest." *Perez v. Ponte*, 236 F. Supp. 3d 590, 622–23 (E.D.N.Y. 2017) (cleaned up). "In determining the overall reasonableness of a strip search, courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Id.*

This claim will also be dismissed. As explained *supra*, the County Officers have offered a legitimate penological interest for conducting the search; *i.e.*, to determine whether LaFever possessed any other contraband. County Facts ¶ 20. Female County Officers conducted the search in the shower area, away from any other inmates or male officers. *Id.* And the search itself was "visual only." *See id.* In short, plaintiff has not offered evidence from which a reasonable jury could conclude that she was strip searched for the purpose of intimidation, harassment, or punishment. *Pizarro v. Bd. of Corr.*, 2018 WL 3462512, at \*5 (S.D.N.Y. July 17, 2018). Accordingly, this claim will be dismissed.

#### d. Municipal Liability

**[61]** LaFever's second amended complaint seems to assert a § 1983 municipal liability claim against the County based on the alleged existence of a *de facto* policy of "summarily punish[ing]" people who resist arrest. *See* Second Am. Compl. ¶¶ 113–15. However, plaintiff has not named the County as a defendant. *See generally id.* Instead, plaintiff has sued Sheriff Cutting in his individual capacity. *Id.* ¶ 6. According to plaintiff, the Sheriff "is liable for the damages suffered by the Plaintiff as a result of the conduct of the Defendants who are employed by the Sheriff's Office at the Chenango County Jail." Pl.'s County Opp'n at 25.

**[62]** That sounds an awful lot like a *respondeat superior* claim against Sheriff Cutting. However, "[a] supervisor may not be held liable under section 1983 merely because his subordinate committed a constitutional tort." *Poe v. Leonard*, 282 F.3d 123, 140 (2d Cir. 2002). Instead, "a plaintiff must plead and prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Tangreti*, 983 F.3d at 618 (cleaned up). There is no evidence that Sheriff Cutting was personally involved in any of the alleged events. Accordingly, any § 1983 supervisory liability claim against Sheriff Cutting in his *individual* capacity will be dismissed.

**[63]** To the extent that LaFever intended to sue Sheriff Cutting in his *official* capacity, the Supreme Court has explained that this kind of claim is "to be treated as a suit against the entity;" *i.e.*, the County itself. *See Kentucky v. Graham*, 473 U.S. 159, 165–66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). This appears to have been LaFever's intention all along, since she invoked *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). *See* Pl.'s County Opp'n at 25.

**\*25** **[64]** In *Monell*, the Supreme Court has held that a municipality may be held liable under § 1983 if a plaintiff can demonstrate that the constitutional violation was caused by a municipal "policy or custom." 436 U.S. at 694, 98 S.Ct. 2018. However, the Supreme Court has intentionally made these so-called "*Monell*" claims "hard to plead and hard to prove." *Crawley*, ---- F.Supp.3d at ----, 2020 WL 6153610, at \*9. "Unlike state tort law, a municipality cannot be held liable under § 1983 merely because it happened to employ the alleged tortfeasor." *Id.*

**[65]** **[66]** Instead, "under § 1983[ ] local governments are responsible only for 'their *own* illegal acts.' " *Connick v. Thompson*, 563 U.S. 51, 60, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011) (emphasis in original) (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)). Thus, "to establish municipal liability under 42 U.S.C. § 1983, a plaintiff must demonstrate that the deprivation of his constitutional right was 'caused by a governmental custom, policy or usage of the municipality.' " *Deferio v. City of Syracuse*, 770 F. App'x 587, 589 (2d Cir. 2019) (summary order) (quoting *Jones v. Town of East Haven*, 691 F.3d 72, 80 (2d Cir. 2012)).

LaFever contends that the County and Sheriff Cutting may be held liable because these defendants failed to provide "adequate training or guidelines" to the County Officers about how to avoid constitutional violations when strip-searching pre-trial detainees. Pl.'s County Opp'n, Dkt. No. 90 at 24-25.

 [67] Upon review, LaFever's *Monell* claim must be dismissed. "*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." *Segal v. City of N.Y.*, 459 F.3d 207, 219 (2d Cir. 2006) (emphasis in original).

As discussed *supra*, LaFever has not established any viable § 1983 claims against any of the individual County Officers or against Sheriff Cutting in his individual capacity. *See, e.g., Carter*, 394 F. Supp. 3d at 239–40 (explaining that the "presence of an underlying constitutional violation remains a 'required predicate' " to pursue a *Monell* claim). Because plaintiff has failed to establish any underlying constitutional violation, her *Monell* claim will also be dismissed.

### 3. The Remaining Doe

As a final matter, the remaining Doe defendant must be dismissed from this action because LaFever failed to ascertain her identity by the close of discovery. *See, e.g., Kenney v. Clay*, 172 F. Supp. 3d 628, 642 (N.D.N.Y. 2016) (dismissing Doe defendants on same basis).

## V. CONCLUSION

LaFever's claims will be dismissed because she has failed to controvert important facts about the events at the hotel and at the County Jail. And even viewing the additional facts offered by plaintiff in the light most favorable to her, they are too sparse and generalized to create a jury question on any of her claims. Finally, because the County defendants' motion will be granted, plaintiff's partial motion for summary judgment will be denied. *See generally* Dkt. No. 71-4.

Therefore, it is

ORDERED that

1. The City's motion for summary judgment is GRANTED;

2. The County's motion for summary judgment is GRANTED;

3. Plaintiff's motion for partial summary judgment is DENIED; and

4. Plaintiff's second amended complaint is DISMISSED.

The Clerk of the Court is directed to terminate the pending motions, enter a judgment accordingly, and close the file.

 **\*26**  IT IS SO ORDERED.

### All Citations

--- F.Supp.3d ----, 2021 WL 921688

K.D. ex rel. Duncan v. White Plains School Dist., 921 F.Supp.2d 197 (2013)

2013 WL 440556, 294 Ed. Law Rep. 845

KeyCite Yellow Flag - Negative Treatment

Distinguished by   Chillemi v. Town of Southampton,   E.D.N.Y.,   May 4, 2013

921 F.Supp.2d 197
United States District Court,
S.D. New York.

K.D., by and through Kerry Kelly
DUNCAN, individually and as Mother
of K.D., a disabled child, Plaintiffs,
v.
WHITE PLAINS SCHOOL DISTRICT;
Mrs. Agnieszka Blazkiewicz, Teacher; Ted
O'Donnell, Social Worker; and John Does 1–
10 (their true names and identities presently
unknown), acting in both their official and
unofficial capacities as Representatives of
White Plains School District, Defendants.

No. 11 Civ. 6756(ER).
|
Feb. 5, 2013.

**Synopsis**

**Background:** Developmentally disabled student and her mother filed § 1983 action alleging that school district and school officials violated their rights under federal constitution and state law by seizing student and directing police officers to interrogate her without warrant, probable cause, or parental consent. Defendants moved to dismiss.

**Holdings:** The District Court, Ramos, J., held that:

[1] district was not subject to liability under § 1983;

[2] district officials were not subject to liability for any constitutional violations arising from their failure to prevent officers from seizing and interrogating student;

[3] intracorporate conspiracy doctrine barred civil rights conspiracy claims;

[4] officials were entitled to qualified immunity;

[5] in-school interview of student in context of abuse investigation did not implicate parents' liberty interests;

[6] officials' purported failure to comply with New York law requiring them to report suspected abuse did not violate due process; and

[7] interview was insufficiently shocking to support substantive due process claims.

Motion granted.

**Procedural Posture(s):** Motion to Dismiss; Motion to Dismiss for Failure to State a Claim.

West Headnotes (28)

[1]  **Civil Rights**  🔑  Acts of officers and employees in general;  vicarious liability and respondeat superior in general

Municipality cannot be held liable under § 1983 on theory of respondeat superior. 42 U.S.C.A. § 1983.

[2]  **Civil Rights**  🔑  Governmental Ordinance, Policy, Practice, or Custom

Section 1983 claim can only be brought against municipality if action that is alleged to be unconstitutional was result of official policy or custom. 42 U.S.C.A. § 1983.

1 Cases that cite this headnote

[3]  **Civil Rights**  🔑  Governmental Ordinance, Policy, Practice, or Custom

**Civil Rights**  🔑  Lack of Control, Training, or Supervision;  Knowledge and Inaction

To establish existence of municipal policy or custom, plaintiff asserting § 1983 claim against municipality must show: (1) formal policy that is officially endorsed by municipality; (2) actions taken or decisions made by government officials responsible for establishing municipal policies that caused alleged violation of plaintiff's civil rights; (3) practice so persistent and

K.D. ex rel. Duncan v. White Plains School Dist., 921 F.Supp.2d 197 (2013)

Case 5:19-cv-00305-TWD   Document 88   Filed 06/01/21   Page 88 of 112

2013 WL 440556, 294 Ed. Law Rep. 845

widespread that it constitutes custom or usage and implies constructive knowledge of policy-making officials; or (4) failure by official policy-makers to properly train or supervise subordinates to such extent that it amounts to deliberate indifference to rights of those with whom municipal employees will come into contact. 42 U.S.C.A. § 1983.

8 Cases that cite this headnote

**[4]** **Civil Rights** 🔑 Governmental Ordinance, Policy, Practice, or Custom

Although plaintiff asserting § 1983 claim against municipality is not required to identify express rule or regulation, single incident alleged in complaint, especially if it involved only actors below policy-making level, does not suffice to show municipal policy. 42 U.S.C.A. § 1983.

7 Cases that cite this headnote

**[5]** **Civil Rights** 🔑 Education
**Civil Rights** 🔑 Education

School district was not subject to liability under § 1983 for school officials' actions in connection with domestic violence investigation involving developmentally disabled student and her family, where there was no district policy concerning particular activities giving rise to student's constitutional claims, and no facts pointing to lack of training or supervision by district that amounted to deliberate indifference to rights of students or their parents. 42 U.S.C.A. § 1983.

**[6]** **Civil Rights** 🔑 Persons Liable in General

Personal involvement of defendants in alleged constitutional deprivations is prerequisite to award of damages under § 1983. 42 U.S.C.A. § 1983.

**[7]** **Civil Rights** 🔑 Vicarious liability and respondeat superior in general; supervisory liability in general

Supervisory official cannot be held liable under § 1983 solely on basis of his subordinates' acts or omissions; supervisor must be personally involved in alleged deprivation, and there must be affirmative causal link between supervisor's actions or inactions and injury. 42 U.S.C.A. § 1983.

2 Cases that cite this headnote

**[8]** **Civil Rights** 🔑 Failure to act or protect or to enforce law

Section 1983 claim for failure to act is cognizable only in presence of corresponding duty to have acted. 42 U.S.C.A. § 1983.

**[9]** **Civil Rights** 🔑 Liability of Public Employees and Officials

Plaintiff asserting § 1983 claim based on official's failure to act must show that official's omissions were substantial factor resulting in deprivation of constitutional right, and that official displayed mental state of deliberate indifference with respect to those rights. 42 U.S.C.A. § 1983.

3 Cases that cite this headnote

**[10]** **Civil Rights** 🔑 Vicarious liability and respondeat superior in general; supervisory liability in general

Allegation that supervisory official merely failed to exercise his or her authority over subordinates, without more, is insufficient to hold official personally liable under § 1983 on failure-to-intercede theory, or on theory of supervisory liability. 42 U.S.C.A. § 1983.

**[11]** **Civil Rights** 🔑 Education

School district officials were not subject to liability under § 1983 for any constitutional violations arising from their failure to prevent police officers from seizing and interrogating developmentally disabled student without warrant, probable cause, or parental consent, where there was no evidence that any

K.D. ex rel. Duncan v. White Plains School Dist., 921 F.Supp.2d 197 (2013)
Case 5:19-cv-00305-TWD Document 88 Filed 06/01/21 Page 89 of 112
2013 WL 440556, 294 Ed. Law Rep. 845

officials were present during alleged seizure and interrogation, had opportunity to intercede to prevent interrogation from occurring, or had supervisory authority over individuals who allegedly committed wrongful acts. 42 U.S.C.A. § 1983.

1 Cases that cite this headnote

[12] **Conspiracy** ⬩ Definition and Elements in General

In order to state § 1983 conspiracy claim, plaintiff must allege facts showing: (1) agreement between two or more state actors or between state actor and private entity; (2) to act in concert to inflict unconstitutional injury; and (3) overt act done in furtherance of that goal causing damages. 42 U.S.C.A. § 1983.

22 Cases that cite this headnote

[13] **Conspiracy** ⬩ Equal privileges and immunities; equal protection

To state valid cause of action for civil rights conspiracy under § 1985(3), plaintiffs must allege: (1) conspiracy (2) for purpose of depriving person or class of persons of equal protection of laws, or equal privileges and immunities under laws; (3) overt act in furtherance of conspiracy; and (4) injury to plaintiff's person or property, or deprivation of right or privilege of United States citizen. 42 U.S.C.A. § 1985(3).

15 Cases that cite this headnote

[14] **Conspiracy** ⬩ Civil rights conspiracies

Plaintiff asserting civil rights conspiracy claim under § 1983 or § 1985(3) must: (1) provide some factual basis supporting meeting of minds, such as that defendants entered into agreement, express or tacit, to achieve unlawful end, augmented by some details of time and place and alleged effects of conspiracy; (2) allege, with at least some degree of particularity, overt acts that defendants engaged in that were reasonably related to promotion of claimed conspiracy; and (3) allege violation of right or rights that

defendants are alleged to have conspired to violate. 42 U.S.C.A. §§ 1983, 1985(3).

22 Cases that cite this headnote

[15] **Conspiracy** ⬩ Classes protected
**Conspiracy** ⬩ Intent, motive, or animus

In order to plead cognizable civil rights conspiracy claim under § 1985(3), plaintiff is required to allege that she was member of protected class, and that conspirators acted with class-based, invidiously discriminatory motivation. 42 U.S.C.A. § 1985(3).

10 Cases that cite this headnote

[16] **Conspiracy** ⬩ Civil rights conspiracies

Intracorporate conspiracy doctrine barred claim by developmentally disabled student and her mother that school district officials conspired to violate their civil rights by seizing and interrogating student without warrant, probable cause, or parental consent, where officials were all acting within scope of their employment, and were not acting solely in their personal interests. 42 U.S.C.A. §§ 1983, 1985(3).

7 Cases that cite this headnote

[17] **Conspiracy** ⬩ Intracorporate conspiracy doctrine in general
**Conspiracy** ⬩ Government entities in general

Under intracorporate conspiracy doctrine, employees of single corporate or municipal entity, each acting within scope of his or her employment, are legally incapable of conspiring together.

13 Cases that cite this headnote

[18] **Public Employment** ⬩ Actions

Qualified immunity is immunity from suit rather than mere defense to liability, and thus should be resolved at earliest possible stage of litigation.

3 Cases that cite this headnote

K.D. ex rel. Duncan v. White Plains School Dist., 921 F.Supp.2d 197 (2013)

Case 5:19-cv-00305-TWD   Document 88   Filed 06/01/21   Page 90 of 112

2013 WL 440556, 294 Ed. Law Rep. 845

**[19]    Civil Rights**  🔑  **Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general**

Qualified immunity was created to shield government officials from civil liability for performance of discretionary functions so long as their conduct does not violate clearly established statutory or constitutional rights of which reasonable person would have known. 42 U.S.C.A. § 1983.

9 Cases that cite this headnote

**[20]    Civil Rights**  🔑  **Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general**

To be "clearly established," for purposes of determining official's entitlement to qualified immunity from liability under § 1983, right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right. 42 U.S.C.A. § 1983.

8 Cases that cite this headnote

**[21]    Civil Rights**  🔑  **Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general**

In determining if particular right was clearly established, for qualified immunity purposes, court looks to whether (1) it was defined with reasonable clarity, (2) Supreme Court or Court of Appeals has confirmed existence of right, and (3) reasonable defendant would have understood that his conduct was unlawful. 42 U.S.C.A. § 1983.

9 Cases that cite this headnote

**[22]    Civil Rights**  🔑  **Schools**

There was no clearly established right requiring school officials to obtain warrant, court order, or parental consent prior to conducting in-school interview of student in context of abuse investigation, and thus school officials were entitled to qualified immunity from liability in § 1983 action brought by 19 year old

developmentally disabled student and her mother alleging that interview violated their Fourth Amendment rights. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

4 Cases that cite this headnote

**[23]    Constitutional Law**  🔑  **Parent and Child Relationship**

**Constitutional Law**  🔑  **Protection of Children; Child Abuse, Neglect, and Dependency**

As general rule, procedural due process requires hearing prior to depriving parents of care, custody, or management of their children without their consent, or prompt post-deprivation hearing if children are removed under emergency circumstances, or where deprivation occurs at time when children are already in state's custody. U.S.C.A. Const.Amend. 14.

3 Cases that cite this headnote

**[24]    Constitutional Law**  🔑  **Parent and Child Relationship**

**Constitutional Law**  🔑  **Protection of Children; Child Abuse, Neglect, and Dependency**

**Education**  🔑  **Interrogation by school personnel**

**Infants**  🔑  **Child abuse reports and investigations**

In-school interview of student by school official, child protective services caseworker, and police officer without parental consent in context of abuse investigation did not implicate parents' liberty interests, and thus school district's failure to obtain parental consent did not violate parents' or student's procedural due process rights. U.S.C.A. Const.Amend. 14.

7 Cases that cite this headnote

**[25]    Constitutional Law**  🔑  **Reports and lists**

**Infants**  🔑  **School authorities and staff**

School officials' purported failure to comply with New York law requiring them to report suspected

K.D. ex rel. Duncan v. White Plains School Dist., 921 F.Supp.2d 197 (2013)

Case 5:19-cv-00305-TWD   Document 88   Filed 06/01/21   Page 91 of 112

2013 WL 440556, 294 Ed. Law Rep. 845

abuse of students to Office of Children and Family Services (OCFS) did not violate student's or her parents' procedural due process rights. U.S.C.A. Const.Amend. 14; 18 NYCRR 432.1.

4 Cases that cite this headnote

[26]   **Constitutional Law**    Familial association, integrity, and privacy in general

Families have, in general terms, substantive right under Due Process Clause to remain together without coercive interference of state's awesome power. U.S.C.A. Const.Amend. 14.

1 Cases that cite this headnote

[27]   **Constitutional Law**    Protection of Children; Child Abuse, Neglect, and Dependency

**Education**    Control and discipline

In-school interview of developmentally disabled student by school official, child protective services caseworker, and police officer without parental consent in context of abuse investigation was insufficiently shocking to support substantive due process claims against school officials, where student was never removed from her parents' custody. U.S.C.A. Const.Amend. 14.

2 Cases that cite this headnote

[28]   **Federal Courts**    Effect of dismissal or other elimination of federal claims

Where all federal law claims are eliminated before trial, traditional values of judicial economy, convenience, fairness, and comity weigh in favor of declining to exercise supplemental jurisdiction over any remaining state law claims. 28 U.S.C.A. § 1367(c)(3).

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*201**  Patsy Bonanno, Pat Bonanno & Associates, P.C., White Plains, NY, for Plaintiffs.

Lewis R. Silverman, Adam Christopher Guzik, Rutherford & Christie, LLP, New York, N.Y. for Defendants.

*OPINION AND ORDER*

RAMOS, District Judge.

**\*\*1**  Defendants White Plains School District ("WPSD"), Agnieszka Blazkiewicz ("Blazkiewicz"), Ted O'Donnell ("O'Donnell"), and John Does 1–10 (the "WPSD Does") (the "Individual Defendants") bring this Motion to Dismiss Plaintiffs' Complaint in its entirety pursuant to Fed.R.Civ.P. 12(b)(6). Doc. 8. For the reasons set forth below, Defendants' Motion is GRANTED in full.

**I. Background**

Plaintiffs K.D. and Kerry Kelly Duncan ("Duncan"), individually and as the mother of K.D., who is described in the caption as a "disabled child," commenced this action by filing a Summons with Notice in the Supreme Court of the State of New York, County of Westchester, on August 8, 2011. Compl. Ex. A.[1] Defendants removed the action to this Court on September 27, 2011, Doc. 1, and Plaintiffs filed the operative complaint on November 3, 2011. Doc. 4.

[1]   In ruling on a motion to dismiss pursuant to Rule 12(b)(6) a district court generally must confine itself to the four corners of the complaint and look only to the allegations contained therein. *Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir.2007). The Court, however, may consider documents that are attached to the complaint or incorporated by reference, provided there is no dispute regarding authenticity, accuracy or relevance. *DiFolco v. MSNBC Cable L.L.C.,* 622 F.3d 104, 111 (2d Cir.2010) (citations omitted). Plaintiffs attached three exhibits to the Complaint: (1) the initial pleadings filed in state court, including an affidavit of Duncan and an affirmation of Plaintiffs' attorney in support of an Order to Show Cause seeking leave to file the Notice of Claim nunc pro tunc pursuant to General Municipal Law § 50(e)(5) ("Ex. A");

K.D. ex rel. Duncan v. White Plains School Dist., 921 F.Supp.2d 197 (2013)

Case 5:19-cv-00305-TWD   Document 88   Filed 06/01/21   Page 92 of 112

2013 WL 440556, 294 Ed. Law Rep. 845

(2) the New York State Office of Children & Family Services (the "OCFS") Summary Guide for Mandated Reporters in New York State ("Ex. B"); and (3) the Individualized Education Program for K.D., dated September 4, 2010 ("Ex. C"). As the exhibits are not separately paginated, the Court has cited to the relevant portions of the exhibits by reference to the exhibit letter and to the continuous ECF pagination for the Complaint.

The Complaint alleges eight causes of action: (1) conspiracy to violate Plaintiffs' Fourth and Fourteenth Amendment rights pursuant to 42 U.S.C. § 1983, against Defendants collectively ("Count I"), Compl. ¶¶ 43–47; (2) supervisory liability and failure to intercede to prevent the violation of **202 K.D.'s and Duncan's Fourth and Fourteenth Amendment rights,[2] respectively, pursuant to 42 U.S.C. § 1983, against the WPSD and the WPSD Does ("Count II"), id. ¶¶ 48–51; (3) deprivation of Plaintiffs' Fourteenth Amendment right to Due Process, pursuant to 42 U.S.C. § 1983, against all Defendants ("Count III"), id. ¶¶ 52–55; (4) conspiracy to interfere with Plaintiffs' civil rights, pursuant to 42 U.S.C. § 1985, against the Individual Defendants ("Count IV"), id. ¶¶ 56–58; (5) gross negligence and intentional and negligent infliction of emotional distress against all Defendants ("Count V"), id. ¶¶ 59–62; (6) respondeat superior against WPSD ("Count VI"), id. ¶¶ 63–66; (7) prima facie tort against the WPSD Does ("Count VII"), id. ¶¶ 67–69; and (8) negligent hiring and supervision against the WPSD ("Count VIII"). Id. ¶¶ 70–83. Additionally, in connection with the instant motion, the parties have offered arguments relating to violations of the Fourth and Fourteenth Amendments that are not otherwise designated as independent causes of action in the Complaint.

[2]     The Court refers throughout this opinion to K.D.'s Fourth Amendment rights, which are applicable to Defendants, who are state rather than federal actors, through the Fourteenth Amendment Due Process Clause. See Kia P. v. McIntyre, 235 F.3d 749, 761 (2d Cir.2000).

### A. Factual Background

The following facts are based on the allegations in the Complaint, which the Court accepts as true for purposes of this motion. Famous Horse Inc. v. 5th Ave. Photo Inc., 624 F.3d 106, 108 (2d Cir.2010).

At all times relevant to the allegations in the Complaint, Plaintiff K.D. was a nineteen-year-old student at White Plains

High School (the "High School"). Compl. Ex. A, at 20. K.D. is a developmentally disabled individual and has been classified as Autistic since elementary school. Compl. Ex. C, at 35; Pls.' Mem. Law Opp. Defs.' Mot. Dismiss ("Pls.' Mem.") 9, Doc. 11. Duncan is K.D.'s mother, but she was not K.D.'s legal guardian at the time of the incidents alleged in the Complaint. See Pls.' Mem. 10; Compl. Ex. C, at 35.

**2  The incident giving rise to Plaintiffs' claims occurred on February 28, 2011, beginning at approximately 2:05 pm, while K.D. was attending class with Blazkiewicz. Compl. ¶¶ 27–29, Ex. A, at 20, 25. At some point during class, Blazkiewicz asked K.D. why there was a mark on K.D.'s face. Compl. Ex. A, at 25. K.D. told Blazkiewicz that her brother had thrown something at her day before, resulting in the injury. Id. Blazkiewicz immediately sent K.D. to speak with O'Donnell, the school social worker, for the purpose of reporting the alleged assault to him. Id. at 20, 25. O'Donnell and/or one of the WPSD Does then notified the White Plains Police Department ("WPPD") of the allegation, and an officer from the WPPD responded to the High School and took a statement from K.D. Id.

In her statement to the WPPD, K.D. accused her brother, Byron Duncan, of assault. Id. at 25. Byron Duncan was subsequently summoned to the WPPD to provide his statement. Id. At some point thereafter, he was arrested and charged with Assault in the Third Degree. Id. The charges against Byron Duncan were ultimately dismissed. Id. Duncan learned of the interrogation of K.D. from her son, after he was summoned to the WPPD. Id. at 20.

Plaintiffs allege that K.D. was told by unidentified WPSD personnel that she had to speak with the police officer, that O'Donnell permitted the officer "unrestricted access" to K.D., and that K.D. was not provided with an opportunity to speak with her mother or an attorney prior to **203 the alleged interrogation by the WPPD officer, which took place in a private office at the school. Id. at 20, 26. Plaintiffs further allege that Defendants never notified Duncan of the interrogation, and that it was conducted without her consent. Id. at 20, 25.

As a result of the foregoing, Plaintiffs allege that O'Donnell conspired with the WPSD Does to violate K.D.'s Fourth Amendment rights by seizing K.D. and directing the WPPD to interrogate her without a warrant, probable cause or parental consent. Id. ¶¶ 27, 29. Plaintiffs further allege that O'Donnell conspired with the WPSD Does to violate Duncan's familial

2013 WL 440556, 294 Ed. Law Rep. 845

rights under the Due Process Clause of the Fourteenth Amendment by questioning K.D. without Duncan's consent. *Id.* ¶ 28. Plaintiffs claim that O'Donnell knew or should have known that allowing K.D. to be questioned by the WPPD was a violation of the mandated reporting protocols set forth by the OCFS regarding instances of suspected child abuse and/or maltreatment. *Id.* 11 30, 39, 45, Ex. A, at 20, Ex. B.

## II. Rule 12(b)(6) Motions to Dismiss

### A. General Legal Standard

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Famous Horse Inc.,* 624 F.3d at 108. However, the court is not required to credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)); *see also id.* at 681, 129 S.Ct. 1937 (citing *Twombly,* 550 U.S. at 551, 127 S.Ct. 1955). "To survive a motion to dismiss, a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.' " *Id.* at 678, 129 S.Ct. 1937 (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly,* 550 U.S. at 556, 127 S.Ct. 1955). More specifically, the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* Federal Rule of Civil Procedure 8 "marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.* at 678–79, 129 S.Ct. 1937. If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955; *Iqbal,* 556 U.S. at 680, 129 S.Ct. 1937.

## III. Section 1983 Claims against the WPSD

**\*3** Defendants argue that Plaintiffs' claims against the WPSD must be dismissed because, even assuming arguendo that Plaintiffs have alleged a violation of their constitutional rights, they have not alleged the existence of any municipal custom or policy that was the moving force behind the purported constitutional violations. Defs.' Mem. Law Supp.

Mot. Dismiss ("Defs.' Mem.") 18–19, Doc. 9. In their opposition papers, Plaintiffs concede that they have not identified, and cannot currently identify, a WPSD custom or policy that is responsible for their alleged constitutional injuries. Pls.' Mem. 20–21. Plaintiffs argue that Defendants' motion to dismiss the claims against the WPSD should be denied **\*204** to permit them to conduct discovery for the purpose of identifying the WPSD policy for the questioning of students by police officers in connection with child abuse investigations. *Id.*

### A. Municipal Liability under Section 1983

**[1]** **[2]** A municipality cannot be held liable under § 1983 on a theory of *respondeat superior. Monell v. N.Y. City Dep't of Soc. Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A section 1983 claim can only be brought against a municipality if the action that is alleged to be unconstitutional was the result of an official policy or custom. *Id.* at 691, 694–95, 98 S.Ct. 2018. Thus, a plaintiff must allege that such a municipal policy or custom is responsible for his injury. *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown,* 520 U.S. 397, 403–04, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997); *see also Connick v. Thompson,* —— U.S. ——, 131 S.Ct. 1350, 1359, 179 L.Ed.2d 417 (2011) ("A municipality or other local government may be liable under [§ 1983] if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." (quoting *Monell,* 436 U.S. at 692, 98 S.Ct. 2018)).

The Second Circuit has established a two prong test for § 1983 claims brought against a municipality. "First, a plaintiff must 'prove the existence of a municipal policy or custom in order to show that the municipality took some action that caused his injuries beyond merely employing the misbehaving officer.' " *Johnson v. City of New York,* No. 06 Civ. 9426(GBD), 2011 WL 666161, at *3 (S.D.N.Y. Feb. 15, 2011) (quoting *Vippolis v. Vill. of Haverstraw,* 768 F.2d 40, 44 (2d Cir.1985)). Second, the plaintiff must establish a causal connection between the policy or custom and the alleged deprivation of his constitutional rights. *Id.* (citing *Brandon v. City of New York,* 705 F.Supp.2d 261, 276–77 (S.D.N.Y.2010)).

**[3]** To satisfy the first prong of the test on a motion to dismiss, a plaintiff must allege the existence of:

K.D. ex rel. Duncan v. White Plains School Dist., 921 F.Supp.2d 197 (2013)

Case 5:19-cv-00305-TWD Document 88 Filed 06/01/21 Page 94 of 112

2013 WL 440556, 294 Ed. Law Rep. 845

(1) a formal policy which is officially endorsed by the municipality; (2) actions taken or decisions made by government officials responsible for establishing municipal policies which caused the alleged violation of the plaintiff's civil rights; (3) a practice so persistent and widespread that it constitutes a custom or usage and implies the constructive knowledge of policy-making officials; or (4) a failure by official policy-makers to properly train or supervise subordinates to such an extent that it amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact.

**\*\*4** *Moray v. City of Yonkers,* 924 F.Supp. 8, 12 (S.D.N.Y.1996) (internal citations and quotation marks omitted); *see also Brandon,* 705 F.Supp.2d at 276–77 (quoting *Moray* and updating citations to cases).

 **[4]** Although a plaintiff is not required to identify an express rule or regulation to state a *Monell* claim, "a single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy." *DeCarlo v. Fry,* 141 F.3d 56, 61 (2d Cir.1998) (quoting *Ricciuti v. N.Y. City Transit Auth.,* 941 F.2d 119, 123 (2d Cir.1991)) (internal quotation marks omitted); *see also City of St. Louis v. Praprotnik,* 485 U.S. 112, 123, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (plurality opinion) (explaining that only municipal officials who have "final policymaking authority" concerning the particular activities giving rise to a plaintiff's claims "may by their actions subject the government to § 1983 liability").

 **\*205 B. Discussion**

 **[5]** Here, Plaintiffs explicitly concede that they have not identified any municipal policy concerning the particular activities giving rise to their constitutional claims, Pls.' Mem. 20–21, and the Complaint does not allege any facts to satisfy *either* prong of the Second Circuit's test for § 1983 claims against municipalities. *See, e.g., Johnson,* 2011 WL 666161, at \*4 ("Plaintiff has pled no facts to demonstrate that some

unidentified policy or custom bears a causal link to the alleged constitutional violations—let alone that the policy or custom was the 'moving force' behind the violations." (citing *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823 n. 8, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985))). While Plaintiffs assert a cause of action against the WPSD for "supervisory liability and failure to intercede," Compl. ¶ ¶ 48–51, there are no facts pointing to a lack of training or supervision by the WPSD that amount to a deliberate indifference to the rights of either WPSD students or the parents of WPSD student. *See Jenkins v. City of New York,* 478 F.3d 76, 94–95 (2d Cir.2007) (explaining that a municipality's failure to train or supervise only constitutes deliberate indifference where a policymaker knows "to a moral certainty" that employees will confront a given situation that presents them with a difficult choice that would be made less difficult by training or supervision, or that has been mishandled in the past, and the mishandling of the situation will frequently cause the deprivation of a constitutional right (quoting *Walker v. City of New York,* 974 F.2d 293, 300 (2d Cir.1992))). Plaintiffs failure to allege a municipal policy or custom that caused the deprivations is fatal to their § 1983 claims against the WPSD. Therefore, Defendants' Motion to Dismiss the § 1983 claims against the WPSD is GRANTED.

**IV. Supervisory Liability and Failure to Intercede**
Count II asserts a cause of action against the WPSD and the WPSD Does pursuant to § 1983 for "supervisory liability"[3] and failure to intercede. Compl. ¶¶ 48–51. The cause of action against the WPSD set forth in Count II has already been dismissed because of the failure to adequately allege a *Monell* claim. *See supra* Section III. Therefore, Count II remains only as asserted against the WPSD Does in their individual capacities.[4]

[3]    The Supreme Court has explained that "[i]n a § 1983 suit or a *Bivens* action—where masters do not answer for the torts of their servants—the term 'supervisory liability' is a misnomer," because "[a]bsent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Iqbal,* 556 U.S. at 677, 129 S.Ct. 1937.

[4]    Plaintiffs' failure to adequately allege a basis for municipal liability requires dismissal of the claims against the Individual Defendants in their official capacities, because such claims are duplicative

K.D. ex rel. Duncan v. White Plains School Dist., 921 F.Supp.2d 197 (2013)

Case 5:19-cv-00305-TWD Document 88 Filed 06/01/21 Page 95 of 112

2013 WL 440556, 294 Ed. Law Rep. 845

of the claims against the WPSD. *See Kentucky v. Graham,* 473 U.S. 159, 165, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (explaining that official capacity suits " 'generally represent only another way of pleading an action against an entity of which an officer is an agent.' " (quoting *Monell,* 436 U.S. at 690 n. 55, 98 S.Ct. 2018)).

**\*\*5** Plaintiffs assert that the WPSD Does had opportunities to prevent the unlawful seizure of K.D. and the unlawful deprivation of Duncan's familial rights, but "due to intentional and deliberate indifference, declined or refused to do so." Compl. ¶¶ 34–35, 49–50. The Complaint does not contain any additional allegations relating to the alleged failure to prevent the alleged deprivation of Duncan's familial \*206 rights or the violation of K.D.'s Fourth Amendment rights.

Defendants argue that Plaintiffs' claim against the WPSD Does for failure to intercede must be dismissed, because the WPSD Does are not identified anywhere in the pleadings, and there are no allegations demonstrating that any WPSD Does participated in the alleged constitutional violations, had notice of any constitutional violations and failed to remedy the wrongful conduct, were grossly negligent in supervising subordinates who caused constitutional violations, or created policies or customs resulting in constitutional violations. Defs.' Mem. 20. In opposition, Plaintiffs assert that their failure-to-intercede § 1983 claim should survive Defendants' motion to dismiss, because "[s]omeone within WPSD holds the authority to have prevented the constitutional violations of plaintiff K.D.," and Plaintiffs should be permitted to conduct discovery to identify that individual. [5]

[5]    Plaintiffs also suggest that O'Donnell's supervisor, whose identity is unknown, is the supervisory official who should be held responsible for failing to intercede to prevent the constitutional violations, Pls.' Mem. 21; however, there are no allegations anywhere in the pleadings concerning O'Donnell's supervisor, and no basis for concluding that O'Donnell's supervisor would be liable for the allegedly wrongful conduct of O'Donnell based on the allegations set forth in the Complaint.

### A. Legal Standard

**[6]    [7]**    It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. *Costello v. City of Burlington,* 632 F.3d 41, 48–49

(2d Cir.2011) (citing *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994)). In other words, a supervisory official cannot be held liable solely on the basis of the acts or omissions of his subordinates; the supervisor must be personally involved in the alleged deprivation, and there must be "an affirmative causal link between the supervisor's actions (or inactions) and the injury." *Turkmen v. Ashcroft,* No. 02 Civ. 2307(JG), 915 F.Supp.2d 314, 333–37, 2013 WL 153158, at \*10– 12 (E.D.N.Y. Jan. 15, 2013); *see also Wright,* 21 F.3d at 501 (explaining that a defendant cannot be held personally responsible merely because he or she is in a high position of authority).

**[8]    [9]    [10]**    "A [§ 1983] claim for failure to act is cognizable only in the presence of a corresponding duty to have acted." *Scott v. Fischer,* 616 F.3d 100, 109 (2d Cir.2010) (citing *Benzman v. Whitman,* 523 F.3d 119, 132 (2d Cir.2008)). In addition, a plaintiff must show that the official's omissions were a "substantial factor" resulting in the deprivation of a constitutional right, and that the official "displayed a mental state of deliberate indifference with respect to those rights." *Scaggs v. N.Y. Dep't of Educ.,* No. 06 Civ. 0799(JFB)(VVP), 2007 WL 1456221, at \*18 (E.D.N.Y. May 16, 2007) (quoting *P.C. v. McLaughlin,* 913 F.2d 1033, 1044 (2d Cir.1990)) (citations and internal quotation marks omitted); *see also Betancourt v. Slavin,* 676 F.Supp.2d 71, 78 (D.Conn.2009) (" 'In order for liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring.' " (quoting *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994))). Thus, an allegation that a supervisory official merely failed to exercise his or her authority over subordinates, without more, is insufficient to hold a defendant personally liable under § 1983 on a failure-to-intercede theory, *Scaggs,* 2007 WL 1456221, at \*18, or on a theory of supervisory liability. *See Rizzo v. Goode,* 423 U.S. 362, 371, 376, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976) (explaining \*207 that supervisory officials do not have a general duty to prevent future misconduct); *see also Vogelfang v. Capra,* 889 F.Supp.2d 489, 502 (S.D.N.Y.2012) ("[T]he mere fact that a defendant possesses supervisory authority is insufficient to demonstrate liability for failure to supervise under § 1983." (quoting *Styles v. Goord,* 431 Fed.Appx. 31, 33 (2d Cir.2011) (summary order))).

### B. Discussion

**\*\*6    [11]**    The *only* factual allegation relating to the conduct of the WPSD Does is the assertion that "O'Donnell and/or John Doe notified the White Plains Police Department [ ] of the incident" reported by K.D. Compl. Ex. A, at 25. There are

K.D. ex rel. Duncan v. White Plains School Dist., 921 F.Supp.2d 197 (2013)

Case 5:19-cv-00305-TWD   Document 88   Filed 06/01/21   Page 96 of 112

2013 WL 440556, 294 Ed. Law Rep. 845

no factual allegations demonstrating that any WPSD Doe was present during the alleged seizure and interrogation of K.D. or that any WPSD Doe had an opportunity to intercede on behalf of Plaintiffs to prevent the interrogation from occurring without parental notice or consent. Moreover, Plaintiffs do not allege that any of the WPSD Does had an affirmative legal duty to intercede to prevent the allegedly unconstitutional "seizure and interrogation." Plaintiffs have plainly failed to allege a cognizable § 1983 claim against any of the WPSD Does in their individual capacities based on a failure to intercede. *Betancourt,* 676 F.Supp.2d at 78; *see also Curley v. Vill. of Suffern,* 268 F.3d 65, 72 (2d Cir.2001) (dismissing failure to intercede claim because plaintiff had not shown that defendant observed or had reason to know that excessive force would be used).

There are also no allegations indicating a grossly negligent failure to supervise the individuals who allegedly committed the wrongful acts, or a deliberate indifference to the rights of Plaintiffs based on the failure to act on information that unconstitutional acts were occurring. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).[6] The Complaint does not even identify any of the WPSD Does *as supervisory officials. See* Compl. ¶¶ 10–11. Thus, Plaintiffs' conclusory, blanket allegations of supervisory liability are also plainly insufficient to meet *Iqbal's* plausibility standard. *See, e.g., Pettus v. Morgenthau,* 554 F.3d 293, 300 (2d Cir.2009) (affirming dismissal of § 1983 failure-to-supervise claim because the complaint "lacks any hint that [the supervisory official] acted with deliberate indifference to the possibility that his subordinates would violate [plaintiff's] constitutional rights." (citing *Poe v. Leonard,* 282 F.3d 123, 140 (2d Cir.2002))). Accordingly, Defendants' Motion to Dismiss Count II of the Complaint against the WPSD Does is GRANTED.

[6] While the *Iqbal* decision calls into question several of the categories of supervisory liability enumerated by the Second Circuit in *Colon,* the Circuit has thus far declined to resolve the conflicting interpretations of the surviving *Colon* grounds among the district courts. *Reynolds v. Barrett,* 685 F.3d 193, 206 n. 14 (2d Cir.2012) (recognizing but declining to resolve the conflict about the continuing vitality of the supervisory liability test set forth in *Colon* ). The uncertainty surrounding the surviving grounds for supervisory liability is not material to the resolution of this motion, however, because the Complaint is

devoid of factual allegations to support a § 1983 supervisory liability claim against any of the WPSD Does on any of the grounds enunciated by the Second Circuit in *Colon. See Grenier v. City of West Haven,* No. 11 Civ. 0808(JBA), 2012 WL 4092587, at *5 (D.Conn. Sept. 17, 2012).

## V. Conspiracy Claims under Section 1983 and 1985

### A. Plaintiffs' Claims

Count I of the Complaint asserts a cause of action for conspiracy under § 1983 against Defendants generally for conspiring to violate K.D.'s Fourth Amendment **\*208** right to be free from an unreasonable seizure and Duncan's Fourteenth Amendment "familial rights." Compl. ¶¶ 44–46. Count IV asserts a cause of action for a "conspiracy to interfere with civil rights" pursuant to 42 U.S.C. § 1985 against the Individual Defendants. *Id.* ¶ 57. Plaintiffs assert that "[t]he individual Defendants, under color of law, conspired with each other to undertake a course of conduct to injure, oppress, threaten and intimidate Plaintiffs in the free exercise and enjoyment of their rights and privileges and equal protection of the law secured to them by the Constitution ...." *Id.*

**\*\*7** Defendants argue that Plaintiffs' conspiracy claims must be dismissed because Plaintiffs have not adequately alleged any of the elements of a conspiracy under § 1983 or § 1985(3), and because any alleged conspiracy among Defendants in this case is barred by the intracorporate conspiracy doctrine. Defs.' Mem. 11–14. Because the two causes of actions have similar elements, they will be discussed together.

### B. Legal Standard

[12]   [13]   In order to state a § 1983 conspiracy claim, a plaintiff must allege facts showing: "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999); *see also Ciambriello v. Cnty. of Nassau,* 292 F.3d 307, 324–25 (2d Cir.2002) (same). To state a valid cause of action under § 1985(3), Plaintiffs must allege: "(1) a conspiracy (2) for the purpose of depriving a person or class of persons of the equal protection of the laws, or the equal privileges and immunities under the laws; (3) an overt act in furtherance of the conspiracy; and (4) an injury to the plaintiff's person or property, or a deprivation of a right or privilege of a citizen

K.D. ex rel. Duncan v. White Plains School Dist., 921 F.Supp.2d 197 (2013)

2013 WL 440556, 294 Ed. Law Rep. 845

of the United States." [7] *Thomas v. Roach,* 165 F.3d 137, 146 (2d Cir.1999).

[7]     Section 1985(3) provides, in relevant part:

> If two or more persons in any State or Territory conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws ... [and] if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

> 42 U.S.C. § 1985(3). Plaintiffs do not indicate, either in the Complaint or in their opposition papers, that they are asserting a conspiracy claim pursuant to subsection 3 of § 1985; however, it is the only subsection of the statute that is conceivably applicable to the facts of this case.

**[14]   [15]**   To withstand a motion to dismiss a § 1983 or § 1985(3) conspiracy claim, a plaintiff "must provide some factual basis supporting a meeting of the minds, such as that defendants entered into an agreement, express or tacit, to achieve the unlawful end," augmented by "some details of time and place and the alleged effects of the conspiracy." *Romer v. Morgenthau,* 119 F.Supp.2d 346, 363 (S.D.N.Y.2000) (quoting *Warren v. Fischl,* 33 F.Supp.2d 171, 177 (E.D.N.Y.1999)) (internal quotation marks omitted); *see also Fisk v. Letterman,* 401 F.Supp.2d 362, 376 (S.D.N.Y.2005) ("A plaintiff is not required to list the place and date of defendants['] meetings and the summary of their conversations when he pleads conspiracy, but **\*209** the pleadings must present facts tending to show agreement and concerted action." (internal citation and quotation marks omitted)). In addition, the plaintiff "must allege, with at least some degree of particularity, overt acts which defendants engaged in which were reasonably related to the promotion of the claimed conspiracy." *Thomas,* 165 F.3d at 147. Finally, the Complaint must adequately allege a violation of the right or rights that defendants are alleged to have conspired to violate. *Romer,* 119 F.Supp.2d at 363 ("A violated constitutional right is a natural prerequisite to a claim of conspiracy to violate

such right."). In order to plead a cognizable civil rights conspiracy claim under § 1985(3), a plaintiff is also required to allege that she was a member of a protected class, and that the conspirators acted with a class-based, "invidiously discriminatory motivation." *Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971); *see also Britt v. Garcia,* 457 F.3d 264, 270 n. 4 (2d Cir.2006) (same).

### C. Discussion

**\*\*8**   Notwithstanding Plaintiffs' amorphous use of "Defendants" and "individual Defendants" in Counts I and IV respectively, the Complaint only contains allegations relating to a conspiracy between O'Donnell and the WPSD Does. Compl. ¶¶ 27–29, 32. As an initial matter, therefore, Defendants' motion to dismiss Counts I and IV against Blazkiewicz must be GRANTED.

With respect to O'Donnell and the WPSD Does, the Complaint does not set forth *any* specific facts that indicate *any* sort of meeting of the minds between O'Donnell and the WPSD Does, let alone an agreement to violate K.D.'s and Duncan's Fourth and Fourteenth Amendment rights, respectively. Furthermore, with respect to the conspiracy claim under § 1985(3), there are no allegations that any defendants acted with an invidiously discriminatory animus anywhere in the pleadings. [8]

[8]     Plaintiffs assert for the first time in their opposition papers that K.D. is a disabled individual who was discriminated against on the basis of her developmental disability, Pls.' Mem. 19; however, there are no allegations in the pleadings to support this argument. Plaintiffs cannot amend their complaint by asserting new facts or theories for the first time in opposition to Defendants' motion to dismiss. *Tomlins v. Vill. of Wappinger Falls Zoning Bd. of Appeals,* 812 F.Supp.2d 357, 363 n. 9 (S.D.N.Y.2011); *Scott v. City of New York Dep't of Corr.,* 641 F.Supp.2d 211, 229 (S.D.N.Y.2009), *aff'd,* 445 Fed.Appx. 389 (2d Cir.2011).

"It is well settled that claims of conspiracy 'containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss.' " *Gallop v. Cheney,* 642 F.3d 364, 369 (2d Cir.2011) (quoting *Leon v. Murphy,* 988 F.2d 303, 311 (2d Cir.1993)), *reh'g denied,* 645 F.3d 519 (2d Cir.2011); *see also Gallop,* 642 F.3d at 369 (affirming district court's

K.D. ex rel. Duncan v. White Plains School Dist., 921 F.Supp.2d 197 (2013)

Case 5:19-cv-00305-TWD Document 88 Filed 06/01/21 Page 98 of 112

2013 WL 440556, 294 Ed. Law Rep. 845

dismissal of conspiracy claim as baseless where plaintiff "offer[ed] not a single fact to corroborate her allegation of a 'meeting of the minds' among the conspirators."). Plaintiffs' conspiracy claims thus fail because the Complaint is devoid of any specific facts relating to the purported conspiracies. *Ciambriello,* 292 F.3d at 325 (affirming dismissal of § 1983 conspiracy claim under Rule 12(b)(6) because allegations were "strictly conclusory," where plaintiff had not provided "any details of time and place," and had "fail [ed] to specify in detail the factual basis" of the claim (internal quotation marks and citations omitted)); *see also Temple of the Lost Sheep Inc. v. Abrams,* 930 F.2d 178, 185 (2d Cir.1991) (affirming dismissal of section 1985(3) claims under Rule 12(b)(6) *210 "since they were couched in terms of conclusory allegations and failed to demonstrate some ... invidiously discriminatory animus behind the conspirators' actions." (internal quotation marks and citation omitted)).

**Intracorporate Conspiracy Doctrine**

[16] [17] Plaintiffs' conspiracy claims also fail because the alleged conspirators are members of the same public entity, i.e., the WPSD. Under the intracorporate conspiracy doctrine, employees of a single corporate or municipal entity, each acting within the scope of his or her employment, are legally incapable of conspiring together. *Herrmann v. Moore,* 576 F.2d 453, 459 (2d Cir.1978) ("[T]here is no conspiracy [under section 1985] if the conspiratorial conduct challenged is essentially a single act by a single corporation acting exclusively through its own ... officers[ ] and employees ...."); *see also Kogut v. Cnty. of Nassau,* Nos. 06 Civ. 6695(JS)(WDW), 06 Civ. 6720(JS)(WDW), 2009 WL 2413648, at *12–13 (E.D.N.Y. Aug. 3, 2009) (dismissing § 1983 conspiracy claim under the intracorporate conspiracy doctrine because plaintiff asserted a conspiracy only between actors of the same municipal entity).

**9** While, " '[a]n exception to the intracorporate conspiracy doctrine applies to individuals within a single entity when they are pursuing personal interests wholly separate and apart from the entity,' " *Quinn v. Nassau Cnty. Police Dep't,* 53 F.Supp.2d 347, 360 (E.D.N.Y.1999) (citation omitted), the Complaint does not allege that O'Donnell or any of the WPSD Does were acting solely in their personal interests. Indeed, the Complaint alleges that O'Donnell and the WPSD Does were "on duty" and acting "within the scope of their employment" at the time of the alleged conspiracies. Compl. ¶ 41. Therefore, Plaintiffs' conspiracy claims are also subject to dismissal because of Plaintiffs' failure to allege a conspiracy between two or more independent state actors

or legal entities. *See Farbstein v. Hicksville Pub. Library,* 254 Fed.Appx. 50, 51 (2d Cir.2007) (affirming district court's conclusion that alleged conspiracy between two or more library employees failed because of the "legal impossibility of pleading conspiracy by exclusive reference to actions of employees of a single corporation." (citing *Herrmann,* 576 F.2d at 459)).

**VI. Fourth Amendment Claim** [9] , [10]

[9] While there is no independent cause of action for a Fourth Amendment violation asserted in the Complaint, there are factual allegations relating to an alleged violation of K.D.'s Fourth Amendment rights, and the parties briefed the legal viability of K.D.'s alleged Fourth Amendment violation in their motion papers. Therefore, the Court will also consider the legal sufficiency of the allegations concerning K.D.'s implied Fourth Amendment claim.

[10] With the exception of the procedural due process claim based on the failure to comply with the OCFS mandatory reporting protocol, the parties agree that K.D. should be treated as if she were a minor, and thus that case law governing Fourth and Fourteenth Amendment claims brought by minor children and their parents should apply to Plaintiffs' claims. Defs.' Mem. 3–4; Pls.' Mem. 5–6. The Court does not agree. At the time of the alleged seizure and interrogation, K.D. was nineteen years old and thus *not* a minor under New York law, N.Y. C.P.L.R. 105(j); N.Y. Dom. Rel. Law § 2; N.Y. Gen. Oblig. § 1–202; N.Y. Soc. Servs. Law §§ 2(31), 371(1), and—notwithstanding her developmental disability-Duncan was not K.D.'s legal guardian, Pls.' Mem. 10, and Duncan was not otherwise legally responsible for K.D. *See* 66 N.Y. JUR.2D*Infants and Other Persons Under Legal Disability* §§ 1–2, 4 (2012). Treating K.D. as a minor is especially inappropriate here, because Plaintiffs' due process claims are based on the familial relationship between K.D. and Duncan, which is factually and legally different from the relationship between a parent and a minor child. *See infra* note 15. Therefore, while the Court has analyzed Plaintiffs' claims under the legal standards applied to such claims in cases involving minor children—because the parties have not offered any

other arguments or legal authorities in their motion papers—the Court has determined the viability of Plaintiffs' claims in light of the undisputed fact that K.D. was nineteen years old and legally independent under New York law. *See Nash v. Yablon–Nash,* 90 A.D.3d 872, 935 N.Y.S.2d 134, 135 (2d Dep't 2011).

### A. K.D.'s In–School Interview

The Complaint alleges that Defendants violated K.D.'s Fourth Amendment rights **\*211** by "seizing and interrogating her in a private office at White Plains High School without a warrant, probable cause or parental consent."[11] Compl. ¶¶ 27, 29, 32, 45. In support of their motion to dismiss, Defendants argue that K.D.'s Fourth Amendment rights were not violated because the interview of K.D., including the decision to call the WPPD to take her statement, was reasonable in the circumstances. Defs.' Mem. 9–11. Defendants contend the Second Circuit has never held that "an interview of a possible child abuse victim at school, without the removal of the child from the parents' custody, constitutes a violation of the Fourth Amendment." *Id.* at 9. Defendants also assert a qualified immunity defense on behalf of the Individual Defendants on the ground that "the Second Circuit has not clearly determined what standard should apply when determining the reasonableness of a search or seizure in the context of abuse investigations in public schools." *Id.* at 9, 16–17.

[11]     While both parties refer to K.D.'s Fourth Amendment claim as asserted against Defendants collectively, the only relevant conduct attributable to Blazkiewicz is the decision to send K.D. to speak with O'Donnell. Compl. Ex. A, at 20, 25. Further, Blazkiewicz is not included in the factual allegations relating to the alleged conspiracy to violate K.D.'s Fourth Amendment rights. *See id.* ¶¶ 27, 32. Therefore, K.D.'s Fourth Amendment claim against Blazkiewicz fails on the merits, because Blazkiewicz is not alleged to have been personally involved in the conduct that allegedly violated K.D.'s Fourth Amendment rights. *Costello,* 632 F.3d at 48–49. For clarity, the Court has continued to refer to the qualified immunity defense asserted on behalf of the "Individual Defendants" collectively.

### B. Qualified Immunity

Since Defendants have asserted a qualified immunity defense based on the absence of a clearly established right, the Court begins, not with an analysis of whether K.D.'s Fourth Amendment rights were violated, but instead by considering whether a reasonable school official in the position of O'Donnell and the WPSD Does would have believed that his conduct would violate K.D.'s Fourth Amendment rights under the Second Circuit and Supreme Court law that existed at the time of the alleged seizure. *See Pearson v. Callahan,* 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (overruling *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) and explaining that judges are no longer required to begin by deciding whether a constitutional right was violated but are instead "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first ....").

**\*\*10** **[18]** Qualified immunity is " 'an immunity from suit rather than a mere defense to liability.' " *Fabrikant v. French,* 691 F.3d 193, 212 (2d Cir.2012) (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)). Accordingly, the Supreme Court has "emphasized that qualified immunity questions should be resolved at the earliest possible stage of litigation." *Anderson v. Creighton,* 483 U.S. 635, 646 n. 6, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). The Court may grant **\*212** a motion to dismiss on qualified immunity grounds where the defense is based on facts that appear on the face of the complaint. *Looney v. Black,* 702 F.3d 701, 710–11 (2d Cir.2012) (citing *McKenna v. Wright,* 386 F.3d 432, 436 (2d Cir.2004)).

### 1. Legal Standard

**[19]** **[20]** **[21]** "Qualified immunity was created to shield government officials from civil liability for the performance of discretionary functions so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Atwater v. City of Lago Vista,* 532 U.S. 318, 367, 121 S.Ct. 1536, 149 L.Ed.2d 549 (2001) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). " 'To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right.' " *Fabrikant,* 691 F.3d at 212 (quoting *Reichle v. Howards,* —— U.S. ——, 132 S.Ct. 2088, 2093, 182 L.Ed.2d 985 (2012)). In determining if a particular right was clearly established, the Court "looks to whether (1) it was defined with reasonable clarity, (2) the Supreme Court

K.D. ex rel. Duncan v. White Plains School Dist., 921 F.Supp.2d 197 (2013)

2013 WL 440556, 294 Ed. Law Rep. 845

or the Second Circuit has confirmed the existence of the right, and (3) a reasonable defendant would have understood that his conduct was unlawful." *Doninger v. Niehoff,* 642 F.3d 334, 345 (2d Cir.2011) (citing *Young v. Cnty. of Fulton,* 160 F.3d 899, 903 (2d Cir.1998)). " 'The question is not what a lawyer would learn or intuit from researching case law, but what a reasonable person in [the] defendant's position should know about the constitutionality of the conduct.' " *Phillips v. Cnty. of Orange,* 894 F.Supp.2d 345, 385 (S.D.N.Y.2012) (quoting *Young,* 160 F.3d at 903).

The Supreme Court has instructed that "when a qualified immunity defense is asserted, a court should consider the specific scope and nature of a defendant's qualified immunity claim .... [as] a determination of whether the right at issue was 'clearly established' must be undertaken 'in light of the specific context of the case, not as a broad general proposition.' " *Id.* at 386 (citing *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151). In other words, the Court must ask whether the right at issue was established "in a particularized sense so that the contours of the right [were] clear to a reasonable official." *Reichle,* 132 S.Ct. at 2094 (internal quotation marks omitted). Although a case directly on point is not required to demonstrate that a right is clearly established, " 'existing precedent must have placed the statutory or constitutional question beyond debate.' " *Fabrikant,* 691 F.3d at 213 (quoting *Ashcroft v. al-Kidd,* ––– U.S. ––––, 131 S.Ct. 2074, 2083, 179 L.Ed.2d 1149 (2011)); *see also Moore v. Vega,* 371 F.3d 110, 114 (2d Cir.2004) ("Only Supreme Court and Second Circuit precedent existing at the time of the alleged violation is relevant in deciding whether a right is clearly established." (citing *Townes v. City of New York,* 176 F.3d 138, 144 (2d Cir.1999))).

## 2. Discussion

**\*\*11** Defendants claim that the Individual Defendants are entitled to qualified immunity because, where there is no physical removal of a child from a parent's custody, there is no clearly established right that requires school officials to obtain a warrant, court order, or parental consent prior to conducting an in-school interview of a student in the context of an abuse investigation. Defs.' Mem. 16–17.

**[22]** The Second Circuit has recognized that "the Fourth Amendment applies in the context of the seizure of a child by a government-agency official during a civil child-abuse or maltreatment investigation." *Kia P.,* 235 F.3d at 762 (citing

*Tenenbaum v. Williams,* 193 F.3d 581, 602 (2d Cir.1999)). However, the Circuit has thus far declined to decide what standard applies to **\*213** determine whether a seizure is "reasonable" under the Fourth Amendment in cases where the State seizes a child in the context of a child abuse investigation. *Southerland v. City of New York,* 680 F.3d 127, 157–59 (2d Cir.), *reh'g in banc denied,* 681 F.3d 122 (2d Cir.2012), *cert. denied,* ––– U.S. ––––, 133 S.Ct. 980, 184 L.Ed.2d 773 (2013); *see also, e.g., Kia P.,* 235 F.3d at 762 (declining to address whether the seizure of a child "requires probable cause, or whether it is subject to a 'less stringent reasonableness requirement' due to the 'special needs' of child protection agencies, or whether [it] must be justified by 'exigent circumstances,' " (quoting *Tenenbaum,* 193 F.3d at 603–05)). "This inquiry is further complicated by the fact that the Second Circuit cases addressing the reasonableness of a child's seizure have all involved situations where the child was physically removed either from the school or from the parents' custody, and thus have not addressed what standard should apply where the seizure did not result in a deprivation of custody." *Phillips,* 894 F.Supp.2d at 364 (discussing Second Circuit cases). The analysis here is even *further* complicated by the fact that K.D. was nineteen years old and legally independent at the time of the alleged seizure and interrogation.

Since no Supreme Court or Second Circuit precedent exists that clearly establishes a right to traditional Fourth Amendment protections during the type of in-school interview alleged here, the Court concludes that a reasonable official would not have understood that the in-school interview of K.D. could implicate her Fourth Amendment rights. Thus, the Individual Defendants are entitled to qualified immunity on K.D.'s Fourth Amendment claim.[12] *See, e.g., Phillips,* 894 F.Supp.2d at 387–89 (granting qualified immunity to CPS employee, village police officer and school social worker on Fourth Amendment claim for in-school interview of minor child relating to abuse investigation that was conducted without probable cause or reasonable suspicion, parental consent, a court order or exigent circumstances). Therefore, Defendants' motion to dismiss K.D.'s implied Fourth Amendment claim is GRANTED.

[12]  Having concluded that the Individual Defendants are entitled to qualified immunity on K.D.'s Fourth Amendment claim, the Court declines to address the constitutionality of Defendants' conduct. *See Turkmen,* 915 F.Supp.2d at 347,

K.D. ex rel. Duncan v. White Plains School Dist., 921 F.Supp.2d 197 (2013)

2013 WL 440556, 294 Ed. Law Rep. 845

Case 5:19-cv-00305-TWD    Document 88    Filed 06/01/21    Page 101 of 112

349, n. 20, 2013 WL 153158, at *21, *23 n. 20 (noting that courts have discretion to decline to reach the merits of a constitutional claim when granting qualified immunity based on the lack of a clearly established right, and exercising such discretion because of the lack of guidance from the Second Circuit and Supreme Court, and the "Supreme Court's admonition ... that lower courts should 'think hard, and then think hard again' before unnecessarily deciding the merits of a constitutional issue." (quoting *Camreta v. Greene,* ─── U.S. ────, 131 S.Ct. 2020, 2032, 179 L.Ed.2d 1118 (2011))).

**VII. Procedural Due Process**

 **\*\*12** Count III asserts a cause of action for depriving Plaintiffs of their Fourteenth Amendment right to Due Process of Law based on Defendants' failure to follow the mandated reporting protocols for suspected child abuse set forth by the OCFS. [13] *Id.* ¶¶ 30, 39, 45, 54, Ex. B. The parties have also addressed the viability of Plaintiffs' procedural due process claim for interviewing K.D. without parental consent.

 **\*214** With respect to the latter claim, which the Court will examine first, Plaintiffs argue that Defendants' conduct violated Duncan's "constitutionally protected liberty interest in the care, custody and management of [K.D.]," as well as Plaintiffs' fundamental right to remain together as a family. [14] Pls.' Mem. 6.

---

[13]    Under New York State Law certain persons, by virtue of their professions, "are required to report or cause a report to made [to Child Protective Services ("CPS") ] when they have reasonable cause to suspect that a child coming before them in their professional or official capacity is an abused or maltreated child." N.Y. Soc. Servs. Law § 413(1) (a) (McKinney's 2012). Such individuals, known as "Mandated Reporters," include school officials, such as "school teacher[s], school guidance counselor[s], school psychologist[s], school social worker[s], school nurse[s], school administrator[s] or other school personnel required to hold a teaching or administrative license or certificate." *Id.*

[14]    In opposing the instant motion, Plaintiffs also argue that if Defendants believed K.D.'s accusation against her brother presented an emergency situation such that no pre-interview process could

be provided, Duncan was entitled to a post-deprivation hearing. Pls.' Mem. 7. There are no factual allegations relating to a due process violation based on the absence of a post-deprivation hearing in the Complaint, and Plaintiffs cannot properly assert such a claim for the first time in opposition to Defendants' motion to dismiss. *Tomlins,* 812 F.Supp.2d at 363 n. 9; *see supra* note 8. Furthermore, the case law cited by Plaintiff is inapposite and does not support Plaintiffs' contention that a post-deprivation hearing is required after the type of in-school interview alleged in this case. *See Shapiro v. Kronfeld,* No. 00 Civ. 6286(RWS), 2004 WL 2698889, at *13– 15 (S.D.N.Y. Nov. 24, 2004) (holding that five-day delay in post-deprivation hearing, including a weekend, did not violate due process where emergency removal of children from mother's custody was justified, and the children were placed in custody of their father during the five-day period of removal).

**A. Legal Standard**

Courts "examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Ky. Dep't of Corrs. v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989) (internal citations omitted). As a threshold matter, the Court must therefore determine whether the interview of K.D. without parental consent infringed Duncan's right to the "care, custody and management" of K.D., or Plaintiffs' right to remain together as a family, such that they can argue that process was due to them either before or after the interview. *See Rodriguez v. McLoughlin,* 214 F.3d 328, 337, 341 (2d Cir.2000).

" 'Choices about marriage, family life, and the upbringing of children are among associational rights [the Supreme] Court has long ranked as 'of basic importance in our society,' ... rights sheltered by the Fourteenth Amendment against the State's unwarranted usurpation, disregard or disrespect.' " *Tenenbaum,* 193 F.3d at 593 (quoting *M.L.B. v. S.L.J.,* 519 U.S. 102, 116, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996)). The Supreme Court has recognized that parents have a "constitutionally protected liberty interest in the care, custody, and management of their children," [15] *id.* (collecting cases), and the Second Circuit has noted that " '[c]hildren have a

K.D. ex rel. Duncan v. White Plains School Dist., 921 F.Supp.2d 197 (2013)

Case 5:19-cv-00305-TWD   Document 88   Filed 06/01/21   Page 102 of 112

2013 WL 440556, 294 Ed. Law Rep. 845

parallel constitutionally protected liberty interest in not being dislocated from the emotional **\*215** attachments that derive from the intimacy of daily family association.' " *Southerland,* 680 F.3d at 142 (quoting *Kia P.,* 235 F.3d at 759).

15    Second Circuit and Supreme Court precedent recognizing a parent's liberty interest in "the companionship, care, custody and management of his or her children," is limited to cases where the parents or legal guardians of *minor* children were seeking to protect "their right to decide matters of child custody and family living arrangements," *Pizzuto v. Cnty. of Nassau,* 240 F.Supp.2d 203, 209–10 (E.D.N.Y.2002) (collecting Supreme Court and Second Circuit case law), or to direct the medical care of their minor children. *Phillips,* 894 F.Supp.2d at 375–76. The Second Circuit has only addressed the constitutional protection afforded to the relationship between parents and an adult child *once,* in a case that is not pertinent to the claims asserted in this case. *See Patel v. Searles,* 305 F.3d 130, 133, 135–36 (2d Cir.2002) (recognizing a right to familial association protected by the Fourteenth Amendment but declining to define exact boundaries or contours of the right); *see also Pizzuto,* 240 F.Supp.2d at 212–13 (holding that *Patel* was inapplicable to a claim for interference with parents' right to the companionship and care of an independent, adult son who was murdered by corrections officers while incarcerated, because plaintiffs did not allege "intentional and direct government interference with family relationships").

As noted above, *supra* note 10, the parties address Plaintiffs' constitutional claims solely under the legal framework applicable to claims arising out of the custodial relationship between parents and *minor* children, and thus did not present any arguments concerning the existence and/or scope of the right to familial association between a parent and an adult child like K.D. Further, Defendants did not move to dismiss Plaintiffs' claims on the basis of K.D.'s legal status as an independent adult. Therefore, *solely for purposes of this motion,* the Court has *assumed without deciding* that Plaintiffs' procedural and substantive due process claims would fall within the scope of the recognized liberty interest relating to the care, custody and management of a *minor* child.

*But cf. McCurdy v. Dodd,* 352 F.3d 820, 826, 829 (3d Cir.2003) (declining to "extend the liberty interests of parents into the amorphous and open-ended area of a child's adulthood," and noting that "childhood and adulthood are markedly distinct, thus requiring different constitutional treatment in this context." (citing *Butera v. District of Columbia,* 235 F.3d 637, 655–56 (D.C.Cir.2001)); *see also Deskovic v. City of Peekskill,* 894 F.Supp.2d 443, 467–69, 469–74 (S.D.N.Y.2012) (discussing the uncertainty as to the scope of the right to familial association recognized in *Patel,* and holding that defendant was entitled to qualified immunity on parent's claim that her right to familial association was violated by defendant who subjected her *minor* child to an eight-hour polygraph examination without notifying her of the interrogation, because the parent had not alleged that defendant *intentionally* interfered with the family relationship).

**[23]**    As a general rule, procedural due process requires a hearing prior to depriving a parent of the care, custody or management of their children without their consent, *id.* at 149 (quoting *Nicholson v. Scoppetta,* 344 F.3d 154, 171 (2d Cir.2003)), or a prompt post-deprivation hearing if the child is removed under emergency circumstances, *Shapiro,* 2004 WL 2698889, at \*12 (citing *Velez v. Reynolds,* 325 F.Supp.2d 293, 303 (S.D.N.Y.2004)), or where the deprivation occurs at a time when the child is already in the custody of the State. *Kia P.,* 235 F.3d at 760 (citing *Gottlieb v. Cnty. of Orange,* 84 F.3d 511, 520 (2d Cir.1996)).

**B. Discussion**

**1. Interview of K.D. without Parental Consent**

**\*\*13**   In light of the Second Circuit case law holding that the liberty interest in the care, custody and management of a minor child is implicated by removal of the child from the custody of the parents, district courts in this Circuit have repeatedly dismissed procedural due process claims where there is no allegation that the parents were ever deprived of custody over their children. *See Phillips,* 894 F.Supp.2d at 373–76 (collecting cases); *see also supra* note 15. "[O]utside of removal or the compulsory provision of medical care, the Second Circuit has not specified what other kinds of government action may violate a parent's protected liberty interest in the care, custody and management of his or her

K.D. ex rel. Duncan v. White Plains School Dist., 921 F.Supp.2d 197 (2013)
Case 5:19-cv-00305-TWD   Document 88   Filed 06/01/21   Page 103 of 112

2013 WL 440556, 294 Ed. Law Rep. 845

child in the child abuse context." *Phillips,* 894 F.Supp.2d at 374; *see also* id. at 376–77.

**[24]** While some lower courts have recognized that government actions other than physical removal might also implicate the liberty interests of parents, *see, e.g., Graham v. City of New York,* 869 F.Supp.2d 337, 349 (E.D.N.Y.2012) (noting **\*216** that "[g]overnment actions other than removal may also implicate important rights," and concluding that temporary orders of protection that forbade a father from having any contact with his son for more than a year and significantly limited their contact for several years implicated the father's "vital rights as a parent."), Plaintiffs cite to no authority, either within or without the Second Circuit, to support their position that the type of in-school interview alleged in this case violates either the parent's or the child's rights to procedural due process, even where the child who is interviewed *is a minor.*

To the contrary, at least two other district courts in this Circuit have dismissed procedural due process claims based on the in-school interview of a *minor* child without parental consent in connection with an abuse investigation, because there is no legal authority to support the conclusion that such an interview violates the parents' liberty interest. *See Phillips,* 894 F.Supp.2d at 376–77 (dismissing procedural due process claim brought by parents of five-year-old child interviewed by CPS employee and police officer in presence of school social worker, without parental notice or consent, after CPS received a report of possible abuse); *see also Corrigans v. Mark Country Day Sch.,* No. 03 Civ. 1414(DLI) (WDW), 2006 WL 3950335, at *6 (E.D.N.Y. July 12, 2006) (dismissing claim brought by parents of five-year-old child who was interviewed at school concerning abuse investigation three separate times, by school officials, a CPS caseworker and a police officer, without parental notice or consent), *adopted as modified in part by J.C. v. Mark Country Day Sch.,* 2007 WL 201163, 2007 U.S. Dist. LEXIS 4716 (E.D.N.Y. Jan. 23, 2007). Since there is no legal authority to support Plaintiffs' procedural due process claim for the interview of K.D. without parental consent, Defendants' motion to dismiss Plaintiffs' procedural due process claim on this ground is GRANTED.

### 2. Failure to Comply with New York State Law

**\*\*14** In Count II of the Complaint, Plaintiffs assert a procedural due process claim based on Defendants' failure to

comply with New York State Law requiring school officials to report suspected abuse to the OCFS. Compl. ¶¶ 30–31, 39, 45, 52–55; *see supra* note 13. This claim fails on the merits for two clear reasons. First, as Plaintiffs concede in their opposition papers, the provisions of New York State law relating to the required reporting of child abuse to the OCFS do not apply to K.D., because she was nineteen years old at the time of the interview. Pls.' Mem. 5; *see* N.Y. Soc. Servs. Law § 412(1), (2) (McKinney's 2012) (defining "abused child" and "maltreated child" to mean a child under the age of eighteen years); *see also* N.Y. COMP.CODES R. & REGS. tit. 18, § 432.1(a), (b) (2012) (same).

**[25]** Second, even assuming arguendo that the mandatory reporting requirements did apply to K.D., Plaintiffs offer no legal authority to support their assertion that Defendants failure to comply with those requirements violated their procedural due process rights. *See Graham,* 869 F.Supp.2d at 351 (" '[M]ere failure to meet local or professional standards' or 'a faulty [child abuse] investigation does not necessarily rise to the level of an unconstitutional investigation.' " (quoting *Wilkinson ex rel. Wilkinson v. Russell,* 182 F.3d 89, 106 (2d Cir.1999))); *see also Love v. Riverhead Cent. Sch. Dist.,* 823 F.Supp.2d 193, 199–200 (E.D.N.Y.2011) (holding that defendants failure to comply with a school policy requiring parental notice for drug searches of students did not, standing alone, amount to a constitutional violation). Therefore, Defendants' motion to dismiss **\*217** the procedural due process claim based on Defendants' failure to comply with the OCFS reporting protocols set forth in Count II is also GRANTED.

### VIII. Substantive Due Process

**[26]** Defendants have also moved to dismiss Duncan's substantive due process claim for a deprivation of her "familial rights" based on Defendants' failure to notify her or obtain her consent prior to interviewing K.D. [16] The Second Circuit has recognized that families have, "in general terms, a substantive right under the Due Process Clause 'to remain together without the coercive interference of the awesome power of the state.' " [17] *Tenenbaum,* 193 F.3d at 600 (quoting *Duchesne v. Sugarman,* 566 F.2d 817, 825 (2d Cir.1977)). Thus, government conduct that infringes on the right to family integrity may also give rise to a substantive due process claim on behalf of the parents. [18] *Southerland,* 680 F.3d at 142, 152. In the child removal and child abuse investigation context, the Second Circuit has repeatedly emphasized that the parents' liberty interest

K.D. ex rel. Duncan v. White Plains School Dist., 921 F.Supp.2d 197 (2013)

Case 5:19-cv-00305-TWD Document 88 Filed 06/01/21 Page 104 of 112

2013 WL 440556, 294 Ed. Law Rep. 845

is counterbalanced by the "compelling governmental interest in the protection of minor children...." *Id.* at 152 (quoting *Wilkinson,* 182 F.3d at 104); *see also Tenenbaum,* 193 F.3d at 595 ("When child abuse is asserted, the child's welfare predominates over other interests of her parents and the State.").

16    As with K.D.'s Fourth Amendment claim, there is no independent cause of action for a violation of Duncan's substantive due process rights; however, there are allegations in the Complaint concerning an allegation deprivation of Duncan's "familial rights" based on the interview of K.D. without prior notice to or consent from Duncan, and the parties address the viability of a substantive due process claim in their motion papers.

17    *See* supra notes 10, 15.

18    To the extent that Plaintiffs' Complaint can be read as bringing a substantive due process claim on behalf of both Duncan and K.D., substantive due process analysis is inappropriate with respect to K.D.'s claim for the alleged seizure and interrogation without parental consent or notification, because K.D.'s claim is cognizable as a Fourth Amendment claim and therefore must be analyzed under the law applicable to claims under the Fourth Amendment. *See Tenenbaum,* 193 F.3d at 599–600 (citations omitted); *see also Albright v. Oliver,* 510 U.S. 266, 273, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (plurality opinion of Rehnquist, C.J.) ("Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.' " (quoting *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989))).

**15 The substantive component of Duncan's due process claim asks whether Defendants' conduct was so arbitrary, conscience shocking or oppressive in a constitutional sense, that it would have been prohibited by the Constitution even if she had been given all of the procedural protections to which she was entitled. *Southerland,* 680 F.3d at 142, 151–52 (citations omitted). "Conduct that is merely 'incorrect or ill-advised' is insufficient to state a claim. .... '[o]nly

the most egregious official conduct can be said to be arbitrary in the constitutional sense,' and can thus be deemed unconstitutional." *Phillips,* 894 F.Supp.2d at 379 (quoting *Cox v. Warwick Valley Cent. Sch. Dist.,* 654 F.3d 267, 275 (2d Cir.2011) (internal citations omitted)).

In *Cox v. Warwick Valley Central School District,* where a thirteen-year-old boy was ordered to undergo a psychiatric evaluation but was not removed from his parents' custody, after a school official made a report of suspected abuse to the Department of Child and Family Services, the Second Circuit dismissed the parents' **218** substantive due process claim and held that "[w]here there is no actual loss of custody, no substantive due process claim can lie." 654 F.3d at 276 (citations omitted); *see also Southerland,* 680 F.3d at 153–54 ("Where the 'brief-removal doctrine' applies, a plaintiff does not have a cause of action for a substantive due process violation in the first place." (citing *Kia P.,* 235 F.3d at 759)); *see also Estiverne v. Esernio–Jenssen,* 833 F.Supp.2d 356, 372 (E.D.N.Y.2011) (noting that the principle that brief removals of a child from a parent's home during a child abuse investigation generally will not rise to the level of a substantive due process violation, which was applied by the Second Circuit in numerous cases prior to *Cox,* "applies to an even greater degree when the brief separation is relatively non-disruptive to the child/parent relationship." (citing *Joyner ex rel. Lowry v. Dumpson,* 712 F.2d 770, 778 (2d Cir.1983))).

[27]   While Plaintiffs argue that Defendants conduct was conscience shocking because of K.D.'s developmental disability, they cite to no legal authority supporting a conclusion that K.D.'s status as a developmentally disabled adult renders this type of in-school interview "outrageous" or "conscience shocking" in a constitutional sense. Pls.' Mem. 8, 13. Nor do they even endeavor to distinguish Duncan's claim from the claims brought by the parents of minor children subjected to similar in-school interviews that have been dismissed as insufficiently shocking to state a substantive due process claim. *See Phillips,* 894 F.Supp.2d at 380–82 (citing *Cox,* 654 F.3d at 275–76); *Corrigans,* 2006 WL 3950335, at *6–7 ("Even viewing the interview without notice as a separation, such a 'temporary separation ... in an effort to obtain assurance that [a child has] not been abused' is not 'the shocking, arbitrary, egregious' conduct that substantive due process prohibits." (quoting *Tenenbaum,* 193 F.3d at 600)); *see also, e.g., Tenenbaum,* 193 F.3d at 600–01 (holding that removal of five-year-old child from school for examination by pediatrician and gynecologist

K.D. ex rel. Duncan v. White Plains School Dist., 921 F.Supp.2d 197 (2013)

Case 5:19-cv-00305-TWD Document 88 Filed 06/01/21 Page 105 of 112

2013 WL 440556, 294 Ed. Law Rep. 845

for signs of possible sexual abuse without parental consent was a "temporary separation ... [that] did not result in the [parents'] wholesale relinquishment of their right to raise [their child]," and thus "[t]he interference was not severe enough to constitute a violation of their substantive due-process rights.").

**16 Even assuming arguendo that K.D.'s developmental disability rendered her identical to a very young child, and that Duncan has the same substantive liberty interest in the care, custody and management of K.D. as do the parents of minor children, the allegations in the Complaint do not come close to stating a violation of Duncan's substantive due process rights. Therefore, Defendants' Motion to Dismiss Duncan's substantive due process claim is GRANTED.

## IX. State Law Claims

[28] Where, as here, all federal law claims are eliminated before trial, the "traditional 'values of judicial economy, convenience, fairness, and comity' " weigh in favor of declining to exercise supplemental jurisdiction over any remaining state law claims. *Kolari v. N.Y.-Presbyterian Hosp.,*

*455 F.3d 118, 122 (2d Cir.2006)* (quoting *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988)). Having dismissed all federal claims asserted in the Complaint, the Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims. 28 U.S.C. § 1367(c)(3). Therefore, Plaintiffs' claims for gross negligence and intentional and negligent infliction of emotional distress (Count V), respondeat superior (Count VI), prima facie tort *219 (Count VII), and negligent hiring and supervision (Count VIII) are DISMISSED without prejudice.

## X. Conclusion

For the reasons set forth above, Defendants' Motion to Dismiss is GRANTED. The Clerk of the Court is respectfully directed to terminate this motion, Doc. 8, and to close this case.

It is SO ORDERED.

## All Citations

921 F.Supp.2d 197, 2013 WL 440556, 294 Ed. Law Rep. 845

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 3715087
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Raiquan K. FALLS, Plaintiff,
v.
Myra RUDE; Trevor Lord; Jonathan Saintiche;
William Anderson; Chris Tabachnick;
Roman Scuadroni; Patrick Bloomer;
Carlos Canario; Ricardo Rivera; Jeffrey
Perez; and John Thomas, Defendants.

17 CV 1339 (VB)
|
Signed 08/07/2019

**Attorneys and Law Firms**

Raiquan K. Falls, Auburn, NY, pro se.

David Lewis Posner, McCabe & Mack LLP, Poughkeepsie, NY, for Defendants.

**OPINION AND ORDER**

Briccetti, District Judge:

 **\*1** Plaintiff Raiquan K. Falls, proceeding pro se and in forma pauperis, brings this action under 42 U.S.C. § 1983, against defendants Officers Myra Rude, Trevor Lord, Jonathan Saintiche, Chris Tabachnick, Roman Scuadroni, Patrick Bloomer, Carlos Canario, Ricardo Rivera, Jeffrey Perez, and John Thomas; and Sergeant ("Sgt.") William Anderson for excessive force, failure to intervene, and false arrest, in connection with plaintiff's September 28, 2015, arrest, detention, and alleged strip search.

Now pending is defendants' motion for summary judgment. (Doc. #106).

For the reasons set forth below, the motion is GRANTED IN PART and DENIED IN PART.

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

**BACKGROUND**

The parties have submitted briefs, statements of material facts, supporting affidavits, declarations, and exhibits, which reflect the following factual background.

A. Police Officers' Accounts of Plaintiff's Arrest
Around 5:14 p.m., on September 28, 2015, police officers were dispatched to the area of 13 Hasbrouck Street in Newburgh, New York, after Jasmine Griffen reported to the police that she had been threatened by a man with a gun. The suspect was reportedly traveling on foot through backyards across the street from 21 Hasbrouck Street. Officers' subsequent incident reports contain different descriptions of the suspect. According to Officer Rude's and Saintiche's incident reports, communications personnel described the suspect to the responding officers as "a black male, wearing no shirt with black and red camouflage shorts and braids." (Doc. #109 ("Posner Aff.") Ex. D ("Police Reports") at 3, 9). [1] Officer Canario's incident report states the suspect was described as a "black male wearing red camouflage pants and in possession of a handgun." (Id. at 6) (emphasis added).

[1] Citations to the Police Reports refer to the red page numbers in the bottom-right corner of each page; citations to plaintiff's deposition (Posner Aff. Ex. C ("Pl. Dep.")) refer to the page numbers in the upper-right corner of each page.

The responding officers set up a perimeter attempting to keep the suspect in the backyards. Sgt. Anderson saw a suspect who matched the description given to him running through the backyards and climbing fences and radioed describing the suspect's direction of travel. Officer Canario was near 28 Hasbrouck Street when he heard Sgt. Anderson's radio transmission. Canario rushed toward Sgt. Anderson's location, where he heard the suspect drop his phone. Canario climbed the fence and saw the suspect heading northbound through the fences.

Meanwhile, Officers Rude and Saintiche responded to the area of West Parmenter Street—which is parallel to and one block away from Hasbrouck Street—and were checking backyards when Rude "observed a black male matching the description of the suspect," whom she knew to be plaintiff. (Police Reports at 3–4). Rude identified herself as a police

officer and told plaintiff to stop. Rude chased plaintiff until plaintiff attempted to jump another fence and fell to the ground, at which point Saintiche apprehended plaintiff without further incident.

**\*2** Officers Lord, Bloomer, Canario, Anderson, Tabachnick, and Perez state they helped form the perimeter to contain plaintiff, but did not have any contact with plaintiff or otherwise participate in his arrest.

### B. Plaintiff's Account of His Arrest

Plaintiff states he was hanging out in front of the corner store at the intersection of Hasbrouck and William Streets with his twin brother and several friends. Plaintiff testified at his deposition he owns a pair of all-red camouflage shorts, but is not sure whether he was wearing those shorts at the time. Indeed, plaintiff testified he does not recall whether he was wearing pants or shorts and was wearing a shirt, but "by the time of the incident was done and over with, I was probably shirtless." (Pl. Dep. at 31). In plaintiff's Rule 56.1 Statement, however, plaintiff states he was dressed "in a plain black T-shirt and dark navy blue pants." (Pl. Rule 56.1 Statement ¶¶ 10–11). [2]

[2] The Court refers to the paragraph numbers in plaintiff's Rule 56.1 Statement ("Pl. Rule 56.1 Statement") and declaration in opposition to the motion for summary judgment ("Pl. Decl."), both of which are contained in ECF Doc. #125—Pl. Rule 56.1 Statement at ECF pages 1, 3, 5, 7, and 9, and Pl. Decl. at ECF pages 27 and 93. In addition, the Court has altered capitalizations in those documents without further indication.

Plaintiff, his brother, and his friends separated when they observed a police car. Plaintiff ran up Hasbrouck Street to his friend's front porch and made his way to the house's back porch and backyard. While standing on his friend's porch, he saw several police officers surrounding the area with their weapons drawn. He then "slowly walked towards the alleyway leading to the exit of the backyard onto Hasbrouck Street," and did not hear voices commanding him to stop. (Pl. Decl. ¶ 13). The police located plaintiff in the backyard of 34 Hasbrouck Street.

As plaintiff proceeded to the alleyway, Officers Saintiche and Lord "came from that direction without warning and forcefully slammed me onto the ground causing my rib cage along with the bones in my chest to crash into the concrete

ground." (Pl. Decl. ¶ 14). Plaintiff states he was arrested in the backyard of 34 Hasbrouck Street, and was "completely compliant" and "did not resist arrest." (Id. ¶ 16). Plaintiff says Saintiche and Lord immediately handcuffed him, then punched and kneed him in his ribs, stomach, chest, and thighs, about ten times. According to plaintiff's declaration, seconds later Officers Rude, Anderson, Canario, Tabachnick, Bloomer, and Perez joined in punching and kneeing him. (Id. ¶ 15). However, plaintiff testified at his earlier deposition that he was not sure who had hit him. (Pl. Dep. at 26).

According to plaintiff, after about a minute, a few officers stepped away to search for weapons and contraband, but the other officers continued to beat plaintiff for two to three more minutes. At plaintiff's deposition, plaintiff testified he was hit no more than ten times; plaintiff states in his subsequent declaration, however, that he was punched and kneed in the upper body about twenty times.

### C. Injuries

In plaintiff's amended complaint, plaintiff states he sustained "minor injures such as scratches [and] bruises around my ribs." (Doc. #28 ("Am. Compl.") at 5) (capitalizations altered). In an August 15, 2018, letter to the Court, plaintiff described his injuries as "de minimis" and "minor" (Doc. #101); plaintiff also agreed in his Rule 56.1 Statement that he had described his injuries as de minimis and minor (Pl. Rule 56.1 Statement ¶ 43). Further, plaintiff provided the following interrogatory responses:

**\*3** 1. State if plaintiff sustained injuries when arrested on September 28, 2017 [sic].

No, plaintiff did not sustain any injuries. But was beaten by several police officers on September 28th (2015).

2. If the answer to Interrogatory No. 1 is "Yes," state the nature of those injuries and identify if plaintiff received medical attention for those injuries and if so, state where plaintiff received medical attention.

N/A No injuries.

(Posner Aff. Ex. H at 3) (capitalizations altered). Plaintiff testified at his deposition that he interpreted "injuries" as "major injuries," such as "broken bones." (Pl. Dep. at 31).

Plaintiff further testified at his deposition he did not suffer any bone fractures and was not bleeding. Plaintiff also testified he "had scrapes everywhere" and "bruises," but they were

"[n]othing to talk about." (Pl. Dep. at 29, 33). According to plaintiff, "[s]crapes and bruises [are] like nothing to me." (Id. at 32). Plaintiff testified he did not show anybody the scrapes or bruises, nor does he have photographs of them.

Plaintiff states his scrapes and bruises were no longer visible by the time he was able to seek medical treatment, and although he was in pain, he did not believe he suffered from any broken bones and therefore did not seek to be examined. Plaintiff also claims he suffered mental anguish and pain and suffering.

### D. Victim Interview

According to Rude's incident report, after she transported plaintiff to the police station, she attempted to bring Jasmine Griffen, the victim, in for an interview. Rude spoke with Griffen, "who was in tears and highly upset." (Police Reports at 4). Her parents were with her and advising her not to talk to the police for fear of retribution. Griffen was not sure she wanted to talk because she believed the suspect would kill her, but provided Rude with a brief description of what had occurred prior to her calling the police.

Rude states in her incident report that Griffen accompanied Rude to the police station, where she sat with Detective Pitt but continued to receive phone calls from her boyfriend and parents; her parents continued to advise her not to speak with the police. Ultimately, according to Rude's incident report, Griffen refused to speak with Pitt "out of fear of retribution to her, her boyfriend, and her unborn child." (Police Reports at 4). According to Pitt's incident report, Griffen refused to sign a statement or file a complaint against plaintiff for menacing her.

### E. K-9 Search of 34 Hasbrouck Street

While Rude and Pitt were attempting to question Griffen, Officer Rivera and his K-9 partner Bane, and Officer Scuadroni and his K-9 partner Lee, searched the area of 34 Hasbrouck Street for the gun Griffen had reported. Bane recovered a black Colt Detective Special caliber .38 Special bearing serial number C10655, loaded with five rounds, underneath the back porch of 34 Hasbrouck Street. The police were not able to match DNA from the gun to plaintiff.

### F. Strip Search and Arraignment

According to plaintiff, he was taken to the police station, where he was fingerprinted and strip searched. However, a

"Strip Search Report" included in the Police Reports states plaintiff was not strip searched. (Police Reports at 16). Rude also states there was no strip search as this was not a drug arrest. Sgt. Anderson likewise says plaintiff was not subject to a strip search, explaining his (Sgt. Anderson's) permission would have been required for a strip search and he would not have given permission in the circumstances under which plaintiff was arrested. Moreover, defendants assert Newburgh Police Department policy prohibits a strip search unless there is a reasonable suspicion the arrestee is concealing drugs or contraband.

**\*4** Plaintiff was held at the police station on charges of resisting arrest and obstructing governmental administration. Plaintiff was arraigned the next morning and remanded to the Orange County Jail. On October 14, 2015, plaintiff was indicted on felony drug sale charges. On March 7, 2016, the Newburgh City Court dismissed by adjournment in contemplation of dismissal plaintiff's resisting arrest and obstructing governmental administration charges arising from his September 28, 2015, arrest.

### DISCUSSION

### I. Standard of Review

The Court must grant a motion for summary judgment if the pleadings, discovery materials before the Court, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

A fact is material when it "might affect the outcome of the suit under the governing law.... Factual disputes that are irrelevant or unnecessary" are not material and thus cannot preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A dispute about a material fact is genuine if there is sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 248. The Court "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." Wilson v. Nw. Mut. Ins. Co., 625 F.3d 54, 60 (2d Cir. 2010) (citation omitted). It is the moving party's burden to establish the absence of any genuine issue of material fact. Zalaski v. City of Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010).

If the non-moving party has failed to make a sufficient showing on an essential element of his case on which he has the burden of proof, then summary judgment is appropriate. Celotex Corp. v. Catrett, 477 U.S. at 323. If the non-moving party submits "merely colorable" evidence, summary judgment may be granted. Anderson v. Liberty Lobby, Inc., 477 U.S. at 249–50. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011) (internal citations and quotation omitted). The mere existence of a scintilla of evidence in support of the non-moving party's position is likewise insufficient; there must be evidence on which the jury could reasonably find for him. Dawson v. County of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

On summary judgment, the Court construes the facts, resolves all ambiguities, and draws all permissible factual inferences in favor of the non-moving party. Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003). If there is any evidence from which a reasonable inference could be drawn in favor of the non-moving party on the issue on which summary judgment is sought, summary judgment is improper. See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82–83 (2d Cir. 2004).

In deciding a motion for summary judgment, the Court need only consider evidence that would be admissible at trial. Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 746 (2d Cir. 1998).

## II. Excessive Force Claim

Defendants argue the Court should grant summary judgment dismissing plaintiff's excessive force claim because plaintiff admitted that his injury was de minimis.

**\*5** The Court disagrees.

"The Fourth Amendment prohibits the use of unreasonable and therefore excessive force by a police officer in the course of effecting an arrest." Tracy v. Freshwater, 623 F.3d 90, 96 (2d Cir. 2010) (citing Graham v. Connor, 490 U.S. 386, 395 (1989)). "The Fourth Amendment test of reasonableness 'is one of objective reasonableness.' " Bryant v. City of New York, 404 F.3d 128, 136 (2d Cir. 2005) (quoting Graham v. Connor, 490 U.S. at 399) (citations omitted). Therefore, "the inquiry is necessarily case and fact specific

and requires balancing the nature and quality of the intrusion on the plaintiff's Fourth Amendment interests against the countervailing governmental interests at stake." Tracy v. Freshwater, 623 F.3d at 96. This assessment may include the "severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham v. Connor, 490 U.S. at 396. It is typically the jury's "unique task ... to determine the amount of force used, the injuries suffered and the objective reasonableness of the officer's conduct." Breen v. Garrison, 169 F.3d 152, 153 (2d Cir. 1999).

Because police officers often must use some degree of force when arresting or otherwise lawfully "seizing" an individual, the Supreme Court has recognized that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." Graham v. Connor, 490 U.S. at 396 (internal quotation omitted). Thus, a plaintiff generally must prove he sustained some injury to prevail on an excessive force claim. McAllister v. N.Y.C. Police Dep't, 49 F. Supp. 2d 688, 699 (S.D.N.Y. 1999); see also Landy v. Irizarry, 884 F. Supp. 788, 798 n.14 (S.D.N.Y. 1995) ("An arrestee must prove some injury, even if insignificant, to prevail in an excessive force claim.").

However, the injury need not be severe. See Robison v. Via, 821 F.2d 913, 924 (2d Cir. 1987) ("If the force used was unreasonable and excessive, the plaintiff may recover even if the injuries inflicted were not permanent or severe."). Indeed, the Second Circuit has permitted claims to survive summary judgment when the only injury alleged is bruising. Hayes v. N.Y.C. Police Dep't, 212 F. App'x 60, 62 (2d Cir. 2007) (summary order). [3] Moreover, a plaintiff's failure to seek medical treatment for injuries is not fatal to a Fourth Amendment excessive force claim. Phelan v. Sullivan, 541 F. App'x 21, 25 (2d Cir. 2013) (summary order).

[3]      Because plaintiff is proceeding pro se, he will be provided with copies of all unpublished opinions cited in this ruling. See Lebron v. Sanders, 557 F.3d 76, 79 (2d Cir. 2009).

Here, there is a genuine issue of material fact as to whether defendants used excessive force against plaintiff, precluding summary judgment on plaintiff's excessive force claim. On the one hand, defendants claim no force was used in plaintiff's arrest. On the other hand, although his testimony is somewhat inconsistent, plaintiff claims Officers Saintiche and Lord

slammed him to the ground and then punched and hit him; according to plaintiff, officers Rude, Anderson, Canario, Tabachnick, Bloomer, and Perez soon joined in punching and kneeing him. Moreover, plaintiff testified at his deposition that he suffered scrapes and bruises from the alleged assault.

**\*6** For the same reason, plaintiff's failure to intervene claims may proceed past summary judgment against the same defendants. The Federal Rules of Civil Procedure recognize claims may be brought in the alternative, even if they are inconsistent. See Fed. R. Civ. P. 8(d)(2), (3); see also Polanco v. City of New York, 2018 WL 1804702, at \*10 (S.D.N.Y. Mar. 28, 2018) (rejecting "notion that both excessive force and failure to intervene claims may not proceed past summary judgment against the same defendant").

Finally, the Court is not persuaded by defendants' argument that plaintiff's claims should be dismissed because plaintiff cannot identify the officers who used force against him or stood by. Plaintiff does identify the officers who he believes assaulted him, and even if he had not done so, at the summary judgment stage, "[a] plaintiff need not establish who, among a group of officers, directly participated in the attack and who failed to intervene." Jeffreys v. Rossi, 275 F. Supp. 2d 463, 474 (S.D.N.Y. 2003), aff'd sub nom. Jeffreys v. City of New York, 426 F.3d 549 (2d Cir. 2005).

Accordingly, the Court declines to grant summary judgment dismissing plaintiff's excessive force or failure to intervene claims against defendants Sainticke, Lord, Rude, Anderson, Canario, Tabachnick, Bloomer, and Perez. [4]

> [4]     Plaintiff states in his declaration in opposition to the motion that Officers Scuadroni, Rivera, and Thomas have nothing to do with his "arrest claims." (Pl. Decl. ¶ 21). Moreover, there are no facts suggesting they were involved in the events giving rise to plaintiff's claim. Cf. Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." (internal quotation and citations omitted)). Accordingly, all claims against Officers Scuadroni, Rivera, and Thomas are dismissed.

### III. Strip Search

Liberally construed, plaintiff's amended complaint asserts a Fourth Amendment claim arising from his alleged strip search. Defendants—who argue only that they did not perform a strip search—are not entitled to summary judgment on that claim.

"The Fourth Amendment requires an individualized reasonable suspicion that a misdemeanor arrestee is concealing weapons or other contraband based on the crime charged, the particular characteristics of the arrestee, and/or the circumstances of the arrest before she may be lawfully subjected to a strip search." Hartline v. Gallo, 546 F.3d 95, 100 (2d Cir. 2008) (internal quotation, citation, and alterations omitted). Both of the counts with which plaintiff was charged are misdemeanors. See N.Y. Penal Code §§ 195.05 (Obstructing governmental administration in the second degree), 205.30 (Resisting arrest).

Here, there is a genuine issue of material fact as to whether defendants performed a strip search on plaintiff: defendants assert they did not perform a strip search on plaintiff; plaintiff asserts they did. Indeed, plaintiff states he was "strip searched at the police station by one of the arresting male officers before being fingerprinted." (Pl. Rule 56.1 Statement ¶ 30). And defendants concede there was no reasonable suspicion that plaintiff was concealing weapons or other contraband. (Doc. #122 ("Def. Br.") at 6).

Accordingly, plaintiff's Fourth Amendment claim arising from the alleged strip search may proceed against defendants Sainticke, Lord, Rude, Anderson, Canario, Tabachnick, Bloomer, and Perez.

### IV. Qualified Immunity

**\*7** Defendants argue they are entitled to qualified immunity on plaintiff's false arrest, excessive force, and failure to intervene claims.

The Court agrees only as to the false arrest claim.

Qualified immunity shields government officials whose conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) (citations omitted). The scope of qualified immunity is broad, and it protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). "Defendants bear the burden of establishing qualified immunity." Garcia v. Does, 779 F.3d 84, 92 (2d Cir. 2015) (internal citation omitted).

"The issues on qualified immunity are: (1) whether plaintiff has shown facts making out violation of a constitutional right; (2) if so, whether that right was 'clearly established;' and (3) even if the right was 'clearly established,' whether it was 'objectively reasonable' for the officer to believe the conduct at issue was lawful." Gonzalez v. City of Schenectady, 728 F.3d 149, 154 (2d Cir. 2013) (quoting Taravella v. Town of Wolcott, 599 F.3d 129, 133–34 (2d Cir. 2010)).

### A. False Arrest

Defendants are entitled to qualified immunity on plaintiff's false arrest claim.

An officer is entitled to qualified immunity on a false arrest claim if the officer had arguable probable cause to arrest. Arrington v. City of New York, 628 F. App'x 46, 49 (2d Cir. 2015) (summary order). "Probable cause exists when one has knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested." Betts v. Shearman, 751 F.3d 78, 82 (2d Cir. 2014) (internal quotation omitted). Moreover, there is probable cause when "a law enforcement officer received information from some person, normally the putative victim or eyewitness, unless the circumstances raise doubt as to the person's veracity. The reliability or veracity of the informant and the basis for the informant's knowledge are two important factors." Id. (internal quotation and alterations omitted).

"Arguable probable cause to arrest exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." Arrington v. City of New York, 628 F. App'x at 49 (internal citation and alterations omitted). "For false arrest claims, the probable cause inquiry focuses on the facts reasonably believed by the officers at the time of arrest; even if it later turns out that the officers were mistaken, a mistake of fact would not undermine probable cause so long as their belief was objectively reasonable." Kent v. Thomas, 464 F. App'x 23, 25 (2d Cir. 2012) (summary order). "Whether probable cause existed for the charge actually invoked by the arresting officer at the time of the arrest is irrelevant." Fernandez-Bravo v. Town of Manchester, 711 F. App'x 5, 7 (2d Cir. 2017) (summary order). As is relevant here, possession of a firearm is banned by New York Penal Law § 265.01.

**\*8** Here, there was arguable probable cause for the officers to arrest plaintiff for possession of a firearm. The record is undisputed that (i) a victim called the police reporting she had been threatened by a man with a gun; (ii) communications personnel subsequently described the suspect to the officers on the scene as a black male wearing no shirt, red camouflage shorts or pants, and braids; and (iii) Officers Rude and Saintiche and Sgt. Anderson state they saw plaintiff, who matched that description, traveling in the direction in which the suspect was reportedly heading. Although the officers' reports differ with respect to whether plaintiff was swearing pants or shorts, they are consistent in all other respects, including as to the fact that the item was red camouflage—a particularly distinctive feature of plaintiff's clothing.

As for plaintiff's statement in his declaration that he was wearing a plain black T-shirt and dark navy-blue pants, the Court does not credit it, as it directly contradicts his earlier deposition testimony that he could not recall what he was wearing. A party may not create an issue of fact by "testif[ying] in his deposition that he was unable to remember a particular fact, and then, in response to a summary judgment motion, submit[ting] an affidavit claiming a recollection of events that would have raised an issue for trial." Kennedy v. City of New York, 570 F. App'x 83, 85 (2d Cir. 2014) (summary order). Moreover, here, plaintiff also admitted at his deposition that he was "probably shirtless" by the time "the incident" was over. (Pl. Dep. at 31).

Accordingly, defendants are entitled to qualified immunity on plaintiff's false arrest claim.

### B. Excessive Force and Failure to Intervene

Defendants also argue they are entitled to qualified immunity on plaintiff's excessive force and failure to intervene claims.

The Court disagrees.

The doctrine of qualified immunity recognizes that "reasonable mistakes can be made as to the legal constraints on particular police conduct." Saucier v. Katz, 533 U.S. 194, 205 (2001). Qualified immunity applies if the officer's mistake as to what the law requires is reasonable. Id. It does not apply if, on an objective basis, it is obvious that no reasonably competent officer would have taken the actions of the alleged violation. Malley v. Briggs, 475 U.S. at 341.

Issues of fact exist as to whether defendants Saintiche, Lord, Rude, Anderson, Canario, Tabachnick, Bloomer, and Perez

used excessive force or failed to intervene to prevent the use of excessive force. Were a jury to credit plaintiff's account of his arrest, it could reasonably conclude it was not objectively reasonable for defendants to have used excessive force.

Accordingly, defendants are not entitled to qualified immunity on plaintiff's excessive force or failure to intervene claims.

## CONCLUSION

The motion for summary judgment is GRANTED IN PART and DENIED IN PART.

All claims are dismissed against defendants Scuadroni, Rivera, and Thomas. In addition, all remaining defendants are entitled to qualified immunity on plaintiff's false arrest claim.

Plaintiff's remaining claims against defendants Saintiche, Lord, Rude, Anderson, Canario, Tabachnick, Bloomer, and Perez are (i) excessive force; (ii) failure to intervene; and (iii) violation of his Fourth Amendment rights arising out of the alleged strip search.

**The Court will conduct a status conference on September 11, 2019, at 11:30 a.m., at which time the Court will set a trial date and a schedule for pretrial submissions. To conserve resources, to promote judicial efficiency, and in an effort to achieve a faster disposition of this case, the parties, prior to that date, are directed to discuss whether they are willing to consent, under 28 U.S.C. § 636(c), to conduct all further proceedings, including trial, before the assigned Magistrate Judge**.

**\*9** The Clerk is instructed to (i) terminate the motion (Doc. #106), and (ii) terminate defendants Roman Scuadroni, Ricardo Rivera, and John Thomas.

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore in forma pauperis status is denied for the purpose of an appeal. See Coppedge v. United States, 369 U.S. 438, 444–45 (1962).

SO ORDERED.

**All Citations**

Slip Copy, 2019 WL 3715087

---

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.